## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| PLANNED PARENTHOOD OF KANSAS AND MID-MISSOURI, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No.: 11-cv-2357 JTM/DJW |
| SAM BROWNBACK, Governor of Kansas, and ROBERT MOSER, MD, Secretary, Kansas Department of Health and Environment, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION FOR PRELIMINARY INJUNCTION

### I.    STATEMENT OF THE NATURE OF THE MATTER BEFORE THE COURT

Defendant Kansas Governor Sam Brownback recently signed into law an appropriations

bill, H.B. 2014, 84th Leg. (Kan. 2011), containing an unlawful provision, Section 107(l) (or "the

defunding provision"), that deprives Plaintiff Planned Parenthood of Kansas and Mid-Missouri

("PPKM" or "Planned Parenthood") of federal family planning funds it has received for more

than twenty-five years.  The defunding provision requires that as of July 1, 2011, all federal Title

X funds in Kansas be distributed according to two "priorities:" (1) first, to public entities; and (2)

second, to hospitals or federally qualified health centers ("FQHC's").  The effect of this

provision — and indeed, its purpose — is to prevent Planned Parenthood from participating in

the Title X program because it performs or is affiliated with the provision of abortions services.

As explained herein, Section 107(l) violates the Supremacy Clause because it imposes

additional conditions upon eligibility for a federal program not required by federal law in at least

two ways: Title X does not contemplate or allow (1) restricting the type of providers who may

provide family planning services; or (2) preventing abortion providers or those affiliated with

them from participating in the program.  In addition, the defunding provision imposes an

unconstitutional condition on the receipt of federal funds, in violation of the constitutional rights

of Plaintiff and its patients, because it amounts to a penalty on PPKM's provision of and

association with abortion services.  If permitted to stand, the defunding provision will have

devastating consequences for PPKM and the women, men, and teens it serves.  Thousands of

patients who currently rely on PPKM, many of whom are low-income, will face higher costs,

less access to services, and longer wait or travel times for appointments.  PPKM likely will also

be forced to close one or more of its health centers.

 PPKM has filed a Complaint pursuant to 42 U.S.C. § 1983 seeking declaratory and

injunctive relief to protect rights secured to it and its patients by the Supremacy Clause and the

First and Fourteenth Amendments to the United States Constitution.  Pursuant to Federal Rule of

Civil Procedure 65, Plaintiff is moving for a preliminary injunction to prevent these harms from

transpiring and submits this memorandum of law and appendix of exhibits in support of its

motion.

## II. STATEMENT OF THE FACTS

### A. The Title X Family Planning Program

 The Title X Family Planning Program ("Title X"), 42 U.S.C. §§ 300 *et seq*., is the federal

program that funds low-cost family planning services provided by organizations like Planned

Parenthood.  It was enacted in 1970 as part of the Public Health Service Act with the specific

intent of providing access to family planning services to low-income and/or uninsured women

and families, including those ineligible for Medicaid.[1]  Title X funds are granted by the United States Department of Health and Human Services ("HHS") to "public or nonprofit entities" ("grantees").  42 U.S.C. § 300(a).  The Kansas Department of Health and Environment ("KDHE") is the Title X grantee for the state of Kansas and it uses those funds for its Family Planning Services Program.  KDHE does not provide the clinical services itself, but subgrants those funds to providers of family planning services, like PPKM.  *See* Decl. of Peter Brownlie ¶ 12 (June 28, 2011) ("Brownlie Decl.") (attached hereto as Exhibit A).

"[A]ny entity" is eligible to apply for Title X funds, 42 C.F.R. § 59.3, as part of a project to provide "services necessary to aid individuals to determine freely the number and spacing of their children."  42 C.F.R. § 59.1.  Neither the Title X statute nor any federal regulation imposes any additional service requirements on entities that receive Title X funds, including mandating the type of provider that they must be or the services that they provide outside of those offered as part of the Title X program.  The Title X statute and regulations also make no mention of the ineligibility of entities that provide abortions to receive Title X funds or operate Title X projects. To the contrary, the Title X statute shows that Congress contemplated that abortion providers would operate Title X projects, and required only that abortion services not be a part of the Title X project.  42 U.S.C. § 300a-6 (no Title X funds "shall be used in programs where abortion is a method of family planning").  Thus, under federal law, an entity may perform abortions with its own funds outside of the Title X project and remain eligible for a Title X grant.

---

[1] *See generally* Office of Population Affairs Title X Family Planning Program Fact Sheet (Jan. 21, 2008), *available at* TitleX-FactSheet_1-21-08[1].pdf (last accessed June 28, 2011).  Patients receiving health care services at Title X providers are placed on a sliding fee scale and charged for their services based on their ability to pay.  *See* 42 C.F.R. § 59.5.

**B.      KDHE's Family Planning Program and PPKM's Participation in It**

PPKM has been a Title X provider in Kansas for more than twenty-five years at its two

Kansas health centers, located in Wichita (Sedgwick County) and Hays (Ellis County).  *See*

Brownlie Decl. ¶¶ 6, 12.  These two health centers have historically received approximately

$330,000 through contracts with KDHE to provide Title X family planning services to more than

5,700 individuals each year.  *Id.* at ¶¶ 16-19.[2]  PPKM provides to these individuals more than

9,000 birth control visits, 3,000 pap tests, 3,000 breast exams, and 18,000 STD tests each year.

*Id.* at ¶ 19.  In addition, PPKM provides education services through the Title X program.  *Id.*

While PPKM does provide abortions at two of its health centers in Missouri and through

its affiliate organization Comprehensive Health of Planned Parenthood of Kansas and Mid-

Missouri ("Comprehensive Health") in Overland Park, Kansas, neither the Wichita nor the Hays

health center offers abortion services.  *See id.* ¶¶ 8, 9, 11.  Comprehensive Health does not

receive any Title X funds, and all abortion services at PPKM and Comprehensive Health are

financed entirely by private funds.  *See id.* ¶ 11.  During the many years in which PPKM has

received Title X funds, there have never been any allegations that PPKM failed to provide the

services required under its agreements with KDHE.  *See id.* ¶ 20.  Nor has PPKM ever misused

Title X funds by allocating such funds for abortion services.  *See id.*

On February 22, 2010, KDHE submitted to HHS a competing continuation grant

application for Title X funds for the Kansas Family Planning Services Program, requesting Title

X funds for the first year of a five-year project period, beginning June 30, 2010 and ending June

29, 2015.  In the application, attached hereto as Exhibit C, as it had in prior years, KDHE

---

[2] For the 2011 fiscal year, KDHE granted PPKM $284,433.00 to serve 4,270 individuals at its
Wichita health center and $46,869.00 to serve 897 individuals at its Hays health center.  *See*
Brownlie Decl. ¶¶ 17, 18.  These contracts expire on June 30, 2011.  *See id.* ¶ 14.

explained how it intended to perform its proposed project and distribute its grant monies, and the number of patients who would be covered by the grant monies.  KDHE included PPKM's Wichita and Hays health centers as two of its 58 subgrantees and represented to HHS that PPKM was its largest subgrantee, shown in the grant application as receiving 13% of the Title X funds to be distributed to subgrantees and serving more patients than any other subgrantee.  *See* Ex. C. KDHE also represented to HHS that PPKM "has been implementing the FP [Family Planning] Program Male Involvement Information and Education Project focusing on African-American and Hispanic young men ages 12-19 and addressing the Title X program priority to more fully involve males in reproductive health, as well as the Healthy People 2010 FP goal to: 'improve pregnancy planning and spacing and prevent unintended pregnancy.'" *Id.*

### C.    Section 107(l) and the Defunding of Planned Parenthood

On May 28, 2011, Kansas Governor Sam Brownback signed into law H.B. 2014, which contains a provision, Section 107(l), which states:

> (l) During the fiscal year ending June 30, 2012, subject to any applicable requirements of federal statutes, rules, regulations or guidelines, any expenditures or grants of money by the department of health and environment—division of health for family planning services financed in whole or in part from federal title X moneys shall be made subject to the following two priorities: First priority to public entities (state, county, local health departments and health clinics) and, if any moneys remain, then, Second priority to non-public entities which are hospitals or federally qualified health centers that provide comprehensive primary and preventative care in addition to family planning services: *Provided,* That, as used in this subsection ''hospitals'' shall have the same meaning as defined in K.S.A. 65-425, and amendments thereto, and ''federally qualified health center'' shall have the same meaning as defined in K.S.A. 65-1669, and amendments thereto.

Because it is not a public entity, hospital, or FQHC, the effect of Section 107(l), which takes effect on July 1, 2011, is to exclude PPKM from eligibility to continue receiving Title X funding.

In fact, the history of the defunding provision makes clear that its purpose was to exclude PPKM from the Title X program and that the reason for that exclusion was PPKM's connection

to abortion services.  When first introduced in the Kansas House of Representatives, H.B. 2014 contained no restrictions on eligibility for Title X funds.  Shortly thereafter, Representative Lance Kinzer offered, and the House adopted, an amendment to Section 57 of the bill imposing the same restrictions on Title X funding for fiscal year 2011 that are also now found at Section 107(l) for fiscal year 2012.  On the House floor, one of the members of the House asked Representative Kinzer directly if the purpose of his amendment was to take funds away from Planned Parenthood and he confirmed that it was.  *See* Declaration of Sarah M. Gillooly ¶ 5 ("Gillooly Decl.") (attached hereto as Exhibit B).[3]  Further confirming Representative Kinzer's purpose, he subsequently issued a press release, attached hereto as Exhibit D, on www.lancekinzer.com, stating that an "amendment, offered by Representative Kinzer and approved by ninety-one members, took all state funding away from Planned Parenthood to ensure that state dollars are not used for abortion services."  *See* Ex. D.  The same day, substantially the same release, attached hereto as Exhibit E, was circulated by Christie Kriegshauser, the Communications Director for the Speaker of the Kansas House, Representative Mike O'Neal.  *See* Ex. E.  In addition, Representative Kinzer posted the following, attached hereto as Exhibit F, on his publicly available Facebook page:

> Delighted to announce that the KS House just approved my floor amendment to deny Title X funding to Planned Parenthood for the balance of FY2011.  The vote was 91-26, a great victory on the first pro-life floor vote of the session.

*See* Ex. F.

---

[3] When the Appropriations Bill came out of the Conference Committee, the Committee Report, which ultimately became law, included the language of Representative Kinzer's February 8 amendment, with substantially similar language for fiscal year 2012.  *See* Kansas State Legislature, H.B. 2014 Bill History, 2011 Sess., *available at* http://kslegislature.org/li/b2011_12/year1/measures/hb2014/ (last accessed June 28, 2011). During the Conference Committee proceedings, members of both the House and the Senate referred to what became Section 107(l) as the "Planned Parenthood" provision.  Gillooly Decl. ¶ 4.  As Ms. Gillooly explains, Plaintiff has been unable to obtain a transcript or recording of either the Conference Committee or House Floor proceedings.  *Id.* ¶ 6.

The explanations for the defunding provision — *i.e.*, to keep Planned Parenthood out of the Title X program and penalize it for its relationship to abortion — were not limited to the provision's legislative sponsors.  A spokesperson for the Governor was quoted in a story about the provision saying: "Gov. Brownback . . . opposes taxpayer subsidy of abortions."  *See* "*Kansas Governor Brownback: Zap Planned Parenthood Funding*," LifeSiteNews.com (Apr. 25, 2011) (attached hereto as Exhibit G).  The Governor was also reported as having "hailed" Representative Kinzer's amendment because it would "zero out funding of Planned Parenthood." *See* "*Planned Parenthood criticizes Kansas budget provision*," Lawrence Journal-World, LJWorld.com (May 13, 2011) (attached hereto as Exhibit H).

The desires of Section 107(l)'s proponents have been borne out.  PPKM recently received letters, attached hereto as Exhibits I and J, dated June 14, 2011, from KDHE advising that PPKM's Wichita and Hays health centers would not receive Title X funds for the 2012 fiscal year and that PPKM's Universal Contract with KDHE was thereby cancelled.  *See* Exs. I, J.  The letters stated that KDHE was "unable" to provide "Title X family planning funding . . . during state fiscal year 2012" because "[d]ue to recent legislative action funding is no longer available for your organization."  *Id.*

As is explained in Section IV.C., *infra*, PPKM and its patients imminently will face irreparable injury if Section 107(l) is permitted to stand.

## III.   STATEMENT OF THE QUESTIONS PRESENTED

(1)     Is Plaintiff likely to prevail on its claim that Section 107(l)'s restriction of Title X funds to public entities, hospitals, or FQHC's violates the Supremacy Clause by placing impermissible eligibility conditions on federal funds that are in excess of and inconsistent with those established by the federal government?

(2)     Is Plaintiff likely to prevail on its claim that Section 107(l)'s denial of Title X funds to Planned Parenthood because it performs or is affiliated with the provision of abortion services violates the Supremacy Clause by placing impermissible eligibility conditions on federal funds that are in excess of and inconsistent with those established by the federal government?

(3)     Is Plaintiff likely to prevail on its claim that Section 107(l) violates the rights of Plaintiff as guaranteed by the First and Fourteenth Amendment because it imposes an impermissible penalty on Plaintiff due to its provision of or association with abortion services?

(4)     Will Plaintiff and its patients suffer irreparable injury without preliminary injunctive relief?  Does that injury outweigh any injury to Defendants?  And, is the preliminary injunction in the public interest?

## IV.   ARGUMENT

To prevail on a motion for preliminary injunctive relief, Plaintiff must demonstrate:  (1) a substantial likelihood that it will prevail on the merits; (2) that it will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the moving party outweighs whatever damage the proposed injunction will cause the opposing party; and (4) that the injunction would not be adverse to the public interest.  *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001); *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980); *Bey v. Douglas Cnty. Corr. Facility*, 540 F. Supp. 2d 1194, 1196 (D. Kan. 2008).  To meet this test, Plaintiff need not prove its case; it is enough to show "questions going to the merits . . . so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."  *Prairie Band of Potawatomi Indians*, 253 F.3d at 1246-47 (omission in original).

8

Plaintiff meets this test.  As is explained herein, given the clear conflicts between the defunding provision and federal law, PPKM is extremely likely to prevail on the merits of its Supremacy Clause claim, and it is also substantially likely to prevail on its claim that the defunding provision is an unconstitutional penalty on its provision of or affiliation with abortion services.  In addition, Plaintiff demonstrates that the defunding provision will cause irreparable injury to its organization and its patients that far outweighs any hardship KDHE would suffer from allowing PPKM to participate in the Title X program, as it has for more than twenty-five years.  *See Lundgrin*, 619 F.2d at 63 ("The function of a preliminary injunction is to preserve the status quo pending a final determination of the rights of the parties.").  Finally, granting injunctive relief serves the public interest by protecting Plaintiff's rights and ensuring that Kansans continue to receive the affordable, high-quality family planning services provided by Plaintiff.  *See Planned Parenthood of Cent. Tex. v. Sanchez*, 280 F. Supp. 2d 590, 612 (W.D. Tex. 2003), *remanded on other grounds by Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324 (5th Cir. 2005).

### A.    Plaintiff Is Likely to Prevail on the Merits of its Supremacy Clause Claim

The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  Thus, the federal government may impose terms and conditions on money it disburses to the States and, once a state chooses to accept money under a voluntary program, such as Title X, the state is bound by the requirements the federal government has established for those funds.  *See King v. Smith*, 392 U.S. 309, 333 n.34 (1968); *Planned Parenthood Ass'n of Utah v. Dandoy*, 810 F.2d 984, 988 (10th Cir. 1987) ("[The state] may participate in the program and thereby accept the conditions attached by the federal acts which may be contrary to state law or unwanted or instead choose not to participate and to use its own funds as it wishes."); *see also Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,

9

458 U.S. 141, 152-53 (1982) (Supremacy Clause theory applies equally to federal regulations over state statutes).  Any state statute or regulation that is inconsistent with the federal requirements is invalid.  *See, e.g.*, *King*, 392 U.S. at 333 n.34; *Dandoy*, 810 F.2d. at 985-88.

As is explained below, the defunding provision is invalid because it conflicts with the federal rules for the Title X program in at least two ways: (1) on its face, it imposes limitations on the type of provider who may participate in the program; and (2) it was targeted specifically at Planned Parenthood because it is an abortion provider or affiliated with the provision of abortions.

       1.     Section 107(l)'s Limitation of Title X Funds to Public Entities, Hospitals, and FQHC's Is in Excess of and Conflicts with Federal Law

The Title X statute allows for participation in the program by "public or nonprofit entities" to establish projects that "offer a broad range of acceptable and effective family planning methods and services."  42 U.S.C. 300(a).  The regulations make clear that: "*Any* public or nonprofit private entity in a State may apply for a grant . . . ."  42 C.F.R. § 59.3 (emphasis added).  The Title X statute provides no further restrictions on which kinds of entities may participate in the program.  *See* 42 C.F.R. § 59.12 (providing that the federal government may add extra conditions only when "necessary to assure or protect advancement of the approved program, the interests of public health, or the proper use of grant funds").

Kansas has sought to restrict who may receive Title X funds in a manner that directly conflicts with Congress' intent:  Section 107(l) provides that federal family planning funds in Kansas shall be granted only to public entities, hospitals, or "federally qualified health centers that provide comprehensive primary and preventative care in addition to family planning services."  H.B. 2014, s. 107(l).  This provision effectively disqualifies a health services provider like PPKM (which is not a hospital or FQHC) by imposing eligibility conditions not required by

Congress that conflict with the intent of Title X to support family planning clinics, and, thus, unlawfully violate the Supremacy Clause.

First, as noted above, both the federal statute and regulations specifically allow non-public entities to participate.  Second, there is nothing in Title X that limits recipients of Title X funds to hospitals.  *See* 42 U.S.C. §§ 300a *et seq*.; 42 C.F.R. §§ 59.1 *et seq*.  For good reason, as nothing about Title X family planning services, such as pap smears, pregnancy testing, and contraception counseling, requires provision only by hospitals.  *Cf. Planned Parenthood of Minn. v. Minnesota*, 612 F.2d 359, 363 (8th Cir. 1980) (striking down Minnesota law that disallowed abortion providers, except for hospitals and HMOs, from participating in the state family planning program because "[p]roviding complete health care has no fair and substantial relation to expanding pre-pregnancy family planning services").

Third, there is nothing in federal law that would support limiting Title X monies to FQHC's.  In particular, to receive Title X funds as a FQHC under the defunding provision, a center must meet the requirements under 42 U.S.C. section 1396d(l),[4] which means that it must provide a range of "required primary health services," including screenings for elevated blood lead levels, communicable diseases, and cholesterol; pediatric eye, ear, and dental screenings to determine the need for vision and hearing correction and dental care; preventive dental services; and emergency medical services.  42 U.S.C. § 254b(b)(1).[5]  Of course, the federal rules and

---

[4] Section 1396d(l) is not a Title X provision.  Rather, it is part of Title XIX, the Medicaid program.  There is no basis for restricting Title X funds to certain health care providers qualified under a distinct statutory scheme.

[5] Specifically, Section 107(l) requires that a Title X grantee be a FQHC as defined by K.S.A. 65-1669, which provides that a "'[f]ederally qualified health center' means a center which meets the requirements for federal funding under 42 U.S.C. section 1396d(l) of the public health service act, and which has been designated as a 'federally qualified health center' by the federal government."  K.S.A. 65-1669(e).  Section 1396d(l), in turn, provides that a "federally-qualified

Footnote continued on next page

regulations for Title X do not require that participating entities provide these — or any other — non-family planning services.  Not only are these state limitations on Title X providers in excess of and in conflict with those established by the federal government, but they also make no sense in light of the purpose of Title X.  Why would an entity need to provide dental care in order to "offer a broad range of acceptable and effective family planning methods and services"?  42 U.S.C. § 300(a).  The entire purpose of the Title X program is to provide family planning services, but the effect of the defunding provision is to deny funds to the very entities that *specialize* in providing that care, such as Planned Parenthood.

Because Kansas has accepted federal Title X funds, it must comply with the federal laws and regulations that govern those funds.  It is well established that a state may not impose additional requirements for an entity to receive those funds which render ineligible contractors who would otherwise be eligible for the program.[6]  As the Fifth Circuit explained in invalidating a law that excluded abortion providers from the Title X program: "a state eligibility standard that altogether excludes entities that might otherwise be eligible for federal funds is invalid under the Supremacy Clause."  *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 336-37 (5th Cir. 2005).  Just last week, a federal district court concurred in connection with a

---

Footnote continued from previous page

health center" must be a grantee under or meet the requirements of Section 254b, "Health Centers," of the Public Health Service Act.  42 U.S.C. § 1396d(l)(2)(B).

[6] Indeed, the Code of Federal Regulations provides that, at the time of awarding the grant, the federal Department of Health and Human Services may impose additional conditions on the funds "when in the Department's judgment these conditions are necessary to assure or protect advancement of the approved program, the interests of public health, or the proper use of grant funds."  42 C.F.R. § 59.12.  This provision indicates that the federal government is the entity that decides the eligibility criteria for these grants.  *Cf. Planned Parenthood of Ind., Inc., v. Comm'r of the Ind. State Dep't of Health*, No. 1:11-cv-00630-TWP-DKL at 28 (S.D. Ind. June 24, 2011) (ruling similar statutory language meant that the federal government retained the sole ability to impose eligibility conditions for funds awarded under 42 U.S.C. § 247c) (attached hereto as Exhibit K).

different federal program, issuing a preliminary injunction against an Indiana law that prevented federal Disease Intervention Services ("DIS") funds from going to abortion providers, ruling that the state could not impose its own additional eligibility criteria on the program. *Planned Parenthood of Ind., Inc., v. Comm'r of the Ind. State Dep't of Health,* No. 1:11-cv-00630-TWP-DKL at 28 (S.D. Ind. June 24, 2011);[7] *see also Dandoy,* 810 F.2d at 988 ("[The state] has itself chosen by its participation to forgo whatever policy the conflicting state statute or regulation sought to accomplish."); *Planned Parenthood Fed. of Am. v. Heckler,* 712 F.2d 650, 663 (D.C. Cir. 1983) ("Title X does not provide, or suggest, that states are permitted to determine eligibility criteria for participants in Title X programs."); *cf. Hern v. Beye,* 57 F.3d 906, 913 (10th Cir. 1995) (by choosing to accept Title XIX funds, state must obey federal regulations and allow funds for use for abortion in cases of rape and incest).

By restricting distribution of Title X funds only to public entities, hospitals, and FQHC's, the defunding provision attempts to impose restrictions on eligibility for Title X funds that are in excess of and inconsistent with restrictions and requirements established by the federal government for these funds. Where, as here, such a conflict with a federal statute, regulations, and policy exists, a state statute is unlawful and, accordingly, must be struck down. *See King,* 392 U.S. at 333 n.34; *Dandoy,* 810 F.2d at 988; *accord Valley Family Planning v. North Dakota,* 661 F.2d 99, 100-01 (8th Cir. 1981) (invalidating state eligibility condition in conflict with Title X); *Planned Parenthood of Billings, Inc. v. Montana,* 648 F. Supp. 47 (D. Mont. 1986) (striking down eligibility condition that required Title X providers to be in physically separate facilities from abortion providers). The Kansas statute's "attempt[] to impose regulations that restrict the

---

[7] It is notable that the state of Indiana tried to defend its imposition of eligibility criteria on the DIS funds at issue by arguing that that program was *unlike* Title X, which "contains specific text addressing who exactly is eligible for Title X grants." *Id.*

scope of a federal program" is preempted by Congress' use of its spending powers, and therefore the Supremacy Clause renders Section 107(l) invalid.  *See Sanchez*, 403 F.3d at 341 (invalidating state statute in conflict with Title X).

> 2.    Section 107(l)'s Intentional Disqualification of Planned Parenthood Because of its Provision of and Association With Abortion Services Is In Excess of and Conflicts with Federal Law

As is evidenced by the many public statements made by those elected officials responsible for the defunding provision, the new state restrictions on Title X funding had one real purpose — *i.e.*, to remove Planned Parenthood from the Title X program because it provides or is associated with the provision of abortion services.  *See* Section II.C., *supra*.  This, too, is an impermissible eligibility criterion that conflicts with federal law.  As is discussed above, the federal Title X rules allow for "any" entity to participate in the program.  42 C.F.R. § 59.3.  The Title X statute and regulations make no mention of the ineligibility of entities that provide abortions to receive funds.  In fact, Congress deliberately chose *not to exclude* abortion providers from participating in Title X; rather, it enacted 42 U.S.C. § 300a-6, which requires only that *the subsidized project* not include "abortion [a]s a method of family planning."  42 U.S.C. § 300a-6.  Thus, under federal law, an entity may perform abortions with its own funds outside of the Title X project, and remain eligible for a Title X grant.

Kansas is not the first state to target abortion providers in the Title X program.  Courts have repeatedly rejected such efforts as violating the Supremacy Clause.  *See, e.g.*, *Sanchez*, 403 F.3d at 341 (state law that keeps abortion providers out of the Title X program "seriously undermine[s] and obstruct[s] Congress's intent in distributing funds under Title X"); *Valley Family Planning*, 661 F.2d at 100-01 (invalidating state statute prohibiting Title X funds from going to an entity that "performs or encourages its clients to obtain abortions"); *Planned Parenthood of Billings,* 648 F. Supp. at 51 (striking down state eligibility condition that required

Title X providers to be in physically separate facilities from abortion providers).  This Court should do the same.

For all of the foregoing reasons, Plaintiff has demonstrated a very strong likelihood of succeeding on their claim that Section 107(l) violates the Supremacy Clause because it imposes additional conditions upon eligibility for a federal program not required by federal law.

**B.      Plaintiff Is Likely to Prevail on its Claim that Section 107(l) Imposes an Impermissible Penalty on Plaintiff's Constitutionally Protected Conduct**

PPKM undoubtedly has a First Amendment right to associate with entities that provide abortion and to advocate for access to abortion services.  *See, e.g.*, *Planned Parenthood of Kansas, Inc. v. City of Wichita*, 729 F. Supp. 1282, 1289-90 (D. Kan. 1990) (holding that city resolution to defund Planned Parenthood violated the First Amendment rights of Planned Parenthood and its patients).  It also has a right to perform abortions that, along with its patients' rights to obtain abortions, is protected by the Fourteenth Amendment.  *See Roe v. Wade*, 410 U.S. 113, 164 (1973); *see also Sanchez*, 280 F. Supp. 2d at 608 (holding that in providing abortions, Planned Parenthood affiliates "are engaging in a constitutionally protected activity").  As is discussed above, it is this constitutionally protected conduct that the sponsors of the defunding provision identified as so abhorrent as to necessitate that Title X funds be taken away from PPKM.

The Supreme Court has consistently recognized a distinction between regulations that penalize an entity from eligibility for a government benefit or program because that entity engages in constitutionally protected conduct, and regulations that refuse to subsidize that conduct.  While the latter is a permissible policy choice, disqualification from eligibility is plainly an unconstitutional penalty because, as the Supreme Court has underscored, "if the government could deny a benefit to a person because of his constitutionally protected speech or

associations, his exercise of those freedoms would in effect be penalized and inhibited . . .

allow[ing] the government to 'produce a result which (it) could not command directly.'" *Perry*

*v. Sindermann*, 408 U.S. 593, 597 (1972) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958))

(alteration in original).

This distinction has been recognized many times in the context of abortion rights.  In

*Harris v. McRae*, 448 U.S. 297 (1980), the Supreme Court upheld a restriction on the use of

government funds to pay for abortions, but noted the difference between the permissible "refusal

to fund protected activity," and the impermissible "disqualification from receipt of public

benefits" because an entity engaged in the protected activity.  *Id.* at 317 n.19.  In *Webster v.*

*Reproductive Health Services*, 492 U.S. 490 (1989), the Supreme Court upheld Missouri's ban

on the use of public facilities for the provision of abortions, but noted that the case would be

different if Missouri "barred doctors who performed abortions in private facilities from the use of

public facilities for any purpose."  *Id.* at 510 n.8.

*Rust v. Sullivan*, 500 U.S. 173 (1991), discussed the same distinction in more detail.  *Rust*

involved now repealed federal regulations that restricted recipients of Title X family planning

funds from providing information about abortion within the project subsidized by the federal

funds.  The regulations, however, did not disqualify from participation in the Title X program

entities that provided such information outside the Title X project.  The Supreme Court upheld

the limitation on the use of government funds, distinguishing it from a regulation that

conditioned receipt of funds on a limitation of the recipient's constitutionally protected conduct

outside of the funded project:

> [H]ere the Government is not denying a benefit to anyone, but is instead simply
> insisting that public funds be spent for the purposes for which they were
> authorized.

*** 

16

> In contrast, our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program.

*Id.* at 196-97 (emphasis in original); *see also Planned Parenthood of Cent. & N. Arizona v. Ariz.*, 718 F.2d 938 (9th Cir. 1983), *remanded*, 789 F.2d 1348 (9th Cir. 1986) (holding unconstitutional a state statute denying eligibility for state funds to organization engaged in abortion-related activities), *summarily aff'd sub nom.*, *Babbitt v. Planned Parenthood of Cent. & N. Ariz.*, 479 U.S. 925 (1986).

In *Planned Parenthood Association Chicago Area v. Kempiners*, 568 F. Supp. 1490 (N.D. Ill. 1983), the court held that an Illinois statute that proscribed granting funds to any applicant that provided abortion counseling or referrals, even if these were funded privately, was an unconstitutional penalty imposed on Planned Parenthood for exercising its constitutional rights.  *Id.* at 1495.  The court stated:

> [T]he Supreme Court has held several times that "[r]efusals to subsidize, if based on constitutionally impermissible criteria, may be invalidated . . . ."  We also pointed out that it has long been clear that government may not deny a person a governmental benefit for a constitutionally impermissible reason.  It is not a sufficient answer that the challenged conduct involves only a refusal to subsidize. If that were enough, the state could, for example, deny welfare to blacks, Republicans, or persons who merely spoke out against the incumbent administration's policies, and defend itself by arguing that persons were no worse off than if the state had provided no welfare at all.  The appropriate test is not whether the challenged conduct involves a refusal to subsidize, but rather whether that refusal is based on a constitutionally permissible criterion.

*Id.* at 1496 (citations omitted) (second alteration and omission in original).

The Supreme Court has recognized this same distinction in other contexts.  In *FCC v. League of Women Voters*, 468 U.S. 364 (1984), the Court declared unconstitutional a provision that disqualified entities that editorialized from receiving federal funds for non-editorial programming.  The Court noted that a restriction on the use of the funds for editorializing would

17

be permissible, so long as the restriction allowed the recipient to editorialize using separate funds.  *Id.* at 399-401; *see also NEA v. Finley*, 524 U.S. 569, 587 (1998) (upholding the use of subjective criteria for arts grants, but noting that "[i]f the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case").

This critical distinction — between restricting the uses to which government funds may be put, and disqualifying an entity for eligibility for funds because of constitutionally protected activities — establishes the test that separates the permissible restriction from the unconstitutional penalty.  Here, it is clear that the defunding provision is an unconstitutional attempt to defund PPKM and penalize it for its constitutionally protected activities and associations.  For example, as noted in the Statement of Facts, *supra*, the lead sponsor of the provision stated that its purpose was "to deny Title X funding to Planned Parenthood" and called it "a great victory on the first pro-life floor vote of the session."  *See* Ex. F (emphasis added); *see also* Gillooly Decl. ¶ 5 (stating that Representative Kinzer stated this provision was designed to defund Planned Parenthood).  The provision was even referred to among legislators as the "Planned Parenthood provision."  Gillooly Decl. ¶ 4.

The defunding provision is not a restriction on how government funds may be used.  It does not, for example, attempt to prohibit the provision of abortion services using Title X funds; in fact, Title X already does that, and PPKM does not perform abortions at its Wichita or Hays health centers.  Instead, the defunding provision impermissibly disqualifies PPKM's Wichita and Hays health centers from eligibility for Title X funds because PPKM and its affiliate, Comprehensive Health, perform abortions elsewhere using separate, private funds, and because PPKM is associated with that constitutionally protected activity.  This is precisely the type of

"unconstitutional condition" the Supreme Court addressed in *Rust*. 500 U.S. at 196-97. The defunding provision clearly "place[s] a condition on the *recipient* of" Title X funds, "rather than on a particular program or service, thus effectively prohibiting [PPKM] from engaging in . . . protected conduct outside the scope of the federally funded program." *Id.* (emphasis in original).

Kansas may not deprive persons or entities of their constitutional rights simply based on disapproval or distaste for those entities or their affiliates. *Planned Parenthood of Kan.,* 729 F. Supp. at 1290 ("[A] bare congressional desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.") (quoting *U.S. Dep't of Agric. v. Moreno,* 413 U.S.528 (1973)) (emphasis in original) (internal quotation marks omitted). The defunding provision is a blatant attempt to restrict the *recipients* of federal Title X funds based on their constitutionally protected conduct. The sole purpose, and the effect, of the defunding provision is to penalize PPKM for its constitutionally protected provision of and/or affiliations with abortion services. Such a penalty is unconstitutional. *See Planned Parenthood of Kan.*, 729 F. Supp. at 1291 (striking down Kansas law banning contract with Planned Parenthood where "the plaintiffs were deprived of the benefit of continued access to Title X funding simply because of the reputation and unpopularity of Planned Parenthood"). This penalty on constitutionally protected activity violates PPKM's rights under the First and Fourteenth Amendments.[8] For this reason, too, Plaintiff is substantially likely to succeed on the merits of these constitutional claims.

---

[8] This penalty, to the extent it was designed to force PPKM's affiliate to stop providing abortion services, also imposes an undue burden on women's right to choose abortions in Kansas. There are only three abortion providers in Kansas, and Comprehensive Health performs more than half of the total number of procedures in the state. *See* Brownlie Decl. ¶ 11.

**C.    Plaintiff and Its Patients Will Suffer Irreparable Injury Without Preliminary Injunctive Relief**

As of July 1, 2011, the defunding provision will strip PPKM of $330,000.00 in historical annual funding for its Wichita and Hays health centers.  *See* Brownlie Decl. ¶¶ 14-16.[9]  PPKM uses this funding to provide comprehensive family planning services, including contraception services, pregnancy testing, HIV testing, treatment of sexually transmitted infections, detection of cervical, breast and testicular cancers, and vaccinations for hepatitis and cervical cancer.  *See id.* ¶ 7.  In particular, PPKM's health center in Wichita provides services to approximately 4,720 individuals who come from southeast and south central Kansas, and the center in Hays provides care to approximately 960 individuals who come from a large area of western Kansas.  *See id.* ¶¶ 17, 18.  PPKM provides more than 9,000 birth control visits, 3,000 pap tests, 3,000 breast exams, and 18,000 STD tests each year to these roughly 5,700 individuals.  *See id.* ¶ 19.  This does not include other individuals to whom PPKM provides education services through the Title X program.  *See id.*

PPKM relies on Title X funding as a crucial component of its annual operating budget, and thousands of Kansans rely on PPKM to obtain low-cost, essential medical services.  *See id.* ¶¶ 21, 22.  PPKM expects that, without Title X funds and 340B pricing, it will only be able to continue its current sliding fee scale for one to two months.  *See id.* ¶ 30.  After that, PPKM will have no choice but to charge patients significantly more for family planning services and likely

---

[9] In addition to the loss of critical Title X funding, PPKM's exclusion from the Title X program will add another significant burden for PPKM's health centers and patients.  Currently, PPKM participates in the 340B drug pricing program, which enables it to purchase outpatient drugs at a significantly reduced cost.  *See* Brownlie Decl. ¶ 23.  However, PPKM's eligibility for this pricing program is based on its participation in Title X.  *Id.*  Therefore, as a result of the termination of PPKM's Title X contracts, it stands to lose an additional $72,000 worth of annual drug pricing benefits, which are passed on to its patients.  *Id.*

will have to reduce the services it provides or close one or more of its health centers, which also would result in PPKM employees losing their jobs. *See id.* ¶ 31.

Plaintiff's patients will, therefore, be faced with two choices: (1) continue to go to PPKM, but pay more (if PPKM does not need to close the health center altogether); or (2) end their established relationships with PPKM and seek Title X services elsewhere, if those services are available. This first option will not be desirable — or feasible — for many of Plaintiff's patients because they have limited financial means. *See id.* ¶ 10 (more than 75% of the clients at both the Wichita and Hays health centers fall below 200% of the federal poverty line). The latter choice will result in significant burdens for PPKM's patients because PPKM is not aware of any other organizations with the capacity, facilities, or staffing to adequately serve its roughly 5,700 patients at the Wichita and Hays health centers. *See id.* ¶ 26.[10] While the Sedgwick County Health Department is a Title X provider, KDHE's Title X plan says that that department was funded to serve 3,282 individuals in 2011. *See id.* ¶ 27. It would, therefore, have to increase its services 144% to serve PPKM's patients, which seems highly unlikely. *Id.* Even if the County Health Department somehow could increase its services so dramatically — and increase them immediately, as of July 1 — more than doubling its patient load would undoubtedly cause patients to endure longer waits for medical services, including services such as cancer screenings and HIV testing, where timely detection is particularly critical. *Id.*

PPKM's patients in Hays face more dire straits because there is no other Title X provider in Ellis County, which means that those residents who rely on PPKM's services there will be forced to travel long distances for health care. *See id.* ¶ 29. According to KDHE's Title X grant application, in three of the eight counties surrounding Ellis County (Graham, Ness, and Rush),

---

[10] PPKM does not know if KDHE has even awarded the funds from PPKM's contracts to other providers. *See* Brownlie Decl. ¶ 15.

there is no Title X provider at all.  Four of the eight counties (Barton, Rooks, Russell, and Trego) have a Title X provider, but with much more limited services (only once or twice per month) than those offered by PPKM.  One of those providers (from Russell County) provides very limited services in the final surrounding county, Osborne County.  *Id.*  Some of PPKM's patients, therefore, will be forced to travel farther to seek treatment or medications, wait longer for appointments, delay testing and other procedures, or otherwise receive care that is not of the same quality that PPKM provides.  *See id.* ¶ 31.

Granting a preliminary injunction is proper to prevent these irreparable harms from happening to PPKM and the thousands of women, men and teens that it serves.  *See* Ex. K, *Planned Parenthood of Ind.,* No. 1:11-cv-00630-TWP-DKL at 29-30 (granting preliminary injunction because shutting down family planning services that provided care to thousands of patients constituted irreparable harm); *see also Planned Parenthood of Minn.*, 558 F.2d at 866-67 (affirming grant of preliminary injunction and concluding that Planned Parenthood demonstrated irreparable injury due to "[t]he adverse effect on Planned Parenthood's business, coupled with the incalculable loss of revenue" in addition to its showing that "the [state] ordinance interfered with the exercise of its constitutional rights and the rights of its patients").

Preliminary injunctive relief is also proper because, as discussed above, Plaintiff has clearly established that the defunding provision will violate its and its patients' constitutional rights.  "It is well settled that the violation of constitutional rights, even for short periods, gives rise to irreparable injury."  *Planned Parenthood Fed'n of Am. v. Bowen*, 680 F. Supp. 1465, 1473 (D. Colo. 1988) (granting motion for preliminary injunction against Secretary of Health and Human Services' promulgation of regulations prohibiting counseling and referral for abortion services); *see also Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("When an

alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *accord Women's Med. Prof'l. Corp. v. Taft*, 114 F. Supp. 2d 664, 704 (S.D. Ohio 2000) ("[I]n the context of abortion regulations, the impairment of a constitutional right alone is sufficient to constitute irreparable harm."); *cf. Dandoy*, 810 F.2d at 988 (affirming injunctive relief to prohibit future refusal by the state of Utah to reimburse providers for family planning services to minors in the absence of proof of parental consent).

PPKM has been a Title X provider of family planning services in the Wichita and Hays communities for more than twenty-five years, and its patients rely on those services. *See* Brownlie Decl. ¶ 12. That PPKM is an important part of Kansas' Title X project is evidenced by KDHE's grant application to HHS. *See* Ex. C (representing that PPKM was its largest subgrantee, shown in the grant application as receiving 13% of KDHE's total statewide Title X grant and serving more patients than any other subgrantee). A preliminary injunction will preserve the status quo and prevent the men, women, and teens who currently rely on PPKM from losing access to quality, affordable family planning services upon which they have depended for years from PPKM.

### D. The Threatened Injury Outweighs Any Damage the Injunction Might Cause, and the Public Interest Will Be Served by Granting the Relief Requested

Defendants cannot seriously claim that a preliminary injunction would cause either KDHE or the public interest harm. The balance of harms clearly favors Plaintiff because without an injunction, PPKM and its patients will not only be deprived of their constitutional rights, but the women and men of Kansas will be further burdened by travel, expense, and decreased access to medical services. *See* Brownlie Decl. ¶ 31. On the other hand, there appears to be no injury to KDHE or the public interest. As the district court recognized in *Sanchez*, granting a preliminary injunction under analogous circumstances was in the public interest because the record "clearly

demonstrate[d] the Plaintiffs are instrumental to ensuring Texas women receive the family planning services Congress intended to fund." *Planned Parenthood of Cent. Tex.*, 280 F. Supp. 2d at 612.

Moreover, as federal courts have recognized, "the public interest will be served by the granting of the [injunction] as the plaintiff is seeking to prevent violations of [its] constitutional rights." *Saint v. Neb. Sch. Activities Ass'n*, 684 F. Supp. 626, 630 (D. Neb. 1988); *accord Murillo v. Musegades*, 809 F. Supp. 487, 497 (W.D. Tex. 1992); *cf. Bowen*, 680 F. Supp. at 1473 (granting motion for preliminary injunction against Secretary of Health and Human Services' promulgation of regulations prohibiting counseling and referral for abortion services).

## V.      CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's motion for preliminary injunction.


Dated:  June 29, 2011

                                          Respectfully submitted,


                                          s/ Lee Thompson
                                          Lee Thompson, #08361
                                          Erin C. Thompson, #22117
                                          THOMPSON LAW FIRM, LLC
                                          106 E. 2nd Street
                                          Wichita, Kansas  67202
                                          Telephone:  (316) 267-3933
                                          Fax:  (316) 267-3901
                                          E-mail:  lthompson@tslawfirm.com

                                          Elissa J. Preheim[*]
                                          Sarah E. Warlick[*]
                                          Arnold & Porter LLP
                                          555 Twelfth St., NW
                                          Washington, DC  20004
                                          (202) 942-5000

Grace Pickering[*]
Arnold & Porter LLP
399 Park Avenue
New York, NY  10022
(212) 715-5000

Roger K. Evans[*]
Planned Parenthood Federation of America
434 W. 33rd Street
New York, NY  10001
(212) 541-7800

Helene T. Krasnoff[*]
Planned Parenthood Federation of America
1110 Vermont Avenue NW, Suite 300
Washington, DC  20005
(202) 973-4800

ATTORNEYS FOR PLAINTIFF

[*]*Application for admission pro hac vice
forthcoming*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **PLANNED PARENTHOOD OF**     )<br>  **KANSAS AND MID-MISSOURI,**   )<br>     )<br>    **Plaintiff,**   )<br>     )<br>    **vs.**   )<br>     )<br>**SAM BROWNBACK, Governor of**   )<br>  **Kansas, and**   )<br>**ROBERT MOSER, MD, Secretary,**   )<br>  **Kansas Department of Health**   )<br>  **and Environment,**   )<br>     )<br>    **Defendants.**   ) | **Case No.: 11-cv-2357 JTM/DJW** |

**APPENDIX IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**
**AND MEMORANDUM OF LAW IN SUPPORT**

Plaintiff submits the attached exhibits in support of its Motion for Preliminary Injunction

and Memorandum of Law in Support:

A.     Declaration of Peter Brownlie, President and Chief Executive Officer of Planned

        Parenthood of Kansas and Mid-Missouri ("PPKM") (June 29, 2011)

B.     Declaration of Sarah M. Gillooly, Lobbyist and Public Affairs Manager of PPKM (June

        28, 2011)

C.     February 22, 2010 Federal Title X Grant Application of Kansas Department of Health

        and Environment

D.     February 8, 2011 Press Release of Representative Lance Kinzer

E.     February 8, 2011 Release of Christie Kriegshauser, Communications Director for Kansas

        Speaker of the House Representative Mike O'Neal

F.     February 8, 2011 Facebook Post of Representative Lance Kinzer

G.      April 25, 2011 LifeSiteNews.com story titled "Kansas Governor Brownback: Zap

          Planned Parenthood Funding"

H.      May 13, 2011 Lawrence Journal-World, LJWorld.com, article titled "Planned Parenthood

          criticizes Kansas budget provision"

I.       June 14, 2011 letter to PPKM (Wichita) terminating PPKM's contract with KDHE

J.       June 14, 2011 letter to PPKM (Hays) terminating PPKM's contract with KDHE

K.      *Planned Parenthood of Ind., Inc., v. Comm'r of the Ind. State Dep't of Health,* No. 1:11-

          cv-00630-TWP-DKL (S.D. Ind. June 24, 2011)