IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PLANNED PARENTHOOD
  OF KANSAS AND MID-MISSOURI,

    Plaintiff,


        vs.                              Case No. 11-2357-JTM


SAM BROWNBACK, GOVERNOR OF KANSAS,
            AND
ROBERT MOSER, M.D., SECRETARY,
  KANSAS DEPARTMENT OF HEALTH
  AND ENVIRONMENT,

        Defendants.


MEMORANDUM AND ORDER


Plaintiff Planned Parenthood of Kansas and Mid-Missouri has filed the present action seeking to prevent the application and enforcement of recent Kansas legislation which has the effect of excluding Planned Parenthood from successfully applying with the state Kansas Department of Health and Environment (KDHE) for federal Title X family planning funding. The defendants in the action are Sam Brownback, Governor of Kansas, and Dr. Robert Moser, the Secretary of KDHE.

The provision in question, Section 107(l) of H.B. 2014, 84th Leg. (Kan. 2011), provides that KDHE subgrants are exclusively prioritized to public entities, and second, to hospitals or federally-qualified health centers (FQHCs). As Planned Parenthood is a private entity which is neither a hospital nor a FQHC, it cannot successfully apply with KDHE to receive Title X funds. Planned Parenthood argues that the statute violates its rights under 42 U.S.C. § 1983 on two grounds. First, it argues that the provision is invalid under the Supremacy Clause, as it creates an additional eligibility requirement which is inconsistent with federal law. Second, it contends that the statute has the effect of violating its constitutional rights by discriminating against it based upon its participation in protected activity.

*Findings of Fact*

*Title X*

Title X, 42 U.S.C. §§ 300 *et seq.*, is a federal program that funds low-cost family planning services. Title X was enacted in 1970 as part of the Public Health Service Act with the specific intent of providing access to family planning services to low-income or uninsured women and families, including those ineligible for Medicaid. Patients of Title X providers make payments on a sliding fee scale, based on their resources. Family planning projects are designed to provide "services necessary to aid individuals to determine freely the number and spacing of their children." 42 C.F.R. § 59.1. Under 42 C.F.R. § 59.3, "[a]ny

public or nonprofit entity in a State" is eligible to apply for Title X funds.

Title X funds are granted by the United States Department of Health and Human Services to "public or nonprofit entities." 42 U.S.C. § 300(a). The grantee for the State of Kansas is the KDHE,  which uses those funds for its Family Planning Services Program. KDHE does not provide the clinical services itself, but subgrants those funds to providers of family planning services, like Planned Parenthood.

Specifically, 42 U.S.C. § 300 provides:

**(a) Authority of Secretary**

   The Secretary is authorized to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents). To the extent practical, entities which receive grants or contracts under this subsection shall encourage familiy [sic] participation in projects assisted under this subsection.

**(b) Factors determining awards; establishment and preservation of rights of local and regional entities.**

   In making grants and contracts under this section the Secretary shall take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance. Local and regional entities shall be assured the right to apply for direct grants and contracts under this section, and the Secretary shall by regulation fully provide for and protect such right.

Under 42 C.F.R. § 59.3, in response to the question "Who is eligible to apply for a family planning services grant?," HHS regulations answer: "Any public or nonprofit private entity in a State may apply for a grant under this subpart." Further, HHS has developed Program Guidelines Title X projects which provides that that services "may be offered by grantees directly and/or by delegate/contract agencies operating under the umbrella of the grantee." Dept. of HHS, Office of Publ. Health & Sci., PROGRAM GUIDELINES FOR PROJECT GRANTS FOR FAMILY PLANNING SERVICES (2001), ¶ 6.1, p. 6 (2001). These Program Guidelines also set forth broad eligibility standards similar to those in the Public Health Service Act and HHS regulations, providing that "[a]ny public or nonprofit private entity located in a state ... is eligible to apply for a Title X family planning services project grant." *Id*. at ¶ 3.1, p. 2.

Neither the Title X statute nor any federal regulation imposes any additional service requirements on entities that receive Title X funds, including mandating the type of provider that they must be, or the services that they provide outside of those offered as part of the Title X program. 42 U.S.C. § 300(b) sets forth the factors which are to be used by the Secretary of HHS in granting awards:

> In making grants and contracts under this section the Secretary shall take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance. Local and regional entities shall be assured the right to apply for direct grants and contracts under this section, and the Secretary shall by regulation fully

4

> provide for and protect such right to apply for direct grants and contracts
> under this section, and the Secretary shall by regulation fully provide for and
> protect such right.

These factors do not include whether the grant or contract applicant performs a wide-variety of hosptital-type services not related to family planning.

Similarly, 42 C.F.R. § 59.5 sets the miniumum requirements for family planning projects under Title X, in particular, mandating that a project must "[p]rovide a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods) and services (including infertility services and services for adolescents)." All of the standards set forth in § 59.5 focus on the nature of the family planning services to be provided; they give no indication that projects must or should also provide a range of other medical care such dental or emergency medical care services.

The Title X statute and regulations also make no mention of the ineligibility of entities that provide abortions to receive Title X funds or operate Title X projects. To the contrary, the Title X statute shows that Congress contemplated that abortion providers would operate Title X projects, and required only that abortion services not be a part of the Title X project. 42 U.S.C. § 300a-6 (no Title X funds "shall be used in programs where abortion is a method of family planning"). In addition, 42 C.F.R. § 59.5(a)(5) excludes funding for projects which use aboriton as a method of family planning. Thus, under federal law, an entity may perform abortions with its own funds, outside of the Title X

5

project, and remain eligible for a Title X grant.

In their Response, defendants emphasize that Planned Parenthood is not a direct grantee, as it has not directly applied with the Secretary of HHS for Title X funds. The defendants note that in nine states Planned Parenthood affiliates are direct grantees of Title X funds.

HHS guidelines authorize grantees to contract through a series of agreements, including (a) a Universal Contract, (b) a Contractual Provisions Attachment to the Universal Contract, (c) a Contract Attachment No. 5, and (d) a Notice of Grant Award Amount & Summary of Program Objectives. The defendants stress that by its own terms a Universal Contract may be non-renewed if "either of the parties notifies the other in writing of its intent not to renew." Further, the Universal Contract and Contract Attachment No. 5 are terminable or modifiable if funding is not available. In addition, the Notice of Grant Award, only becomes an agreement after the grantee's first payment to the contractor. Accordingly, the defendants contend that the Universal Contract between KDHE and Planned Parenthood was comprehensively eliminated, as it "did not become an agreement under the Contractual Provisions Attachment; it was not renewed; it was cancelled pursuant to the June 14, 2011 letters." (Dkt. 35, at 8).

Defendants stress that Planned Parenthood is only one part of the Title X universe in Kansas. For State Fiscal year 2011 (which ended June 30, 2011), KDHE contracted with

56 entities to provide family planning services. Of these, 53 are public entities in the form of local health departments. The remaining three are the two Planned Parenthood clinics in Wichita and Hays, and the Dodge City Family Planning Clinic. The defendants thus stress that the now-excluded providers are "only 5% of the entities" receiving Title X subgrants. (*Id*. at 9).

But this gives a misleading impression of the state of Title X funding in Kansas, as it assumes each subgrantee receives a similar amount of funding. In fact, Planned Parenthood was the second-largest subgrantee in Kansas, receiving more than 12.5% of the funds allocated by KDHE.

*History of Planned Parenthood's Title X Funding in Kansas*

Planned Parenthood has been a Title X provider in Kansas for more than 25 years at its two Kansas health centers, located in Wichita (Sedgwick County) and Hays (Ellis County).

These two health centers have historically received approximately $330,000 through contracts with KDHE to provide Title X family planning services to more than 5,700 individuals each year. Each year, Planned Parenthood provides receives some 9,000 birth control visits, and conducts approximately 3,000 pap tests, 3,000 breast exams, and 18,000 STD tests. Planned Parenthood also provides education services through the Title X

program.

Planned Parenthood performs abortion services at two of its health centers in Missouri and through an affiliate (Comprehensive Health of Planned Parenthood of Kansas and Mid-Missouri) in Overland Park, Kansas. However, Planned Parenthood offers no abortion services in either the Wichita or Hays health centers. Its affiliate Comprehensive Health receives no Title X funds, and all abortion services at Planned Parenthood and Comprehensive Health are financed entirely by private funds.

On February 22, 2010, KDHE submitted to HHS a competing continuation grant application for Title X funds for the Kansas Family Planning Services Program, requesting Title X funds for the first year of a five-year project period, beginning June 30, 2010 and ending June 29, 2015. In its application, KDHE explained how it intended to perform its proposed project and distribute its grant monies, and the number of patients who would be covered by the grant monies. KDHE included Planned Parenthood's Wichita and Hays health centers as two of its 58 subgrantees and represented to HHS that Planned Parenthood was its largest subgrantee, shown in the grant application as receiving 13% of the Title X funds to be distributed to subgrantees and serving more patients than any other subgrantee. KDHE also stated that Planned Parenthood

> has been implementing the FP [Family Planning] Program Male Involvement Information and Education Project focusing on African-American and Hispanic young men ages 12-19 and addressing the Title X program priority to more fully involve males in reproductive health, as well as the Healthy

People 2010 FP goal to: "improve pregnancy planning and spacing and prevent unintended pregnancy." There has never been any allegation that Planned Parenthood failed to provide the services required under its agreements with KDHE, or that it ever misused Title X funds by allocating such funds for abortion services.

### Adoption of Section 107(l)

Section 107(l) of H.B. 2014, which took effect on July 1, 2011, provides:

During the fiscal year ending June 30, 2012, subject to any applicable requirements of federal statutes, rules, regulations or guidelines, any expenditures or grants of money by the department of health and environment—division of health for family planning services financed in whole or in part from federal title X moneys shall be made subject to the following two priorities: First priority to public entities (state, county, local health departments and health clinics) and, if any moneys remain, then, Second priority to non-public entities which are hospitals or federally qualified health centers that provide comprehensive primary and preventative care in addition to family planning services: *Provided*, That, as used in this subsection "hospitals" shall have the same meaning as defined in K.S.A. 65-425, and amendments thereto, and "federally qualified health center" shall have the same meaning as defined in K.S.A. 65-1669, and amendments thereto.

Because it is not a public entity, hospital, or FQHC, the effect of Section 107(l), which took effect on July 1, 2011, is to exclude Planned Parenthood from eligibility to continue receiving Title X funding.[1]

---

[1] Under K.S.A. 65-1669, a federally qualified health center is defined as "a center which meets the requirements for federal funding under 42 U.S.C. section 1396d(l) of the public health service act, and which has been designated as a 'federally qualified health center' by the federal government." 42 U.S.C. § 1396d(l)(2)(B) provides that a "Federally-qualified health center" is an entity which is either has a grant as a health center, or receives such funding as a subgrantee and otherwise meets the requirements

As originally introduced, H.B. 2014 contained no restrictions on eligibility for Title

X funds. Subsequently Representative Lance Kinzer offered, and the House adopted, an

---

of receiving such a grant, under 42 U.S.C. § 254b of the Public Health Service Act. 42
U.S.C. § 254b(a) defines a "health center" as "an entity that serves a population that is
medically underserved, or a special medically underserved population comprised of
migratory and seasonal agricultural workers, the homeless, and residents of public
housing."

In addition, such centers must provide a minimum level of "basic health
services," which includes:

> (I)   health services related to family medicine, internal medicine,
> pediatrics, obstetrics, or gynecology that are furnished by physicians
> and where appropriate, physician assistants, nurse practitioners, and
> nurse midwives;
>
> (II)  diagnostic laboratory and radiologic services;
>
> (III) preventive health services, including —
>
>> (aa)  prenatal and perinatal services;
>>
>> (bb)  appropriate cancer screening;
>>
>> (cc)  well-child services;
>>
>> (dd)  immunizations against vaccine-preventable diseases;
>>
>> (ee)  screenings for elevated blood lead levels, communicable
>> diseases, and cholesterol;
>>
>> (ff)  pediatric eye, ear, and dental screenings to determine the need
>> for vision and hearing correction and dental care;
>>
>> (gg)  voluntary family planning services; and
>>
>> (hh)  preventive dental services;
>
> (IV)  emergency medical services; and
>
> (V)   pharmaceutical services as may be appropriate for particular
> centers....

42 U.S.C. § 254b(b)(1)(i).

amendment to Section 57 of the bill imposing the same restrictions on Title X funding for fiscal year 2011 that are also now found at Section 107(l) for fiscal year 2012.

According to an affidavit filed by Sarah Gillooly, an associate of Planned Parenthood, she observed another House Representative directly ask Kinzer on the House floor if the purpose of his amendment was to take funds away from Planned Parenthood. Kinzer confirmed that it was. Kinzer subsequently issued a press release on a website stating that an "amendment, offered by Representative Kinzer and approved by ninety-one members, took all state funding away from Planned Parenthood to ensure that state dollars are not used for abortion services." Representative Kinzer also posted on his Facebook page:

> Delighted to announce that the KS House just approved my floor amendment to deny Title X funding to Planned Parenthood for the balance of FY2011. The vote was 91-26, a great victory on the first pro-life floor vote of the session.

Christie Kriegshauser, the Communications Director for the Speaker of the Kansas House, Representative Mike O'Neal, circulated a press release similar to Kinzer's.

After a referral to Conference Committee, the Appropriations Bill emerged as the Committee Report with language substantially similar to Representative Kinzer's amendment. In the Conference Committee, according to Gillooly, members of both the House and the Senate referred to what became Section 107(l) as the "Planned Parenthood" provision.

11

Governor Brownback signed H.B. 2014 into law on May 28, 2011. The Lawrence, Kansas *Journal-World* reported on May 13, 2001 that Governor Brownback "hailed" the Kinzer amendment on the grounds that it would "zero out funding of Planned Parenthood."

On June 14, 2011, KDHE wrote to Planned Parenthood stating that its Wichita and Hays health centers would not receive Title X funds for the 2012 fiscal year, and that Planned Parenthood's Universal Contract with KDHE was thereby cancelled. "Due to recent legislative action," KDHE wrote, "funding is no longer available for your organization." *Id.*

**Standard for Injunctive Relief**

A preliminary injunction is an extraordinary equitable remedy which seeks to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). A party seeking injunctive relief must show a substantial likelihood that it will prevail on the merits, that absent the injunction it was suffer an irreparable injury, the threatened injury outweighs the cost to its opponent, and the injunction is not against the public interest. *See Westar Energy v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009); *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001).

The defendants contend that Planned Parenthood must meet the heightened burden of *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975-76 (10th Cir. 2004) (*en banc*), as it is seeking mandatory action (compelling a recontracting of family planning services), is seeking revision of a governmental action adopted in the public interest, and is essentially seeking its final relief by the present injunction. As such, they contend, the court must closely scrutinize the plaintiff's arguments to determine if it has made a strong showing of likely success on the merits and the balance of harms. Further, it must show injuries that are certain, great, actual, and not theoretical. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

In *O Centro Espirita*, the Tenth Circuit held that injunctions which fall within one (or more) of the three "disfavored categories" of injunctive relief (injunctions which alter the status quo, require mandatory action, or which grant the movant all the relief that it could recover at trial) must be predicated on a stronger showing of need, and such injunctions

> must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course. Furthermore, because a historically disfavored preliminary injunction operates outside of the normal parameters for interim relief, movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard. Instead, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on our modified likelihood-of-success-on-the-merits standard.

389 F.3d at 975-76.

The court finds that the heightened standard recognized in *O Centro Espirita* is not applicable here. Although the defendants have moved to replace Planned Parenthood as a subgrantee by finding other replacements to fulfill its historical role, they have done so with the knowledge that Planned Parenthood is actively contesting the legality of their actions.

Planned Parenthood filed the present action, and filed its Motion for Preliminary Injunction, shortly after receiving KDHE's letter informing it that it was effectively barred from Title X funding "[d]ue to recent legislative action" — that is, Section 107(l). This lawsuit, and the Motion for Preliminary Injunction, were filed prior to the end of the 2011 State Fiscal Year, and timely sought relief as to the continuation grant for the 2012 year.

After the filing of Planned Parenthood's motion, the court initially scheduled a hearing for July 8, 2011. Prior to the scheduled hearing, defendants filed their Emergency Motion for Continuance of Hearing Date (Dkt. 19), seeking a 30 day extension of the preliminary injunction hearing.

If the status quo has changed in the interim, it is because of defendants's actions, undertaken while Planned Parenthood's motion was pending, to implement such changes. For purposes of injunctive relief, the relevant status quo is the "last peaceable uncontested status existing between the parties before the dispute developed." *Schrier v. University of Co.*, 427 F.3d 1253, 1260 (10th Cir. 2005) (quoting 11A Charles Alan Wright, FED. PRAC. &

PROC. § 2948 (2d ed.1995)). In the present case, the status quo would be prior to KDHE's

application of Section 107(l) and resulting determination that the statute precluded further

grants to Planned Parenthood.

Further, the court does not find that the passage of time has created a fundamental

change in the status quo. In their motion to continue the preliminary injunction hearing,

defendants affirmatively stated:

> Nor should the Court be concerned about the impact of these efforts on the
> ultimate resolution of Plaintiff's Motion for Preliminary Injunction. Should
> the Court determine that Plaintiff should continue to receive funds as a Title
> X provider in Sedgwick and Ellis County, the new arrangement with the
> Sedgwick County Health Department and the Ellis County FQHC may be
> cancelled on 30 days notice to the provider.

(Dkt. 19, at 4).

Nor does the court believe that the present motion reflects a request for mandatory

injunctive relief, to the extent that it would require extensive, court-supervised positive

action by the defendants.

> Mandatory injunctions are more burdensome than prohibitory injunctions
> because they affirmatively require the nonmovant to act in a particular way,
> and as a result they place the issuing court in a position where it may have
> to provide ongoing supervision to assure that the nonmovant is abiding by
> the injunction. See Note, 78 Harv.L.Rev. 994, 1062-63 (1965).

*SCFC ILC, Inc., v. Visa UNITED STATES*, 936 F.2d 1096, 1099 (10th cir. 1991), *overruled on*

*other gds.*, *O Centro Espirita*, 389 F.3d 973, 975 (10th Cir. 2004). In the present case, the

injunctive relief sought by Planned Parenthood is primarily negative in character, seeking

15

to require the defendants to prospectively act with respect to Title X funding without reference to or reliance on the allegedly unconstitutional standards created by Section 107(l).

Finally, the relief sought by Planned Parenthood does not grant the plaintiff all the relief it may obtain at a full trial on the merits. Motions effectively granting complete relief are disfavored based on the preference for full trial on the merits, since such motions are "similar to the 'Sentence first-Verdict Afterwards' type of procedure parodied in Alice in Wonderland, which is an anathema to our system of jurisprudence," 936 F.2d at 1099 (footnote omitted)

> "[T]he terms 'all the relief to which the movant would be entitled' or 'all the relief sought' have ... been the source of confusion because, read literally, they appear to describe any injunction where the final relief for the plaintiff would simply be a continuation of the preliminary relief." *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir.1995). There is no reason, however, to disfavor a preliminary injunction simply because "the plaintiff would get no additional relief if he prevailed at the trial on the merits." *Id.* (internal quotation marks omitted). The only reason to disfavor a preliminary injunction that grants substantially all the relief sought is if it would "render a trial on the merits largely or completely meaningless." *Id.* at 35. Therefore, "'all the relief to which a plaintiff may be entitled' must be supplemented by a further requirement that the effect of the order, once complied with, cannot be undone." *Id.*; *see also id.* (giving examples of preliminary relief that cannot be undone — for instance, "a case involving the live televising of an event scheduled for the day on which preliminary relief is granted" or "a case involving the disclosure of confidential information").

*Prairie Band*, 253 F.3d at 1247-48 (citations and internal quotations omitted). There is

nothing in the present action which suggests that the preliminary relief sought by Planned Parenthood, if granted, could not be undone. Moreover, the plaintiff by its motion seeks a continuation of payments under the 2012 State Fiscal Year. It does not seek all the relief which it might obtain by the way of a permanent injunction following a trial.

Accordingly, the court finds that the plaintiff need not meet the heightened, "strong showing" standard applicable to disfavored injunctions. Instead, the plaintiff may obtain relief if it establishes the normal standard of showing a likelihood of success on the merits. However, as discussed below, the court finds that the issue is not decisive, as the plaintiff satisfies the requirements for injunctive relief under either standard.

*Eleventh Amendment*

The defendants contend in their response that this action is precluded by the Eleventh Amendment, which bars actions against unconsenting States in federal courts. *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89  (1984). Nor, the defendants contend (Dkt. 35, at 20), can the action be maintained pursuant to *Ex Parte Young*, 209 U.S. 123, 160 (1908), as the doctrine originating in that case only permits prospective relief for ongoing violations of federal law. Here, they emphasize, they have already fundamentally altered the status quo.

> The State has entered into a contract with the Sedgwick County Health Department, and is in negotiations with at least one other entity to provide

17

family planning services. The State has discretion as to whether it will provide family planning services itself, or contract with others to do so. And it has discretion as to the providers with whom it chooses to enter into contracts. Even if Section 107(l) had never been passed, the State could have chosen not to contract with Planned Parenthood. Planned Parenthood's requested relief therefore must include an order for the State to sign a contract with and pay money to Planned Parenthood, thereby violating the State's sovereign immunity.

(Dkt. 35, at 18-19).

But, as noted earlier, these changes occurred only after Planned Parenthood's motion for injunctive for relief. Further, in obtaining the continuance of the hearing on Planned Parenthood's motion, the defendants have affirmatively represented that any contracts with alternative providers can be terminated upon notice to the contracting entity. Finally, the argument that the State has discretion in awarding Title X subgrants and "could" have decided to independently discontinue grants to Planned Parenthood is contrary to the facts, which establish that KDHE decided not to issue grants to Planned Parenthood, as it stated in its letters of June 14, 2011, not because of some independent exercise of discretion or hypothetical reevaluation of the merits of Planned Parenthood's application, but simply "[d]ue to recent legislative action."

The court finds that the injunctive relief sought by Planned Parenthood will not violate the Eleventh Amendment, as it seeks an order which would simply preclude the defendants from any decision allocating Title X funding on the basis of the allegedly unconstitutional Section 107(l). While such an order may have an effect on the allocation

18

of state funds, it reflects a proper application of *Ex Parte Young* to correct prospectively an ongoing violation of federal law, and is not invalid under the Eleventh Amendment. *See Planned Parenthood of Indiana v. Commissioner of Indiana St. Dep't of Health*, ___ F. Supp. 2d ___, No. 11-630-TWP, 2011 WL 2532921, at *25 (S.D. Ind. 2011) (finding invalid state Title X funding restriction and "enjoin[ing defendants] to take all steps to insure that all monies are paid").

### Supremacy Clause

Planned Parenthood argues that Section 107(l) creates a direct conflict between federal and state law, by generating additional eligibility requirements not contained in Title X. (Dkt. 5, at 10). It contends that, as a result of this conflict, the legislation is invalid under the Supremacy Clause, citing a variety of cases which have held that additional state eligibility requirements are inconsistent with Title X's broad application, and are therefore constitutionally invalid. *See Planned Parenthood of Houston & S.E. Tex. v. Sanchez*, 403 F.3d 324, 336-37 (5th Cir. 2005); *Planned Parenthood of Minn. v. Minnesota*, 612 F.2d 359, 363 (8th Cir. 1980). *See also Planned Parenthood of Ind. v. Comm'r of Ind. State Dep't of Health*, 2011 WL 2532921; *Planned Parenthood of Billiings v. Montana*, 648 F.Supp. 47 (D. Mont. 1986).[2]

---

[2] Defendants suggest that Planned Parenthood's claim is properly evaluated as a Spending Clause claim, (Dkt. 35, at 24), noting that the Supreme Court has recently granted *certiorari* in *Maxwell-Jolly v. Independent Living Ctr. of S. Cal.*, 131 S.Ct. 992, 178 L.Ed.2d 824 (2011) on the issue of whether Medicaid recipients and providers may

By participating in Title X, the state is obliged to forgo seeking to implement policies

contrary to Title X. *Planned Parenthood Ass'n of Utah v. Dandoy*, 810 F.2d 984 (10th Cir. 1987).

As a result, "a state eligibility standard that altogether excludes entities that might

otherwise be eligible for federal funds is invalid under the Supremacy Clause." *Sanchez*,

403 F.3d at 336-37. *See also Planned Parenthood Fed. of Am. v. Heckler*, 712 F.2d 650, 663 (D.C.

Cir. 1983) ("Title X does not provide, or suggest, that states are permitted to determine

eligibility criteria for participants in Title X programs"); *Hern v. Beye*, 57 F.3d 906, 913 (10th

Cir. 1995) (reaching similar conclusion as to Title XIX funding).

In *Sanchez*, the Fifth Circuit agreed that a state law which added eligibility

requirements which would effectively exclude abortion providers from participating in

Title X "would seriously undermine and obstruct Congress's intent." 403 F.3d at 341.

Similarly, in *Planned Parenthood of Billings*, the court struck down a state law which added

maintain a cause of action under the Supremacy Clause to enforce § 1396a(a)(30)(A) of
the Medicaid Act. All existing cases treat claims similar to the plaintiff's within the
context of the Supremacy Clause, however. Moreover, the issue is not decisive, as
defendants essentially agree that Section 107(l) cannot survive if there is a direct conflict
with federal law:

> The State may not pass a statute in direct conflict with the federal statute
> that defines the terms and conditions of the State's receipt of the federal
> money; nor may it pass a statute that 'stands as an obstacle to the
> accomplishment and execution of the full purposes and objectives of
> Congress.

(Dkt. 35, at 36). They simply argue that no conflict exists.

as an eligibility requirement for Title X funding that any abortions provided by the recipient must occur in a physically separate facility from the family planning services. 648 F.Supp. at 51.

The defendants argue there is no conflict between Section 107(l) and federal law on its face, and the court should not "speculate" as to the Legislature's true intent "based upon ... a hearsay, side-bar question and answer between two House representatives" as reflected in "a litigation-spawned affidavit of a lobbyist" for Planned Parenthood. (Dkt. 35, at 26). In this vein, they cite decisions such as *Bath Iron Works v. Director of Office of Workers' Comp'n Prog.*, 506 U.S. 53, 166 (1993) (Court would give "no weight to a single reference by a single Senator during floor debate in the Senate") and *Davis v. City of Leawood*, 257 Kan. 512, 524-28 (1995), but the application of these cases is limited.

In *Bath Iron Works*, the Court held that a Senator's "passing reference to [an administrative decision] and suggest[ion] House and Senate conferees disagreed with the Board's decision." was not controlling in the result. 506 U.S. at 166. In *Davis*, the Kansas Supreme Court merely concluded that "the post-enactment statements of individual legislators would not be reliable indicators of legislative intent," 257 Kan. at 528.

Neither case stands for the proposition that the contemporaneous, pre-enactment statements of the sponsor of legislation carry no weight in the assessment of legislative intent. Indeed, *Kansas v. Dickson*, 275 Kan. 683, 689, 69 P.3d 549 (2003), another case relied

21

upon by defendants, recognizes that "[i]n ascertaining that intent, we are not limited to consideration of the language used but look to historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested."

Nor is Section 107(l) free from ambiguity. As defendants stress, the provision states that the new funding priorities are "subject to any applicable requirements of federal statutes, rules, regulations or guidelines." But one of those federal requirements is the provision in 42 U.S.C. § 300 that "any entity" may apply for a grant.

Given the obvious conflict between state and federal law, the court would be remiss in ignoring the legislative history cited by the plaintiff. Further, it is important to stress that plaintiff's claim includes the allegation that Section 107(l) was passed for an improper purpose, that of punishing Planned Parenthood for its association with abortion. The court accordingly considers the contemporaneous floor statements of the author of the challenged legislation as highly probative of legislative intent.

If anything, it is the defendants' suggestion that the statute was simply designed to prioritize funding to entities who have a higher percentage of poor clients which appears to be a *post-hoc*, "litigation-spawned" attempt to find some alternative, benign rationale for Section 107(l). (Dkt. 35, at 9-10). For example, defendants cite various other subgrantees who have a higher percentage of indigent users than Planned Parenthood. But the

22

defendants offer no support for the idea that any of these considerations played even the slightest role in the adoption of Section 107(l). Further, the "prioritization" language actually employed by Section 107(l) — requiring applicants to be either public entities, hospitals, or FQHCs — has no direct or logical connection with such a hypothetical policy of ensuring greater service to the poor. Section 107(l) acts by requiring non-governmental applicants to be either a hospital or FQHC, thus requiring the applicant to provide a wide-range of services such as emergency medical services and preventive dental care, which are wholly unrelated to family planning services. The defendants have made no showing as to how this requirement of expanded services in Section 107(l) has any logical connection to making more effective family planning services available to the poor.

In addition, the history of Title X funding in Kansas demonstrates no prior concern by the State with Planned Parenthood's level of service to the poor. In fact, as late as the March 31, 2001 continuation grant application, the KDHE explicitly cited Planned Parenthood as one of its subgrantees that was helping to "assure delivery of quality family planning and related preventive health services with priority to individuals from low-income families."

Finally, even if this *post-hoc* rationale was legitimate and not, as is apparent, simply a mask for discrimination against Planned Parenthood, Section 107(l) is still be invalid under the Supremacy Clause as an additional eligibility requirement beyond the scope of

23

what has been adopted by Congress. Federal law broadly provides that "[a]ny public or nonprofit entity in a State" may apply for Title X funds, and State grantees may not substitute their own eligibility requirements for successful application. Even if the purported rationale was one of the motives for the adoption of Section 107(l), it would not entitle the State to create a conflict with federal law by narrowing eligibility requirements for successful subgrantee applicants.

With respect to Kinzer's floor statement, notwithstanding the additional time allowed defendant to prepare their Response, they make no attempt to offer any affidavit by either Representative that the statement was not made. Nor does defendant Brownback make any attempt to disavow his statement indicating that his understanding of the purpose of Section 107(l) was to "zero out" Planned Parenthood from Title X funding.

Citing *Planned Parenthood Ass'n of Utah v. Schweiker*, 700 F.2d 710 (D.C.Cir. 1983), the defendants next argue that Planned Parenthood "is still eligible to apply for Title X grants." *Schweiker* held, they stress, that Title X protects "only the right to *apply* for direct grants," and is not a guaranty of receiving funds. 700 F.2d at 723 (emphasis in original).

But Section 107(l) does more that simply render *uncertain* Planned Parenthood's ability to receive Title X funds. By the adoption of priorities which effectively block Planned Parenthood from successfully applying for funding, the statute actually makes it *certain* that Planned Parenthood cannot successfully participate in Title X funds. Any application

is automatically futile. The defendants may call this prioritization, but in form and intent it is exclusion.

The defendants' action in barring Planned Parenthood, whether as a grantee or contractee, is in direct conflict with federal law. As noted earlier, both the statute and the implementing regulations specify that "any entity" is allowed to apply for Title X grants. The statute and regulations also set forth a variety of criteria for the evaluation of project applications, all of which relate to nature of the family planning services. None of these criteria include the required provision of other medical services unrelated to family planning.

It is irrelevant that Planned Parenthood might – after considerable delay and damage — obtain a direct grant of funding from HHS in some future year. Section 107(l)'s requirement of unrelated medical services is in direct conflict with the standards of Title X. The court rejects the argument that Title X's broad "all entities" eligibility standard only applies to direct grantees. The statute explicitly provides that "[l]ocal and regional entities shall be assured the right to apply for direct grants *and contracts* under this section, and the Secretary shall by regulation fully provide for and protect such right." 42 U.S.C. § 300(b) (emphasis added).

The defendants in their Response distinguish *Planned Parenthood of Indiana* on the grounds that the funding statute in that case, the Preventative Health Services Block Grant

Program, 42 U.S.C. § 274c(c), did not allow prospective grantees to seek grants directly from the federal government. (Dkt. 35, at 34-35). In addition, defendants criticize the Fifth Circuit's "fundamentally flawed" decision in *Sanchez* for failing to recognize the same point — that the Texas prohibition of funding to entities associated with abortion services "did not prevent Planned Parenthood from applying for or receive Title X money from the federal government." (*Id*. at 32, 33).

In addition, the defendants also seek to distinguish other cases cited by Planned Parenthood. *King v. Smith*, 392 U.S. 309 (1968), *Herne v. Beye*, 57 F.3d 906, 910 (10th Cir. 1995), and *Planned Parenthood Ass'n of Utah v. Dandoy*, 810 F.2d 984 (10th Cir. 1987), they contend, are inapplicable because in those cases there was a direct conflict between state and federal provisions.[3] (Dkt. 35, at 36-38). Further, they argue, *Planned Parenthood of Minnesota v. Minnesota*, 612 F.2d 359 (8th Cir. 1980) is unhelpful, as that was an equal protection case, an argument which the plaintiff has not raised here. (*Id*. at 38). Finally, defendants stress that decisions such as *Dandoy* and *Planned Parenthood Fed. of America v. Heckler*, 712 F.2d 650, 663 (D.C. Cir. 1983) involved questions of eligibility of the end user of medical services. Section 107(l) is not a direct conflict with federal law, they contend,

---

[3] In *King*, a conflict existed between Alabama federal law as to eligibility for AFDC payments. *Hern* involved a conflict between state and federal law as to the eligibility for Medicaid payments for abortions in the case of rape or incest. In *Dandoy*, Utah's parental consent statute was in conflict with a Medicaid provision, 42 U.S.C. § 1396d(a)(4)(C)).

26

because "[i]t merely prioritizes state funding into more comprehensive primary care and preventative health hospitals and clinics, and does not prevent those entities from performing abortions, counseling or referring for abortion, or locating with or next to an abortion provider." (*Id.* at 40-41).

The court finds that the proffered rationales create no valid cause to ignore the consistent conclusions of other courts that state legislation which effectively narrows the eligibility requirements for Title X recipients is invalid under the Supremacy Clause. That some of these decisions involved restrictions on the eligibility of patients as opposed to grant applicants has no bearing on the relevance of those cases. By adopting broad eligibility standards for grantees — that "any entity" may apply for Title X funds — Congress foreclosed states participating in Title X from creating additional, narrower standards for application. That broad standard is not restricted, as defendants suggest, to direct applications with HHS, but to any party seeking Title X funds.

In addition, it may be noted that defendants offer not a single case in support of their argument that it may effectively exclude Planned Parenthood as a subgrantee, on the grounds that it is free to seek a direct grant from HHS. Indeed, in their lengthy argument on the subject, the only case cited by the defendants which reached a putatively favorable result, *Planned Parenthood Ass'n of Utah v. Schweiker*, merely established the now unexceptional (and here irrelevant) conclusion that Title X applicants are not guaranteed

funding. But, as noted earlier, Planned Parenthood's complaint is not that Section 107(l) fails to guarantee it a successful result, but that it guarantees an unsuccessful one.

The court holds that Section 107(l) serves to create an additional condition for a successful subgrant application, completely excluding a class of entities who are otherwise qualified under federal law for Title X participation. As a result, the statute is in direct conflict with federal law and is unconstitutional *See Sanchez*, 403 F.3d at 340-41; *Planned Parenthood of Billings*, 648 F. Supp. at 51. The plaintiff has demonstrated a strong likelihood of success on the merits of its Supremacy Clause claim.

### *First and Fourteenth Amendment Claim*

In addition to its Supremacy Clause claim, the plaintiff also contends that Section 107(l) is unconstitutional as an attempt to punish the plaintiff for its support for abortion rights and its association with abortion services providers. The statute reflects, it contends, an illegal "disqualification from receipt of public benefits" based upon its protected activities. *See Harris v. McRae*, 448 U.S. 297 (1980).

The defendants contend that Planned Parenthood's argument must fail because, as a facial challenge to the validity of Section 107(l), the statute is valid if there are any set of circumstances under which it might be valid, citing *Rust v. Sullivan* , 500 U.S. 173, 183 (1991). The Kansas statute, they contend, "merely establishes priorities for various kinds

28

of comprehensive health care providers, completely unrelated to their counseling or referral for abortion." (Dkt. 35, at 42). No facial claim exists because

> Section 107(l) does not mention Planned Parenthood; it does not mention abortion; on its face it has no constraints on abortion, on abortion speech, on abortion counseling, on parental consent for abortion, on those who might associate or affiliate with abortion providers, or any other language that in any respect relates to or touches upon abortion speech, counseling, or association.

(*Id*. at 41).

The defendants argue (Dkt. 35, at 46-47) there is no independent First Amendment claim since, even if there were a conflict between Section 107(l) and federal law, it would not implicate a constitutional violation under *Rust*, as that Court held that "[t]he recipient [of federal funds] is in no way compelled to operate a Title X project; to avoid the force of the regulations, it can simply decline the subsidy," and observed: "We have never held that the Government violates the First Amendment simply by offering that choice." 500 U.S. at 199 n. 5. The defendants also argue that Section 107(l) is valid because nothing on the face of the statute illustrates any discriminatory intent.

*Rust* provides little support for defendants' argument. In that case the court dealt with regulations implementing 42 U.S.C. § 300a-6, which expressly provided that no Title X funds "shall be used in programs where abortion is a method of family planning." The regulations required that Title X projects refrain from counseling on abortion as a method of family planning, from lobbying for or encouraging abortion, and must conduct their

activities separate (financially and physically) from any abortion services. 500 U.S. at 179-80. The court ultimately concluded that "refusal to fund protected activity, without more, cannot be equated with the imposition of a penalty on that activity." 500 U.S. at 193 (internal quotation omitted).

The Court prefaced its analysis with the observation that there was "no question but that the statutory prohibition ... is constitutional." *Id*. at 192. In the earlier case of *Maher v. Roe*, 432 U.S. 464 (1977), the Court noted

> we upheld a state welfare regulation under which Medicaid recipients received payments for services related to childbirth, but not for nontherapeutic abortions. The Court rejected the claim that this unequal subsidization worked a violation of the Constitution. ... The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other. A legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right. ... There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.

500 U.S. at 192-193 (internal citations and quotations omitted).

The Court distinguished its "unconstitutional conditions" cases such as *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) on the grounds that the regulations restricted were directed at the Title X project itself, not a restriction the independent activities of the recipient.

30

The Secretary's regulations do not force the Title X grantee to give up abortion-related speech; they merely require that the grantee keep such activities separate and distinct from Title X activities. Title X expressly distinguishes between a Title X *grantee* and a Title X *project*. The grantee, which normally is a health-care organization, may receive funds from a variety of sources for a variety of purposes. The grantee receives Title X funds, however, for the specific and limited purpose of establishing and operating a Title X project. The regulations govern the scope of the Title X *project*'s activities, and leave the grantee unfettered in its other activities. **The Title X grantee can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy; it simply is required to conduct those activities through programs that are separate and independent from the project that receives Title X fund**s.

In contrast, our "unconstitutional conditions" cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program.

500 U.S. 196-97 (citations omitted) (bold emphasis added, italic emphasis in original).

Here, the purpose and effect of Section 107(l) is precisely to bar Planned Parenthood *as a recipient* of any Title X subgrants in Kansas. This bar does not reflect merely a desire to avoid "funding [abortion related] activities out of the public fisc," *id*. at 198, but to bar an entity associated with abortion from the benefit of federal funding for which it would be otherwise eligible. The bar is applied under the statute despite the fact that Planned Parenthood has undertaken to, in the words of *Rust*, "conduct [its abortion-related] activities through programs that are separate and independent projects." Indeed, the bar has been applied precisely because of Planned Parenthood's otherwise legal and

constitutionally-protected conduct.

Section 107(l) reflects not simply a refusal to fund a given activity, but serves to entirely deny the plaintiff access to Title X subgrant funding, based entirely upon the plaintiff's participation in unrelated political conduct. This punitive aspect of the statute, arising from the plaintiff's protected association with abortion related services, renders the statute unconstitutional. *Planned Parenthood of Kansas v. Wichita*, 729 F. Supp. 1282 (D. Kan. 1990).

While the face of Section 107(l) may not appear to directly infringe any constitutional rights, the statute is nonetheless invalid if it was enacted for an improper, discriminatory purpose. *Hunter v. Underwood*, 471 U.S. 222, 233 (1985). The evidence before the court demonstrates that the statute was enacted with precisely this purpose.   *See Planned Parenthood of Mid-Missouri and Eastern Kansas v. Dempsey*, 167 F.3d 458, 463 (8th Cir. 1999) (holding that state statute excluding abortion providers from receiving state family planning funds was an unconstitutional penalty under *Rust*).

As discussed earlier, the circumstances surrounding the passage of Section 107(l) convince the court that the purpose of the statute was to single out, punish, and exclude Planned Parenthood, the only historical Kansas subgrantee which provides or associates with a provider of abortion services, from receiving any further Title X subgrants. The court finds that the plaintiff has demonstrated a strong likelihood of success on its claim that

32

Section 107(l) is an unconstitutional infringement of its rights of association under the First and Fourteenth Amendments.

### *Elements of Injunctive Relief*

Having determined that the plaintiff has shown a likelihood of success on the merits of its claims, the right to injunctive relief accordingly depends upon whether Planned Parenthood has demonstrated the existence of an irreparable injury, that this injury outweighs the damages to the defendants from granting the injunction, and that the injunction is not against the public interest. The court finds that plaintiff has met this burden, and that it has made a strong showing that injunctive relief is appropriate. That is, the court finds that the plaintiff has met its burden of demonstrating its right to injunctive relief whether or not the court imposes a heightened standard for relief.

Planned Parenthood has demonstrated convincingly the existence of an injury which may be effectively addressed only by granting the injunction sought. *See Planned Parenthood of Minn.*, 558 F.2d at 866-67 (finding irreparable injury arising from Title X exclusion, based on "[t]he adverse effect on Planned Parenthood's business, coupled with the incalculable loss of revenue"); *Planned Parenthood of Indiana*, ___ F.Supp.2d ___, 2011 WL 2532921 at *17 (finding irreparable harm based on evidence showing plaintiff would be required to close health centers and eliminate jobs).

Historically, Planned Parenthood has received over $300,000 in annual Title X subgrants in Kansas, which it has used to provide family planning services for nearly six thousand lower income persons. These services include contraception services, pregnancy testing, HIV testing, treatment of sexually transmitted diseases (STDs), vaccinations for hepatitis and cervical cancer, and testing for cervical, breast and testicular cancers. Through its health centers in Wichita and Hays, Planned Parenthood annually provides some 9,000 birth control visits, 3,000 pap tests, 3,000 breast exams, and 18,000 STD tests.

In the absence of Title X funding, Planned Parenthood will be required to either increase its charges to clients,  fire employees, close one or more of its health centers, or engage in some combination of these responses. Further, the evidence establishes that the drastic, eleventh hour change in family planning funding may cause significant harm to persons seeking family planning services in the Wichita and Hays areas. The evidence does not support any conclusion that the Sedgwick County Health Department will be able to drastically increase its resources to the point that it will be able to provide services to the level previously provided by Planned Parenthood. And there is no evidence that any entity will be able to replace Planned Parenthood as to the provision of family planning services in Hays.

Further, plaintiff has made a strong showing that Section 107(l) is an unconstitutional infringement of its rights of association. "The Supreme Court has made

clear that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1190 (10thCir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)). The court finds that the plaintiff will suffer an irreparable injury to its rights to freedom of association in the absence of injunctive relief.

The potential damages to Planned Parenthood, and its clients, in the absence of an injunction greatly outweigh any costs to the defendants by its award. The Title X funding in question originated under the federal government's Title X program. Granting the award will simply require the defendants to refrain from relying upon the illegal "prioritization" scheme of Section 107(l), and provide funding to Planned Parenthood — a provider of family planning services which has never been the subject of any previous complaint or criticism by the State. To the contrary, as noted above, the State (through the KDHE) has previously favorably cited Planned Parenthood's participation as a subgrantee in its communications with HHS. The balance of interests between the parties strongly supports an injunction.

Finally, the court finds that the public interest supports injunctive relief. The public interest is advanced by the use of Title X funding consistent with the intent of Congress, and free from punitive, view-point based or associational discrimination. The public interest is advanced by allowing family planning services to be provided in a manner

consistent with uniform local history, avoiding disruptions in the provision of such services.

IT IS ACCORDINGLY ORDERED this 1st day of August, 2011, that the plaintiff's Motion for Preliminary Injunction (Dkt. ) is hereby granted, and the defendants are hereby enjoined from any further enforcement or reliance on Section 107(l) of H.B. 2014, 84th Leg. (Kan. 2011), are ordered and directed to allocate all Title X funding for State Fiscal Year 2012 without reference to Section 107(l), and to provide continuation grant funding to the plaintiff.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE