IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PLANNED PARENTHOOD OF KANSAS
    AND MID-MISSOURI,

        Plaintiff,

DODGE CITY FAMILY PLANNING CLINIC, INC.,

        Plaintiff-Intervenor,

        vs.                                Case No. 11-2357-JTM

ROBERT MOSER, M.D., SECRETARY,
KANSAS DEPARTMENT OF HEALTH AND
    ENVIRONMENT,

        Defendant.

MEMORANDUM AND ORDER

This matter is before the court on the Motion for Temporary Restraining Order and Preliminary Injunction by intervenor Dodge City Family Planning Clinic, Inc. (DCFP). The intervenor argues, as did plaintiff Planned Parenthood, that the application of recent legislation in Kansas is unconstitutional, creating conflicting eligibility requirements for participation in Title X family planning funding. DCFP is not an abortion provider and is not affiliated with any abortion provider, and thus does not advance the First Amendment claim also advanced by Planned Parenthood. The court adopts and incorporates its findings and rulings previously rendered in the action. (Dkt. 39).

In his Response, the defendant raises nine arguments: (1) that the intervenor plaintiff has a heightened burden for injunctive relief; (2) that Eleventh Amendment Immunity precludes the intervenor's claim, as the requested injunction "is actually an award of past and future damages," (Dkt. 6, at 6); (3) a lack of standing to raise Supremacy Clause claim; (4) the absence of any direct conflict with Title X (*id*. at 7-19), as Section 107(l) it is merely a prioritization of funding, which is not precluded by federal law; (5) the injunction would usurp HHS's oversight of Title X (*id*. at 19); (6) the State would be irreparably injured by an Order requiring payment (*id*. at 20); (7) the failure of the intervenor to show irreparable injury (*id*. at 20-21); (8) injunctive relief is not in the public interest (*Id*. at 21-22); and (9) that the intervenor should post a $100,000 bond (*id*. at 22-23).

In its Order granting intervention and providing for accelerated briefing on the motion for injunctive relieve, the court observed that the effect of such briefing was minimized by the court's familiarity with the issues and the lack of a need to repeat arguments advanced by the parties in previous briefing. (Dkt. 71, at 4). Interpreting this conclusion as a "suggestion that Defendant not repeat all arguments" he has previously raised, Dr. Moser states (Dkt. 35, at 1 n. 1) that he further "incorporates by reference" the pleadings submitted in six previous responsive pleadings. (Dkt. 35, 43, 44, 52, 55, 70).

While the defendant's 25-page Response may not contain all of the arguments previously advanced in the case, most of the arguments advanced in opposition to the injunction — and indeed all of the arguments set forth at any length — are repetitions of previously advanced arguments. (For the heightened burden argument, *see* Dkt. 35, at 13-17; Eleventh Amendment, Dkt. 35, at 17-21; standing, Dkt. 35, at 25-25; Dkt. 44, at 19-20; absence of actual conflict with federal law, Dkt. 35,

at 31-41; existence of irreparable injury to state, Dkt. 55, at 2-3). All of these arguments have been previously rejected by the court.

The arguments which are not effectively resolved by the court's prior rulings are the claim that injunctive relief would usurp HHS authority, the existence of irreparable injury to the intervenor, the balancing of the public interest, and whether to require the posting of a bond. Only the claim of usurpation represents a truly novel challenge to the plaintiff's claim as a matter of law, as the court would in any event be required to make an independent assessment of the need for injunctive relief, based upon a fact-specific balancing of the injury to the intervenor, the costs to the defendant, and the interests of the public.

The court finds that defendant's one–paragraph usurpation argument is without merit. The defendant argues that, if an injunction was issued, "the State of Kansas would also have DCFPCI — aided by an order of this Court — imposing its view of Title X on the State of Kansas." (Dkt. 77, at 19). The defendant argues that this is inconsistent with Title X, and quotes *Astra UNA, Inc., v. Santa Clara County*, 131 S.Ct. 1342, 1347 (2011) as indicating that "Congress vested compliance with the [federal program] with HHS and assigned no auxiliary enforcement role to covered entities." Even if Section 107(l) violates federal law, defendant argues, "that is a matter between HHS and the State of Kansas; DCFPI has no interest in this relationship." (*Id.*)

*Astra UNA* did not involve Title X funding, or a claim of a breach of constitutional rights under the Supremacy Clause. Rather, the case dealt with the unique circumstances of Section 340B of the Public Health Services Act, 42 U.S.C.A. § 256b (Oct. 2010 Supp.) which created price ceilings on drugs sold to certain public hospitals and community health centers. The parties conceded that "Congress vested authority to oversee compliance with the 340B Program in HHS and assigned

3

no auxiliary enforcement role to covered entities," 131 S.Ct. at 1347, and the only issue in the case was whether the hospital owner plaintiff, notwithstanding the absence of any statutory right of action, could sue for alleged overcharges as a third party beneficiary. The Court held that it could not.

But the suit involved no claims of state law preemption under the Supremacy Clause. This is not a case in which, as defendant argues, the intervenor is "imposing its view of Title X on the State of Kansas," but a matter in which the court is preventing the State from adopting eligibility requirements directly in conflict with those adopted by Congress. In doing so, the court acts consistently with all recent decisions involving attempts by state legislatures to similarly constrain access to Title X. (*See* Order, Dkt. 39, at 19)

With respect to the injury to the plaintiff, the defendant acknowledges that, for FY 2012, two clinics (including the intervenor) applied for Title X subcontracts in Ford County, and that the state rejected both applications.

It argues, however, that there are Title X subcontract agencies in adjacent or nearby counties (Edwards, Kiowa, Finney, Pawnee, Meade and Gray Counties). Delegate or subcontract agencies also have clinics within an hour drive of Dodge City (Meade, Cimarron, Greensburg, Garden City, Kinsley, and Larned).

Further, the defendant stresses the existence in Dodge City of a clinic operated by the United Methodist Mexican American Ministries. This organization is a federally qualified health center (FQHC) and thus eligible for funding under Section 107(l), although "chose not to apply to be a delegate agency" (Dkt.77, at 3). The defendant's brief cites the Ministries' website as indicating that "[f]amily practice services are available at all community health centers," 2009 tax forms showing

$ 2 million in government grants and $600,000 in other contributions, and the regulatory requirement that FQHC's provide access to family planning services.

It is unclear how much of a valid alternative the Mexican-American Ministries is. Accepting the defendant's information, it apparently has around a $2.6 million budget, but this is spread around a large part of western Kansas, and on many things besides family planning services. In addition to a clinic in Dodge City, it also has clinics in Garden City, Liberal, and Ulysses. And while FQHCs are generally expected to provide family planning services, the expectation is listed as one of nine areas, including cancer screening and emergency medical services.

Against this, there is the declaration submitted by Karla Demuth, Advanced Registered Nurse Practitioner and a board-certified Family Nurse Practitioner. Demuth is the executive director of the intervenor Dodge City Family Planning Clinic and, along with a receptionist, one of its two employees. DCFP first began receiving Title X funds through the KDHE in 1976, and was the only Title X provider in Ford County up until June 30, 2011. Since that time, there has been no Title X provider in Ford County. According to Demuth, "No other medical provider in Ford County is willing to provide Title X services; no entity has applied for the Title X funds." (Demuth Decl. ¶ 2).

> Prior to Kinzer amendment, the KDHE has never had any problem with DCFP's services: In all these years, there has never been any allegation whatsoever that we failed in any way to fulfill our agreements with KDHE or our obligations under Title X. In 2007, we passed a federal audit with flying colors, and the auditor commented that we were the most cost-efficient operation he had inspected. Part of the way we keep our costs low is that my colleague and I have low salaries; we use such savings to make our medical services more affordable for more low-income patients.

(Id. at ¶ 8).

In fact, in the prior fiscal year, the KDHE had expanded DCFP's responsibilities, precisely because of a lack of nearby alternative providers:

5

> For the 2011 fiscal year, which ended June 30, 2011, KDHE awarded DCFP $39,288 in Title X funds, including $8,360 to expand the availability of family planning care to greater numbers of low-income patients, for a total of at least 590 Title X family planning patients.... Part of the reason KDHE gave us money to expand is that Ford County is a high-need county in terms of family planning, and is in an area of southwest Kansas with many high-need counties. In addition, the counties directly north and south of Ford County have no Title X provider.

(*Id*. at ¶ 9).

DCFP lost its Title X funding, not due to any problem with the quality of its service, but solely due to legislative changes in 2011. The loss of the Title X funding from KDHE has caused additional damage to DCFP, with the United Way discontinuing a grant based upon the loss of Title X funding and exclusion from the 340B drug pricing program.

Demuth's affidavit addresses potential alternatives for family planning services within Ford County She avers that, from conversations with these providers, she learned that KDHE has sought to "encourage them — strongly to apply for the [Title X] grant, but they are not interested in being a Title X provider." (*Id*. at 14). According to Demuth:

> The Ford County Health Department provides no family planning care whatsoever; does not do pap tests; and does not have anyone on staff who can write a prescription. The [United Methodist Mexican-American Ministries] FQHC has a very small contraceptive formulary (for example, it offers only one kind of birth control pill) and has a 2-3 month wait for an appointment. Patients can get an appointment at DCFP within a week. In addition, the medical professional at the FQHC is a man, which means many of our patients would hesitate to seek contraceptive and other reproductive health care from the FQHC with it current staffing.

(*Id*. at 13).

Her affidavit also addresses the idea that patients can simply travel across western Kansas for family planning services.

> Many have no means of transportation to travel farther to get care, and cannot pay more money for that care. If DCFP closes, then, as KDHE knows very well, many of

>those patients will simply lose access to these essential services. Their health will suffer, as will family health and public health in our high-need community and in the greater southwest Kansas area. In addition, many of our patients would hesitate to seek care if their only option were a male provider and/or someone who cannot provide the care in Spanish. For some, DCFP is their only access to the health care system; some of them will simply not get care if DCFP closes. Of those who do manage to access care, some will be forced to travel further to seek treatment or medications, wait longer for appointments, delay testing and other procedures, or otherwise receive care that is not of the same quality as the Title X-quality services that DCFP provides. But the greatest single concern for our patients is increased fees, which many of them simply cannot pay.

(*Id*. at ¶ 21).

The DCFP has remained open only because its two employees have been working without pay.

As with its prior argument against the injunction sought by Planned Parenthood, the State argued at the hearing of the present motion that it is simply using its discretion to "prioritize" spending, now citing an HHS grant form discussing "Title X Program Priorities." (Def. Exh. C). As before, the problem with Section 107(l) is that it is not a prioritization, but a complete exclusion of an otherwise qualified applicant. And the effect is the complete failure to provide any federally-funding family planning services in an area where such services are in need. Moreover, as with Planned Parenthood, KDHE's letter to DCFP explaining the funding denial establishes that the revocation of Title X subgrant funding was not due to some hypothetical reevaluation of priorities, but the absolute preclusive effect of Section 107(l).

There is a sufficient basis for an injunction. The application of Section 107(l) has created irreparable injury to the plaintiff, both by direct loss of funding and the loss of additional resources as a direct result of that legislation. It has begun to lose patients and has remained open only because its employees are working without pay.

An injunction would not cause irreparable injury to the defendant. Rather, it would restore the status quo by requiring the State to provide Title X funding to the only entity in Ford County able to provide family planning services commensurate with the local need, and as a provider of services which the State has always expressed satisfaction.

Denial of an injunction would work serious damage to the public interest. Despite the State's argument that patients may obtain family planning services from other providers in Ford County, the evidence shows that these entities are not interested in providing the type or level of services provided by DCFP. Further, contrary to the State's argument that patients may simply travel elsewhere, the evidence shows that this is not a realistic alternative for the low-income patients served by DCFP. Indeed, the evidence indicates that KDHE recently increased DCFP's Title X funding, precisely because of the growing local need for family planning services.

The facts show that an irreparable injury is occurring to the intervenor DCFP, that any damage to the defendant is substantially less, and that the public interest strongly supports the issuance of an injunction. For reasons previously stated by the court. (Dkt. 39), the court finds that DCFP has presented a strong showing of likely success on the merits.

In its discretion, the court grants the requested injunction without a bond. There has been no showing that any funds extended to DCFP would not be properly used for necessary and valuable family planning services.

Accordingly, the court grants DCFP's motion for the prevention of enforcement of Section 107(l). (Dkt. 73, at 1). As the only reason for KDHE's discontinuation of Title X funding to DCFP was the unconstitutional Section 107(l), the defendant is ordered and directed to prospectively provide, on or before October 25, 2011, Title X funding to DCFP for the Second Quarter of the 2012

Fiscal Year, and to further provide, no later than 30 days from the conclusion of the Second Quarter, funding for the Third Quarter, subject to any intervening court order directing otherwise.

    IT IS SO ORDERED this 18th day of October, 2011.

                                              s/ J. Thomas Marten
                                              J. THOMAS MARTEN, JUDGE