FILED
**United States Court of Appeals**
Tenth Circuit

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**March 25, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

_____

| | |
|---|---|
| PLANNED PARENTHOOD OF KANSAS AND MID-MISSOURI,<br><br>Plaintiff - Appellee,<br><br>v.<br><br>ROBERT MOSER, M.D., Secretary, Kansas Department of Health and Environment,<br><br>Defendant – Appellant.<br>-------------------------------<br>EAGLE FORUM EDUCATION & LEGAL DEFENSE FUND,<br><br>Amicus Curiae. | Nos. 11-3235, 12-3178 & 13-3175<br>(D.C. No. 2:11-CV-02357-JTM-DJW) |

_____

## JUDGMENT
_____

Before **LUCERO**, **HARTZ**, and **O'BRIEN**, Circuit Judges.
_____

These cases originated in the District of Kansas and were argued by counsel.

The judgment of that court is reversed. The cases are remanded to the United States District Court for the District of Kansas for further proceedings in accordance with the opinion of this court.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 25, 2014**

<u>PUBLISH</u>

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

———————————————

PLANNED PARENTHOOD OF
KANSAS AND MID-MISSOURI,

         Plaintiff - Appellee,

v.

ROBERT MOSER, M.D., Secretary,
Kansas Department of Health and
Environment,

         Defendant - Appellant.
_____

EAGLE FORUM EDUCATION &
LEGAL DEFENSE FUND,

         Amicus Curiae.

Nos. 11-3235, 12-3178 & 13-3175

———————————————

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 2:11-CV-02357-JTM-DJW)**

———————————————

James M. Armstrong, Foulston Siefkin LLP, Wichita, Kansas, for Defendant - Appellant.

Elissa Joy Preheim, Arnold & Porter LLP, Washington, D.C. (Lee Thompson and Erin C. Thompson, Thompson Law Firm, LLC, Wichita, Kansas; Roger K. Evans and Helene T. Krasnoff, Planned Parenthood Federation of America, New York, New York and Washington, D.C., with her on the briefs), for Plaintiff - Appellee.

Lawrence J. Joseph, Washington, D.C., for Amicus Curiae.

———————————————

Before **LUCERO**, **HARTZ**, and **O'BRIEN**, Circuit Judges.

————————————————

**HARTZ**, Circuit Judge.

————————————————

The federal government subsidizes the cost of family-planning services for low-income individuals through Title X of the Public Health Service Act. It often grants Title X funding directly to a state, which in turn makes subgrants to family-planning service providers. Kansas is one such state.

In May 2011 Kansas Governor Sam Brownback signed into law an appropriations bill restricting the classes of entities eligible for Title X subgrants. It limits the recipients to public entities, hospitals, and federally qualified health centers that provide comprehensive primary and preventative healthcare services. This restriction disqualified two family-planning clinics operated by Planned Parenthood of Kansas and Mid-Missouri (Planned Parenthood). Planned Parenthood sued Governor Brownback and Robert Moser, M.D., in his capacity as the Secretary of the Kansas Department of Health and Environment (KDHE), challenging the legislation on the grounds (1) that it violates Title X and is therefore unconstitutional under the Supremacy Clause; (2) that it violates Planned Parenthood's First Amendment rights by penalizing it for associating with providers of abortion and for its advocacy of access to abortion services; and (3) that it violates the Fourteenth Amendment by imposing an unconstitutional burden on the rights of women to choose abortion (a claim not raised on appeal).

Ruling that Planned Parenthood had established a likelihood of success on the merits of the first two claims and had otherwise satisfied the requirements for a preliminary injunction, the district court enjoined KDHE from implementing the legislation.

Moser challenges the injunction on several grounds, most of which we need not address.  As to the Supremacy Clause claim, we hold that Planned Parenthood cannot establish a likelihood of success on the merits because there is no private cause of action for injunctive relief for the alleged violation of Title X.  Although Planned Parenthood and the dissent assert that the view we adopt is contrary to circuit precedent in *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 764 (10th Cir. 2010), and *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258 (10th Cir. 2004), this opinion does not call into question the validity of the injunctions affirmed by those two decisions.  Our holding is much narrower than what the dissent suggests.  We hold only that when actual or threatened state action is allegedly contrary to a federal statute, the Supremacy Clause does not necessarily (it is a matter of statutory interpretation that depends on the specifics of the federal statute) authorize an injunction against the state action when four conditions are all satisfied:  (1) the statute does not specifically authorize injunctive relief, (2) the statute does not create an individual right (which may be enforceable under 42 U.S.C. § 1983), (3) the statute is enacted under the Constitution's Spending Clause, and (4) the state action is not an enforcement

action in adversary legal proceedings to impose sanctions on conduct prohibited by law.

As to the First Amendment claim, we hold that Planned Parenthood cannot establish a likelihood of success because the legislation does not restrict the rights of speech or association of subgrantees and the motives of individual lawmakers are irrelevant.

After summarizing the relevant background of this case, we will set forth the reasoning behind our two holdings, distinguishing the cases relied on by Planned Parenthood and the dissent.  We then vacate the preliminary injunction, reverse, and remand for further proceedings.

## I.    BACKGROUND

### A.    Overview of Title X

In 1970 Congress passed the Family Planning Services and Population Research Act (Act).  *See* Pub. L. No. 91-572, 84 Stat. 1504 (1970).  The Act's stated purposes include "assist[ing] in making comprehensive voluntary family planning services readily available to all persons desiring such services."  *Id.* § 2, 84 Stat. at 1504.  It established the Office of Population Affairs (OPA), the responsibilities of which include "administer[ing] all Federal laws . . . which provide for or authorize the making of grants or contracts related to . . . family planning programs."  *Id.* §§ 3–4, 84 Stat. at 1504–05; 42 U.S.C. § 3505b(1).  OPA

resides within the Department of Health and Human Services (HHS).  *See*
42 U.S.C. § 3505a(a).

Of particular relevance to this appeal, the Act amended the Public Health
Service Act, Pub. L. No. 410, 58 Stat. 682 (1944), to add a new title:  "Title
X—Population Research and Voluntary Family Planning Programs" (Title X).
Pub. L. No. 91-572, § 6, 84 Stat. 1504, 1506–08 (codified at 42 U.S.C.
§§ 300–300a-6).  Title X facilitates the provision of family-planning services by
federally subsidizing such services.  It authorizes the Secretary of HHS:

> to make grants to and enter into contracts with public or nonprofit
> private entities to assist in the establishment and operation of
> voluntary family planning projects which shall offer a broad range of
> acceptable and effective family planning methods and services
> (including natural family planning methods, infertility services, and
> services for adolescents).

42 U.S.C. § 300(a).  Title X is relatively sparse, consisting of just a few short
provisions.  It mostly confers executive authority.  It authorizes the HHS
Secretary to make grants for various purposes related to family planning.  *See id.*
§ 300(a) (family-planning project grants); *id.* § 300a(a) (formula grants to state
health authorities); *id.* §300a-1(a) (training grants); *id.* § 300a-2 (research grants);
*id.* § 300a-3 (grants for educational materials).  And it gives the Secretary
authority to determine the amounts of grants, *see id.* § 300a-4(a), the conditions
to which grants are subject, *see id.* § 300a-4(b), and whether projects satisfy the
statutory eligibility requirements, *see id.* § 300a-4(c).

Under Title X, "[l]ocal and regional entities shall be assured the right to apply for direct grants and contracts . . . , and the Secretary shall by regulation fully provide for and protect such right." *Id.* § 300(b); *see also id.* § 300a-4(a) (authority to promulgate regulations governing grants). The regulations thus provide that "[a]ny public or nonprofit private entity in a State may apply for a grant under this subpart." 42 C.F.R. § 59.3. The regulations detail the application process and the requirements of a Title X project. *See id.* §§ 59.4, 59.5. HHS provides successful applicants with a "notice of grant award," which informs the grantee how long HHS intends to fund the project before requiring the grantee to recompete for funding. *Id.* § 59.8. Although this period typically lasts three to five years, the initial grant is usually for only one year; the grantee must submit subsequent applications for "continuation awards" each year, subject to "consideration of such factors as the grantee's progress and management practices, and the availability of funds." *Id.*

Direct Title X grantees need not provide family-planning services themselves but may contract to have the services provided "by delegate/contract agencies operating under the umbrella of the grantee" (delegate agencies). U.S. Dep't of Health & Human Servs., Office of Pub. Health & Sci., Office of Population Affairs, Program Guidelines for Project Grants for Family Planning Services § 6.1 (2001) (Program Guidelines). But the direct grantee remains "responsible for the quality, cost, accessibility, acceptability, reporting, and

performance of the grant-funded activities provided by delegate/contract agencies." *Id.*; *see also* Marilyn J. Keefe, Deputy Assistant Sec'y for Population Affairs, Dep't of Health & Human Servs., Memorandum on Title X Grantee Compliance with Grant Requirements and Applicable Law 2 (March 1, 2011) ("Title X grantees are responsible for conducting periodic reviews of sub-recipient agencies, and must undertake immediate steps to address issues related to lack of compliance with established policies and procedures."). Although Title X also authorizes *direct* federal grants to service providers, *see* Program Guidelines § 6.1, "[m]ost Title X funds flow initially to state and local governmental agencies and non-profit organizations[, which] function as intermediaries that in turn distribute the funds to subgrantees who actually administer the programs." *Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 828 (D.C. Cir. 2006).

The Title X regulations cross-reference "HHS Department-wide regulations," which apply to Title X grants. 42 C.F.R. § 59.10. The referenced regulations include 42 C.F.R. pt. 50 and 45 C.F.R. pts. 16, 74, and 92, which create an administrative scheme for HHS grants and cooperative state-federal funding agreements. The scheme, promulgated primarily under the general grant of authority to heads of executive agencies, *see* 5 U.S.C. § 301, provides for centralized executive enforcement of Title X. It states, "If a grantee or subgrantee materially fails to comply with any term of an award, whether stated

in a Federal statute or regulation, an assurance, in a State plan or application, a notice of award, or elsewhere, the awarding agency may" temporarily withhold payments, disallow funding to cover the cost of the noncomplying activities, terminate the award, withhold further awards, or pursue other legally available remedies. 45 C.F.R. § 92.43(a). A grantee subjected to an adverse determination may request an informal review of the decision before the agency. *See* 42 C.F.R. §§ 50.404(a) (defining adverse determination), 50.405 (authorizing review committees to review adverse determinations), 50.406 (setting forth steps in administrative review process). A grantee may appeal an adverse final decision to the Departmental Appeals Board. *See* 45 C.F.R. §§ 16.3 (requirements for appeal to be heard by the board), 16.7–.8 (steps in initiating appeals process). And a grantee may seek judicial review under the Administrative Procedure Act (APA) of a final agency decision. *See* 5 U.S.C. § 704; *see also* 45 C.F.R. § 74.90(c)–(d) (requirements for final decisions in HHS disputes).

In Kansas, HHS grants Title X funds to the State, which distributes the funds to delegate agencies. The State applies directly to HHS for Title X funds through KDHE, which is the sole direct grantee in Kansas. Most recently, KDHE submitted a competitive grant application on February 22, 2010, requesting funds for the five-year period from June 30, 2010, through June 29, 2015. KDHE applied for a continuation grant on March 21, 2011, and the notice of grant award was issued on June 27, 2011. KDHE provides no family-planning services itself,

but instead contracts with delegate agencies.

Before the events giving rise to this litigation, those delegate agencies included Planned Parenthood.  Planned Parenthood had received Title X funds under contract with KDHE for over 25 years.  Because KDHE included Planned Parenthood in its application for the 2010–15 grant, Planned Parenthood did not apply to HHS for a direct grant.  Although Planned Parenthood does not provide abortion services at the Wichita and Hays clinics, which have been subgrantees, it provides the services in two clinics in Missouri and is affiliated with Comprehensive Health of Planned Parenthood of Kansas and Mid-Missouri, which provides them in Overland Park, Kansas.

## B.    Section 107(*l*)

On May 28, 2011, Governor Brownback signed into law Senate Substitute for House Bill 2014, an appropriations bill containing the provision at issue. Section 107(*l*) of the law provides:

> During the fiscal year ending June 30, 2012, subject to any applicable requirements of federal statutes, rules, regulations or guidelines, any expenditures or grants of money by the department of health and environment—division of health for family planning services financed in whole or in part from federal title X moneys shall be made subject to the following two priorities:  First priority to public entities (state, county, local health departments and health clinics) and, if any moneys remain, then, Second priority to non-public entities which are hospitals or federally qualified health centers that provide comprehensive primary and preventative care in addition to family planning services:  *Provided*, That, as used in this subsection "hospitals" shall have the same meaning as defined in K.S.A. 65-425, and amendments thereto, and "federally qualified

-9-

> health center" shall have the same meaning as defined in K.S.A.
> 65-1669, and amendments thereto.

Aplt. App., Vol. I at 31 (30 Kan. Reg. 793 (June 9, 2011)).[1]  Thus, only (1) public

entities and (2) nonpublic hospitals and federally qualified health centers

(FQHCs) may become delegate agencies of KDHE, with public entities receiving

priority.  Kansas law adopts the definition of FQHC set forth in 42 U.S.C.

§ 1396d(l).  *See* Kan. Stat. Ann. § 65-1669(e) (2008).  Section 1396d(l), in turn,

provides that an FQHC is an entity that is receiving or satisfies the requirements

to receive a grant under 42 U.S.C. § 254b.  *See* 42 U.S.C. § 1396d(l)(2)(B).  And

to be eligible for a grant under § 254b, an entity must provide a range of primary

health services.  *See id.* § 254b(a)(1)(A), (b)(1)(A).

All agree that the two categories of eligible entities under § 107(*l*) do not

include Planned Parenthood, an operator of private, specialized family-planning

clinics.  Accordingly, KDHE notified Planned Parenthood by letter dated June 14,

2011, that Title X funding would not be available in the upcoming fiscal year

_____

[1] On June 1, 2012, Kansas Governor Sam Brownback signed into law
Section 82(k) of House Substitute for Senate Bill No. 294, a funding provision
that reenacted the restrictions on Title X funding contained in Section 107(*l*),
applying it to the upcoming fiscal year.  *See* 2012 Kan. Sess. Laws 2022; 31 Kan.
Reg. 861 (June 7, 2012).  On June 29, 2012, the district court extended its
preliminary injunction to apply to and enjoin enforcement of Section 82(k).  The
appeal of this injunction is case No. 12-3178.  On June 28, 2013, the district court
again extended its preliminary injunction, this time to apply to and enjoin
enforcement of Section 131(k) of Senate Bill No. 171, passed by the Kansas
legislature in 2013. The appeal of this injunction is our case No. 13-3175. These
two appeals have been consolidated with the appeal of the Section 107(*l*)
injunction in case No. 11-3235; our reasoning applies to all three appeals.

through its contract with KDHE.  KDHE then sought or procured new or expanded contracts with other service providers satisfying the requirements of § 107(*l*) to serve the geographical areas previously served by Planned Parenthood, but the district court's preliminary injunction in this litigation halted KDHE's efforts.

### C.    Procedural History

On June 27, 2011, Planned Parenthood filed suit in the United States District Court for the District of Kansas seeking declaratory and injunctive relief. The complaint alleged three counts:  (1) that § 107(*l*) violates, and is therefore preempted by, Title X because it places eligibility restrictions on the receipt of funding in excess of and inconsistent with those imposed by federal law; (2) that § 107(*l*) violates the First Amendment by penalizing Planned Parenthood for associating with abortion providers and advocating for access to abortion services; and (3) that § 107(*l*) violates the Fourteenth Amendment by penalizing the provision of, and association or affiliation with, abortion services, thereby burdening the right to choose abortion.  The complaint named as defendants both Moser and Brownback, in their official capacities, but the parties have since dismissed Brownback with prejudice by stipulation.  Planned Parenthood sought a preliminary injunction against the implementation of § 107(*l*).

On August 1, 2011, the district court granted a preliminary injunction.  The court decided (1) that § 107(*l*) imposes eligibility requirements that render it

"*certain* that Planned Parenthood cannot successfully participate in Title X funds," Aplt. App., Vol. III at 473 (Memorandum & Order at 24, *Planned Parenthood of Kan. & Mid-Mo. v. Brownback*, No. 11-2357-JTM (D. Kan. Aug. 1, 2011) (Mem. Op.)); and (2) that the purpose and effect of § 107(*l*) is to bar Planned Parenthood, "an entity associated with abortion[,] from the benefit of federal funding for which it would be otherwise eligible." *Id.* at 480 (Mem. Op. at 31). It therefore ruled that Planned Parenthood had demonstrated a likelihood of success on the merits of its Supremacy Clause claim and its claim that § 107(*l*) infringed on its constitutional rights of association. The court weighed the other three factors required for a preliminary injunction—the risk of irreparable injury to the plaintiff, whether the threatened injury outweighs the injury to the opposing party from an injunction, and whether the injunction would be adverse to the public interest, *see Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012)—and ruled that each favored Planned Parenthood. Accordingly, it enjoined "any further enforcement or reliance on Section 107(l)" and ordered Moser "to allocate all Title X funding for State Fiscal Year 2012 without reference to Section 107(l)." Aplt. App., Vol. III at 485 (Mem. Op. at 36). The court did not address the Fourteenth Amendment claim based on the right to choose abortion, and that claim is not at issue in this appeal.

Moser filed an interlocutory notice of appeal challenging the preliminary injunction. He raises several grounds for reversal: (1) that neither a § 1983

action nor an equitable cause of action is available to raise Planned Parenthood's

Supremacy Clause claim;[2] (2) that even if the Supremacy Clause supplies a cause

of action, Planned Parenthood lacks prudential standing to assert HHS's exclusive

entitlement to enforce Title X; (3) that the district court erred in finding that

Planned Parenthood is likely to succeed on the merits of its claims; (4) that the

court improperly weighed the other factors required for injunctive relief; and (5)

that the injunction exceeds the limited exception to state sovereign immunity

recognized by the Supreme Court in *Ex parte Young*, 209 U.S. 123 (1908)

(allowing injunctive relief against state officials violating federal rights).

Planned Parenthood responds that the district court properly evaluated each of the

four considerations for granting injunctive relief, including the likelihood of

success on the merits.  It further contends that it has a cause of action under the

Supremacy Clause (although it does not claim to have a cause of action under

§ 1983), that it has standing to assert its claims, and that the injunction does not

infringe the State's sovereign immunity.

## II.    DISCUSSION

---

[2]  As noted in Part II(A)(2) below, there is a substantial question whether
Moser adequately raised in his original briefs the argument that Planned
Parenthood lacks a cause of action for injunctive relief based on alleged
violations of Title X.  Nevertheless, this court requested and received
supplemental briefs on the matter and, as explained in Part II(A)(2), properly
considers it.

-13-

We have jurisdiction under 28 U.S.C. § 1292(a)(1), which authorizes appellate review of a district court's interlocutory order granting a preliminary injunction. "We review the district court's grant of a preliminary injunction for abuse of discretion. A district court abuses its discretion when it commits an error of law or makes clearly erroneous factual findings." *Edmondson*, 594 F.3d at 764 (citation and internal quotation marks omitted). If the claims by the party seeking injunctive relief have no merit, granting relief is an abuse of discretion. *See Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1111 (10th Cir. 2010).

### A.     Supremacy Clause Claim

### 1.     Likelihood of Success on the Merits

The district court agreed with Planned Parenthood that it had shown a likelihood of success on its Supremacy Clause claim. In the court's view, "Congress foreclosed states participating in Title X from creating additional, narrower standards for application." Aplt. App., Vol. III at 476 (Mem. Op. at 27). It explained that § 107(*l*) created such a standard, "completely excluding a class of entities who are otherwise qualified under federal law for Title X participation." *Id.* at 477 (Mem. Op. at 28). Thus, it concluded, § 107(*l*) "is in direct conflict with federal law and is unconstitutional." *Id.* It therefore enjoined Moser from applying the statute.

Moser contests this ruling. He argues that § 107(*l*)'s scheme of prioritizing funding to public and full-service healthcare providers is consistent with the

-14-

Congressional policy of facilitating the provision of services to low-income patients. He further argues that although Title X contemplates broad eligibility for *direct grants*, nothing in the statute prevents a direct grantee from imposing additional eligibility criteria for *subgrants*. And he insists that the State can simultaneously comply with both Title X and § 107(*l*). We need not reach those issues, however, because Moser prevails on another ground: Planned Parenthood lacks a cause of action to assert its claim for injunctive relief.

### a.   Cause of Action for Injunctive Relief

Planned Parenthood does not claim that its cause of action is under 42 U.S.C. § 1983. Nor does it claim that Title X expressly authorizes its suit. It relies solely on its contention that the Supremacy Clause itself gives it the right to seek an injunction against state or local law inconsistent with Title X.

We disagree. We hold that, regardless of whether § 107(*l*) is inconsistent with Title X, Planned Parenthood does not have a private cause of action for injunctive relief under the Supremacy Clause. Our reasons, which we discuss more fully below, can be summarized as follows: Whether to recognize a private cause of action for injunctive relief is a matter of statutory interpretation. And we cannot infer such a cause of action from Title X. HHS, the expert federal agency charged by Congress with administering Title X, has ample power to enforce the requirements of the law; private suits for injunctive relief can undermine the advantages of uniformity and expertise provided by HHS

supervision; Title X does not clearly notify States that they are subject to such

suits; implementation of § 107(*l*) does not constitute state enforcement action

forbidding Planned Parenthood from acting as it wishes (as opposed to state

action complying with legislation simply denying subsidies for that activity); and

private suits for injunctions are not traditionally implied in statutes enacted under

the Constitution's Spending Clause, U.S. Const. art. I, § 8, cl. 1.  The remedy for

a State's violation of Title X is action by HHS, which can then be judicially

reviewed under the Administrative Procedure Act, 5 U.S.C. §§ 701–06.  We

explain.

The Supremacy Clause provides:  "This Constitution, and the Laws of the

United States which shall be made in Pursuance thereof . . . , shall be the supreme

Law of the Land; and the Judges in every State shall be bound thereby, any Thing

in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S.

Const. art. VI, cl. 2.  It declares that when state or local law conflicts with federal

law, federal law prevails.  It does not, however, tell us what that federal law is.

This proposition may seem obvious, but the point might be overlooked when one

considers what *remedies* are available under federal law.  A statute declaring what

the substantive rule is does not necessarily endorse every potential remedy for

violation of that rule.  For example, a statute may not allow recovery of punitive

damages, *see, e.g.*, 42 U.S.C. § 2210(s) (Price-Anderson Act), may not allow

damages for emotional distress, *see, e.g.*, *id.* § 1997e(e) (restricting right of

-16-

prisoner to recover damages for emotional or mental injury under 42 U.S.C.
§ 1983), or may not allow any damages at all, *see, e.g.*, *United States v. Johnson*,
481 U.S. 681 (1987) (restricting right of service members to sue under Federal
Tort Claims Act).

Planned Parenthood suggests that the Supremacy Clause requires that
whenever a state statute conflicts with federal law, a private person harmed by the
statute can obtain an injunction in federal court to prohibit the operation of the
statute. True, there are occasions when such injunctions can be obtained. But not
always. For example, under the doctrine established in *Younger v. Harris*, 401
U.S. 37 (1971), certain state-court proceedings, such as ongoing criminal
prosecutions, cannot be enjoined despite allegations that the statute underlying
the proceeding violates the federal Constitution. And the Tax Injunction Act
(TIA), 28 U.S.C. § 1341, ordinarily forbids a federal court from enjoining the
collection of a state tax even if it allegedly violates federal law. *See Rosewell v.
LaSalle Nat'l Bank*, 450 U.S. 503 (1981). We doubt that anyone would suggest
that the Supremacy Clause authorizes an injunction barred by the TIA. After all,
the federal law that is supreme is a statute forbidding the injunction. Granting an
injunction "under the Supremacy Clause" would undermine Congress' statutory
command, not effectuate it.

Determining what remedies are available for violations of a statute is a
matter of statutory construction. *Cf. Alexander v. Sandoval*, 532 U.S. 275, 286

(2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just the private right but also a private remedy."). The statute may make the task easy by spelling out the remedies. But a court may have to infer whether or not a remedy is available by using traditional methods of statutory construction. This is true regardless of what remedy is in question, be it punitive damages, compensation for emotional distress, or injunctive relief. The answers are not the same for every statute; and the answers may differ depending on the remedy (for example, injunctive relief may be implied when a damages remedy is not). But the Supremacy Clause does not provide the answers. It does not tell us how to interpret federal statutes. It proclaims only that the federal statute, once interpreted, prevails over state or local law.

Deciding whether injunctive relief is available can sometimes be straightforward. For example, when a federal statute creates a personal right, Congress has provided an injunctive remedy in 42 U.S.C. § 1983, which states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, *suit in equity*, or other proper proceeding for redress, . . . .

(emphasis added); *see Mitchum v. Foster*, 407 U.S. 225, 242 (1972) ("Congress plainly authorized the federal courts to issue injunctions in § 1983 actions, by

-18-

expressly authorizing a 'suit in equity' as one of the means of redress."). Even then, however, injunctive relief under § 1983 may not be appropriate. The remedial scheme of the statute creating the right may be exclusive, *see City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120–27 (2005), or equitable principles may limit the right to an injunction, *see Younger*, 401 U.S. at 49–55; *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584 (2013).

The test can be more challenging when the federal statute does not create a personal right. We need not provide here a test to resolve in all circumstances when there is a cause of action for injunctive relief even though no personal right is created by the federal statute allegedly violated by the State. We need analyze only whether there is such a cause of action under Spending Clause legislation of the type involved here. Our analysis persuades us that Planned Parenthood has no cause of action under Title X to enjoin the application of § 107(*l*).

First, in deciding whether Congress intended to create an injunctive remedy, we look to see what other remedies are available for violation of the federal law. When the law is Spending Clause legislation such as Title X, there is a powerful alternative remedy available to deter and sanction violations. Congress has appropriated money and, within limits, *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2601–07 (2013), can require the States to comply with certain conditions in return for accepting some of that money. Inherent in such legislation is the power of the purse to assure compliance. That

is certainly the case here. The provision of Title X allegedly violated by § 107(*l*)
directs how grantees of Title X funds must spend money appropriated by
Congress. If HHS, which administers the grants, thinks that the money is being
misspent, it can refuse to give more funds to Kansas and even clawback money
that Kansas has misspent. *See* 45 C.F.R. § 92.43(a).

Second, we ask whether permitting private persons to seek injunctive relief
for alleged violations of Title X would substantially interfere with the
administration of the program by HHS. In our view, it would. HHS has deep
experience and expertise in administering Title X, and the great breadth of the
statutory language suggests a congressional intent to leave the details to the
agency. Although Planned Parenthood may be confident that § 107(*l* ) is
inconsistent with Title X, HHS may disagree, completely or in part. Absent
private suits, HHS can maintain uniformity in administration with centralized
control. If private suits were allowed, however, interpretation of Title X could be
in the hands of numerous courts. Rather than having a uniform rule enunciated by
the agency in interpreting and applying federal law, different courts could impose
disparate rules depending on which state is expending the appropriated funds. Of
course, administrative actions taken by HHS will often be reviewable under the
Administrative Procedure Act, but only after the federal agency has examined the
matter and had the opportunity to explain its analysis to a court that must show

substantial deference.  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

The advantages of such centralized, expert administration do not appear to be controversial and would be obvious to Congress.  As the Supreme Court wrote in denying a private cause of action for damages under 42 U.S.C. § 1983 and the Family Educational Rights and Privacy Act, "It is implausible to presume that the same Congress [that created a centralized administrative enforcement scheme] nonetheless intended private suits to be brought before thousands of federal- and state-court judges, which could only result in the sort of 'multiple interpretations' the Act explicitly sought to avoid."  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002).  Justice Breyer concurred, saying:

> Congress may well have wanted to make the agency remedy that it provided exclusive—both to achieve the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking and to avoid the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action for damages.

*Id.* at 292 (Breyer, J., concurring).  And Chief Justice Roberts recently made the following observation about legislation similar to Title X:

> The Medicaid Act commits to the federal agency the power to administer a federal program; the agency is comparatively expert in the statute's subject matter; the language of the particular provision at issue here is broad and general, suggesting that the agency's expertise is relevant; and APA review would provide an authoritative judicial determination.  Allowing for both Supremacy Clause actions and agency enforcement threatens potential inconsistency or

-21-

confusion, and imperils the uniformity that Congress intended by
centralizing administration of the federal program in the agency . . . .

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1214–15 (2012)

(Roberts, C.J., dissenting) (citations and internal quotation marks omitted); *see*

*also United States v. Hohri*, 482 U.S. 64, 71–73 (1987) (observing that the

advantage of national uniformity is one reason why breach-of-contract suits

against the government must ordinarily be brought in the Court of Claims and are

reviewable only in the Federal Circuit).

Moreover, an important, and apparently desirable, feature of supervision of

spending programs by federal agencies is the play in the joints—the

flexibility—of administrative enforcement.  State and local governments can

negotiate compromises, even obtain waivers, from the federal agency.  Courts

have much more limited authority in that regard.  This feature of administrative

enforcement is of particular moment because of the special nature of Spending

Clause legislation.  In the federal-grant context, the State is more a partner than a

subordinate of the federal government, and this relationship limits the authority of

the courts to devise remedies.  The State should be informed of what its burdens

are before it accepts the federal funds and assumes the concomitant

responsibilities.  "[L]egislation [such as Title X] enacted pursuant to the spending

power is much in the nature of a contract," and "if Congress intends to impose a

condition on the grant of federal moneys, it must do so unambiguously."

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  By accepting federal funding, States necessarily agree to be subject to applicable federal administrative procedures.  That is, they submit to federal executive authority and acknowledge that the executive authority can pursue remedies—usually concerning funding—for violations of the federal scheme.  Such remedies are part of any contractual arrangement.  But that is a far different burden on the States than being answerable in court to potentially numerous private parties seeking to enjoin the operation of state law.  States, being political animals, likely prefer placing enforcement power exclusively with a federal agency, in part because of its flexibility and the opportunity for negotiation; and they likely expect that to be the exclusive enforcement power.  We should not impose on the States the burden of private suits unless the Spending Clause legislation "unambiguously" so requires.  *Id.*

A third consideration is the nature of the harm suffered by the private person as a result of a violation of the federal statute.  It is one thing if the State prohibits the person from engaging in conduct protected by the federal law.  It is another if, as with § 107(*l*), the State only declines to subsidize the conduct. There is a qualitative difference between prohibiting an activity and refusing to subsidize it.  The Supreme Court, for instance, has drawn that line in rejecting state laws prohibiting certain abortions but not laws refusing to provide funds for the practice.  *See Harris v. McRae*, 448 U.S. 297 (1980).  And it has held that

-23-

protected speech does not need to be subsidized by the government.  *See Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 546 (1983) ("Congress has not infringed any First Amendment rights or regulated any First Amendment activity.  Congress has simply chosen not to pay for TWR's lobbying.")  True, denial of a subsidy can create hardship, even great hardship, and Congress may well decide that the hardship is sufficiently significant that a person denied the subsidy should have a judicial remedy.  But Planned Parenthood does not suggest that Title X granted it an individual right, which could be enforced under § 1983.

Finally, we look to tradition.  We assume that Congress enacts legislation aware of a judicial tradition interpreting similar statutes.  For example, equitable tolling is generally read into a federal statute of limitations even when not expressed in the statute's language.  *See Holland v. Florida*, 130 S. Ct. 2549, 2560–62 (2010).  Relevant to this case, there is no tradition of recognizing a private party's right to injunctive relief against a state law that is contrary to Spending Clause legislation not creating a personal right.  There is no reason to assume that the Congress that enacted Title X anticipated creation of such a remedy.

We find significant support for our analysis in a recent Supreme Court dissent by Chief Justice Roberts, joined by three other Justices and not challenged by any other Justice on this point.  In *Douglas*, 132 S. Ct. at 1211, Medicaid providers and beneficiaries had sued to enjoin amendments to California's

Medicaid plan that reduced payments to the providers. *See id.* at 1208–09. They argued that the amendments were preempted because the amended plan did not "'enlist enough providers' to make Medicaid 'care and services' sufficiently available," as required by the Medicaid Act. *See id.* at 1209 (quoting 42 U.S.C. § 1396a(a)(30)(A)). The Ninth Circuit held that the plaintiffs could sue to enforce § 1396a(a)(30)(A) under the Supremacy Clause, because state-plan amendments that conflict with the Medicaid Act are invalid. *See id.*; *id.* at 1211–12 (Roberts, C.J., dissenting). After oral argument in *Douglas*, the federal Center for Medicare and Medicaid Services (CMS) approved the challenged amendments. *See id.* at 1209. Then, instead of reaching the merits, the Court remanded for the Ninth Circuit to consider in the first instance whether the plaintiffs could maintain their Supremacy Clause action after CMS had acted and a suit under the APA would be available. *See id.* at 1211.

Chief Justice Roberts, joined by Justices Scalia, Thomas, and Alito, would have decided that the plaintiffs lacked a cause of action. Noting that the statute did not authorize the suit, he explained that "as this case comes to us, the federal rule is that Medicaid reimbursement rates must meet certain criteria, but private parties have no statutory right to sue to enforce those requirements in court." *Id.* at 1212 (Roberts, C.J., dissenting). He then concluded that the Supremacy Clause provides no cause of action. *See id.* He observed that unlike other constitutional provisions, the Supremacy Clause itself creates no federal rights, but merely

-25-

"ensure[s] that, in a conflict with state law, whatever Congress says goes." *Id.*

Thus, he reasoned, it is not the role of the Supremacy Clause to supply a cause of

action to enforce a federal statute if Congress did not intend to do so. *See id.* at

1212–13. To hold otherwise, he observed, "would effect a complete end-run

around [the] Court's implied right of action and [§ 1983] jurisprudence." *Id.* at

1213. The Chief Justice found unavailing the plaintiffs' appeal to "the traditional

exercise of equity jurisdiction." *Id.* For a court to recognize an equitable cause

of action when Congress chose not to supply one, he argued, "would raise the

most serious concerns regarding both the separation of powers (Congress, not the

Judiciary, decides whether there is a private right of action to enforce a federal

statute) and federalism (the States under the Spending Clause agree only to

conditions clearly specified by Congress, not any implied on an ad hoc basis by

the courts)." *Id.* The dissent's reasoning is sound.

　　　Turning to the specifics of Title X, the statutory scheme indicates that the

reasons for not recognizing private actions for injunctive relief operate with full

force. The statute clearly contemplates that grants will be administered under the

supervision of HHS. It provides that "[g]rants under [Title X] shall be . . . subject

to such conditions as the Secretary [of HHS] may determine to be appropriate to

assure that such grants will be effectively utilized for the purposes for which

made," 42 U.S.C. § 300a-4(b); it contains no provision for private enforcement;

and it delegates authority to HHS to establish the regulatory scheme for

-26-

enforcement, *see* 42 C.F.R. § 59.10; 45 C.F.R. §§ 74.62, 74.73, 92.43, 92.52. When a statute rests all enforcement authority in a federal agency, never mentioning the possibility of private litigation, the natural inference is that Congress favored centralized enforcement, with the courts getting involved only through the deferential oversight provided by the APA.

We find persuasive Chief Justice Roberts's analysis of the quite similar circumstances presented in *Douglas*:

> The Medicaid Act commits to the federal agency the power to administer a federal program; the agency is comparatively expert in the statute's subject matter; the language of the particular provision at issue here is broad and general, suggesting that the agency's expertise is relevant; and APA review would provide an authoritative judicial determination. Allowing for both Supremacy Clause actions and agency enforcement threatens potential inconsistency or confusion, and imperils the uniformity that Congress intended by centralizing administration of the federal program in the agency. . . . [I]n light of all this, . . . the Supremacy Clause challenge appears at best redundant, and [the] continuation of the action in that form would seem to be inefficient.

132 S. Ct. at 1214–15 (Roberts, C.J., dissenting) (citations and internal quotation marks omitted).

In our view, Title X does not "display[] an intent to create" the remedy sought by Planned Parenthood under the Supremacy Clause. *Alexander*, 532 U.S. at 286. On the contrary, the message of the statutory scheme is that statutory requirements should be enforced through the administering agency. Supporting this view is the opinion by the Seventh Circuit in *Planned Parenthood of Indiana,*

*Inc. v. Comm'r of Indiana State Department of Health*, 699 F.3d 962 (7th Cir.

2012).  Although it relied on other grounds to reject a claim under the Medicaid

Act virtually identical to the one presented here, it noted that, for the reasons set

forth in Chief Justice Roberts's dissent, it was "not inclined to agree" with the

proposition that the Supremacy Clause supplied a right of action for injunctive

relief.  *Id.* at 983.  Similarly, the Massachusetts Supreme Judicial Court has

adopted the dissent in *Douglas*.  *See Bos. Med. Ctr. Corp. v. Sec'y of Exec. Office

of Health & Humans Servs.*, 974 N.E.2d 1114, 1127–28 (Mass. 2012).

### b.    Distinguishing Planned Parenthood's Cases

Planned Parenthood argues that our conclusion is contrary to binding

precedent.  But it cites to no decision of the Supreme Court or this court holding

that when a state (or local) law is contrary to a federal statute not conferring a

personal right, a person can bring a claim under the Supremacy Clause to enjoin

operation of the state law even when (1) the federal law is Spending Clause

legislation and (2) the state law does not subject the person to an adversary

enforcement action prohibiting the person from engaging in particular conduct.

Before showing why the decisions cited by Planned Parenthood are far from

binding in this case, we discuss why we should distinguish cases in which the

federal statute invoked is Spending Clause legislation and the person seeking

injunctive relief is not facing an enforcement action.

It should be apparent from our prior discussion why courts should distinguish cases in which the allegedly preempting statute is Spending Clause legislation.  In that circumstance the federal government's power of the purse gives it a very effective means for ensuring that federal law is honored.  The availability of that effective means makes it unnecessary to also recognize remedies (such as private suits for injunctive relief) that can interfere with important policies such as reliance on the experience and expertise of administrative agencies and uniformity of interpretation of the law.  Additionally, when construing Spending Clause legislation (which is of a quasi-contractual character) courts should be reluctant to infer a private cause of action not clearly created by the statute.

The reason to distinguish cases involving enforcement actions should also be apparent, but further explanation can be helpful.  State and local laws prohibit a good deal of conduct, from selling narcotics, to driving over the speed limit, to disturbing the peace, to conducting a business without a license.  If a person violates such a law, the government can commence adversary proceedings to impose sanctions for the violation.  When we use the term *enforcement actions*, we are referring to adversary legal proceedings by a government to impose such sanctions on conduct prohibited by law.  Sometimes the prohibitory law is contrary to federal law.  One remedy generally recognized in that circumstance is the availability to the accused of a defense in the adversary proceeding that the

law allegedly violated is preempted by federal law.  For example, in *Thompson v. City of Louisville*, 362 U.S. 199 (1960), a person accused of loitering under a Louisville ordinance successfully defended himself on the ground that the loitering law was too vague to satisfy federal due process.  Given the uniform precedent in permitting such a defense, one might infer that the defense is compelled by the Supremacy Clause.  But that precedent can readily be explained on the ground that it is almost always reasonable to infer from the federal law at issue that it is intended to be available as a defense to enforcement of state or local law.  As in *Thompson,* permitting the defense may be the only way to effectuate the federal law.  And the "equities" weigh heavily in favor of one who is being prohibited from engaging in conduct that, under the Supremacy Clause, is lawful.

It is important to recognize, however, that even in this circumstance there may be exceptions.  What if, for example, the federal statute prohibited its use as a defense?  Say, Congress, in an effort to assist the trucking industry, enacted a statute providing that a State receiving federal highway funds could not impose a speed limit under 80 miles per hour on rural parts of interstate highways.  Assume further that a federal agency could withhold highway funds from States that did not comply with the speed-limit requirement.  To avoid confusion that could endanger those traveling on interstate highways, however, the statute included a proviso that forbade anyone from defending against a speeding ticket on the

-30-

ground that the posted speed limit on a highway was below federal requirements. Could a driver still invoke the Supremacy Clause as a defense to enforcement of a state speed limit?  Certainly not.  The Supremacy Clause is the law, but it does not amend federal legislation to contradict congressional intent.  Recognizing the driver's defense would infringe the authority of Congress, not effectuate it. Congress obviously decided that its purposes could best be advanced by limiting the sanctions against contrary state laws to those provided by the power of the purse.

Nevertheless, we can generally presume that a person accused in a state or local enforcement action of engaging in prohibited conduct is entitled to defend against the charge on the ground that the conduct is protected under federal law.[3] When that is so, we can also generally presume that a person likely to face such an enforcement action may proceed in federal court to enjoin enforcement insofar as it is contrary to federal law.  As Justice Kennedy has written, an anticipatory action to enjoin enforcement of state law is "nothing more than the pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law."  *Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1642 (2011) (Kennedy, J, concurring).  To be sure, a person who seeks injunctive relief already has one remedy available—if

---

[3]  We note that Planned Parenthood has not identified any enforcement action that could be taken against it in which it could *defend* on the ground that § 107(*l*) is preempted by federal law.

enforcement proceedings begin, federal law can be used as a defense.  But that remedy may be ineffectual because the threat of enforcement itself can be disabling; enforcement proceedings may never need to be initiated because the person may decide to halt the conduct to avoid the risk.  In that circumstance the injunctive remedy may serve an important purpose and does not interfere with any other remedy.  Once enforcement proceedings begin, however, an injunction is ordinarily unavailable, both because the "defense" remedy is available and because permitting injunctions against ongoing enforcement actions could greatly impair important state interests.  *See Younger*, 401 U.S. at 44–45; *Sprint Comm'ns, Inc. v. Jacobs*, 134 S. Ct. 584 (2013).  Thus, the preemption defense and injunctive relief serve as complementary means (really, two forms of the same remedy) for effectuating federal law when other means are likely unavailable.

Moreover, once the courts recognize a federal preemption defense to an enforcement action, allowing suits to enjoin state enforcement does not increase the risk of nonuniform interpretation of federal law.  Yes, multiple courts will have the authority to interpret federal law in deciding whether to grant an injunction.  But multiple courts already have the authority to interpret the federal law in deciding whether that law provides a preemption defense to state enforcement action.

It should be plain that the compelling reasons not to recognize a private cause of action for injunctive relief under Title X are inapplicable (or at least of much less weight) when a court is considering an injunction against a state or local enforcement action based on preemption by federal law not enacted under the Spending Clause.  Unlike the present suit to enjoin § 107(*l*), such suits for injunctive relief are a component of what is probably the only means of effectuating the federal law (the combination of the preemption defense and injunctive relief); centralized uniformity of interpretation of the federal law is impossible (at least until a Supreme Court ruling); the state is *prohibiting* conduct, not just refusing to *subsidize* it; and the remedy is a traditional one.

We now turn to an examination of the cases that Planned Parenthood asserts to be binding precedent contrary to our conclusion.  It is useful to begin with a lesson from Chief Justice Marshall on how to read precedent.  He wrote:

> It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.  If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.

*Cohens v. Virginia*, 19 U.S. 264, 399 (1821).

The path of the law is not a straight line.  It would be a wooden jurisprudence if every general statement by a court were set in stone.  Every lawyer (and certainly every judge) knows that factual circumstances and arguments (that is, insights) may be presented that were not anticipated or

considered by the court issuing the original opinion.  We should not read into an

opinion more than the author wrote into it.  When courts are presented with new

facts or new arguments, they regularly, and properly, decide to qualify general

rules or recognize exceptions.

Of course, revisions to precedents can be taken to extremes.  Because no

two cases are identical, we could always say we are not bound by precedent

because of differences between the facts in the precedent and in the case before

us.  But there needs to be a good reason on which to distinguish a precedent.  And

the need for a good reason increases in proportion to the extent to which the

precedent has analyzed and elaborated on the issue.  By that standard, it is easy to

see that in this case we are not bound by any precedent of the United States

Supreme Court or this court.  No binding opinion has addressed the factors that

we find compelling in this case—the federal statute's origin in the Spending

Clause and the absence of an enforcement action.  Indeed, in not one of the

allegedly precedential decisions cited by Planned Parenthood was the existence of

a Supremacy Clause cause of action for injunctive relief a disputed issue, and

statements regarding the existence of such a cause of action (which appear in only

a couple of the cases) were brief and not supported by substantial analysis.

We begin with the Supreme Court "precedents" cited by Planned

Parenthood.   Most striking, a number of these cases (unavailability of the records

keeps us from knowing precisely how many) were brought under 42 U.S.C.

§ 1983, which independently provides a right to obtain injunctive relief, mooting whether the Supremacy Clause does the same. *See Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 501 (1990)*; Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 419 (1987); *Shea v. Vialpando*, 416 U.S. 251, 257 (1974); *Townsend v. Swank*, 404 U.S. 282 (1971) *(see* Brief for Appellants Alexander*, Alexander v. Swank*, No. 70-5032, 1971 WL 134144, at *2 (S. Ct. 1971)); *King v. Smith*, 392 U.S. 309, 311 (1968).

In other cited cases we cannot discern the source of the cause of action because the Court does not address the matter; certainly none of the opinions state that the source was the Supremacy Clause. In *Arkansas Department of Health & Human Services v. Ahlborn*, 547 U.S. 268, 292 (2006), there is no mention of the Supremacy Clause in the Court's unanimous opinion, nor is there any mention of the Clause in the district-court or circuit-court opinions in the case. In *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), the source of the cause of action was apparently not a matter of contention because the opinion contains no discussion of whether a cause of action exists. In *Green v. Mansour*, 474 U.S. 64 (1985), the Court denied relief, so the opinion could not be a precedent for the existence of a cause of action. And *Jones v. T_H_*, 425 U.S. 986 (1976), was a summary affirmance with no discussion of the basis of the cause of action. *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 182–83 (1979) (discussing the very limited precedential effect of a summary affirmance).

*Shaw v. Delta Airlines, Inc.*, 463 U.S. 85 (1983), is sometimes cited as supporting the existence of a Supremacy Clause cause of action.  But it addressed only whether there was federal jurisdiction, not the existence of a cause of action, in a case involving an injunction against a state law prohibiting discrimination. The existence of a cause of action is a distinct question from whether there is jurisdiction to consider a claim.  *See Bell v. Hood*, 327 U.S. 678, 682 (1946) ("Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.").  This point was made clear in another opinion relied on by Planned Parenthood. *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002), held that the federal courts had jurisdiction to hear the case.  But in response to the argument that there was no private cause of action, the Court said that jurisdiction required only an arguable, not a valid, cause of action, so it did not need to decide if a cause of action actually existed.  *See id.* at 642–43. Similarly, *Lawrence County v. Lead-Deadwood School District No. 40-1*, 469 U.S. 256 (1985), was a review of a *state-court* mandamus action and contained no discussion of the propriety of the cause of action; a footnote cited by Planned Parenthood criticizes a federal circuit court for holding that it lacked jurisdiction to hear a case raising the same claim, but the Court said nothing about whether there would have been a proper cause of action in federal court, *see id.* at 259 n.6.

Finally, in *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644 (2003), the Court affirmed the circuit court's reversal of a preliminary injunction against a state law without addressing whether the plaintiff had a cause of action.  Justice Thomas's concurrence pointed out that the respondents had failed to argue that the petitioner was "not entitled to bring a pre-emption lawsuit as a third-party beneficiary to the Medicaid contract."  *Id.* at 683.

We note that the dissent also cites *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1 (1983), as rejecting our view when it stated that "a claim of federal preemption does not always arise as a defense to a coercive action," *id.* at 12 n.12.  But the cases cited by the Court as illustrations of that proposition, *see id.* at 20 n.20, make clear that all the Court was saying is that preemption can be raised not only as a defense but also in suits for injunctions or declaratory judgments.  It was not deciding *when* it can be a basis for injunctive relief, and it was hardly saying that preemption always provides a cause of action for injunctive relief.  As for the dissent's citation of *Virginia Office for Protection & Advocacy v. Stewart*, 131 S. Ct. 1632 (2011), the only issue before the Court was the scope of the exception to the Eleventh Amendment recognized in *Ex parte Young*, 209 U.S. 123 (1908).  The existence of a cause of action was not addressed.  Suggesting caution in reading too much into the opinion is that the author was Justice Scalia, who less than a year later joined the dissent in *Douglas*.

The Supreme Court has told us that even on questions of jurisdiction, which courts always have a duty to consider, precedent is not established by the Court's decision to hear a case if the Court does not address the issue of jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("drive-by jurisdictional rulings . . . have no precedential effect"). *A fortiori*, cases that do not consider whether a cause of action under the Supremacy Clause exists do not create precedent on the issue. It is hardly unusual for the Court to assume, without deciding, the existence of a cause of action that has not been challenged. *See, e.g.*, *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 444 U.S. 391, 398 (1979).

Turning to the decisions of this court, the earliest three opinions cited by Planned Parenthood as precedential did not address the possibility of causes of action under the Supremacy Clause. In *Planned Parenthood v. Dandoy Ass'n of Utah*, 810 F.2d 984 (10th Cir. 1987), the suit was brought under 42 U.S.C. § 1983, which unquestionably allows for injunctive relief. *See Planned Parenthood Ass'n of Utah v. Dandoy*, 635 F. Supp. 184, 186 (D. Utah 1986) (stating that case was brought under § 1983). In *Jane Does 1 Through 4 v. Utah Department of Health*, 776 F.2d 253 (10th Cir. 1985), the opinion made no mention of the basis of the cause of action, did not mention the Supremacy Clause, and stated, "We do not see a preemption issue in this case," *id.* at 256.

And in *Hern v. Beye*, 57 F.3d 906 (10th Cir. 1995), the court also did not discuss the basis of the cause of action and did not mention the Supremacy Clause.

That leaves us with the two of our opinions on which Planned Parenthood places its principal reliance: *Edmondson*, 594 F.3d 742, and *Qwest Corp.*, 380 F.3d 1258. But as opinions that purportedly have definitively resolved the issue before us, they are remarkably short on discussion. In neither was the existence of a Supremacy Clause cause of action disputed. And of particular importance, neither involved Spending Clause legislation and both involved relief from enforcement actions.

*Edmondson* dealt with the issue in a footnote stating that one of the defendants had challenged the plaintiffs' right to bring suit under 42 U.S.C. § 1983 but had not challenged the plaintiffs' invocation of the Supremacy Clause. It then quoted *Qwest* as follows: "We have held that '[a] party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action.'" 594 F.3d at 756 n.13. That is the sum of the court's discussion and analysis on an issue not contested by the parties. Of course, a short holding is as binding as a long one. But the point here is that the parties had not sought a ruling on the issue, the issue was not argued in the briefs, and the court certainly had no occasion to consider the full extent of when the general rule would apply. Our holding in this case is limited to a claim for injunctive relief under the Supremacy Clause when the

allegedly preempting federal law is a statute enacted under the Spending Clause and the injunction sought is not to halt an enforcement action. In *Edmondson* the preempting statute was the federal Immigration Reform and Control Act (not Spending Clause legislation) and the injunctive relief affirmed by the panel was to halt enforcement action.[4] It would be to adopt a formalism inconsistent with our duties as judges to say that the sentence in *Edmondson* forecloses our authority to recognize an exception to the general rule stated in *Edmondson* for the very different circumstances present in this case.

The discussion in *Qwest* was not significantly longer. It consisted of four conclusory sentences, citing decisions by two other circuits. *See id.* at 1266. There was no need for any additional analysis because no one disputed the

---

[4] The district-court injunction at issue in *Edmondson* involved three provisions of the Oklahoma Taxpayer and Citizen Protection Act of 2007. First, it enjoined the Oklahoma Attorney General from enforcing Section 7(B), which prohibited a contractor from contracting with a public employer unless it used a particular system to verify eligibility. We reversed that portion of the injunction. *See Edmondson*, 594 F.3d at 750. Our decision therefore cannot be characterized as affirming a cause of action in that respect. Second, it enjoined the state Human Rights Commission from enforcing Section 7(C), which made it a "discriminatory practice," *id.* at 760, for an employer to discharge an employee while retaining another employee that the employer knew or should have known was an unauthorized alien. *See id.* at 758, 760, 765 (describing the Act's remedies—cease-and-desist orders, reinstatement, back pay, costs, and attorneys' fees—as "'sanctions'"). This was certainly an injunction against potential enforcement action. Third, the district-court injunction enjoined the state Tax Commission from enforcing Section 9, which, as characterized by our decision, imposed "a regulatory penalty, not a tax," on "contracting entities that do not verify eligibility [under the immigration laws] or withhold taxes from their independent contractors." *Id.* at 763. Again, this was an injunction against potential enforcement action.

existence of a cause of action.  In its reply brief on appeal, the City of Santa Fe

argued for the first time that the district court *lacked jurisdiction* because there

was no federal-question jurisdiction to hear the request for an injunction.  The

*Qwest* opinion dealt with the jurisdictional issue in a footnote.  *See* 380 F.3d at

1264 n.1.  As explained above, the existence of jurisdiction is quite different from

the existence of a cause of action.  *See Bell*, 327 U.S. at 682.

The statement in *Qwest* regarding a Supremacy Clause cause of action was

not in response to a question raised by a party about whether a cause of action

existed.  No such question was raised.  Rather, the statement appeared in a

discussion addressing Qwest's (losing) argument that it had a personal right under

47 U.S.C. § 253 that was enforceable under § 1983, so it could recover attorney

fees under 42 U.S.C. § 1988(b).  The statement was background used by the panel

majority to argue that some comments by Senators in the Congressional Record

did not indicate that the Senators intended to create a personal right.  *See* 380

F.3d at 1265–66.  Indeed, our analysis did not require that there actually be a

private right to injunctive relief but only that the few Senators whose statements

had been relied on (by courts reaching a different result from ours on the § 1983

issue) *believed* that there was such a private right of action.

Ironically, our *Qwest* opinion recognized that the existence of a private

right of action under a federal statute may be affected by whether the statute is

Spending Clause legislation.  In analyzing whether § 253 created a right

enforceable through § 1983, we applied the test set forth by the Supreme Court in *Gonzaga University v. Doe*, 536 U.S. 273. We noted that *Gonzaga*, unlike *Qwest,* involved Spending Clause legislation, and that the Supreme Court had been reluctant to interpret such legislation as creating federal rights; but we assumed, without deciding, that the *Gonzaga* test applied because the parties had agreed that it did. *See Qwest*, 380 F.3d at 1265 n.2. Presumably the *Qwest* court would not have thought it untoward to consider whether to distinguish Spending Clause legislation from other legislation with regard to whether it created a cause of action for damages. The same should be true for a cause of action for injunctive relief.

Again, *Qwest* had no occasion to consider whether there is a private cause of action for an injunction under the Supremacy Clause when the allegedly preempting statute is Spending Clause legislation and the injunction is not to halt enforcement action. The injunction in *Qwest* was founded on the Federal Telecommunications Act of 1996, not enacted under the Spending Clause. And, as set forth in the footnote,[5] the injunction in *Qwest* was described by the

_____

[5] Qwest's complaint alleged, and the City's answer admitted, that failure to comply with the Santa Fe ordinance would subject Qwest to criminal and civil penalties. *See* Compl. (*Qwest v. City of Santa Fe*, No. CIV 00 795 LH (D.N.M. June 1, 2000)), and City of Santa Fe's Answer to Pl.'s Compl. dated June 1, 2000 (*id.,* June 22, 2000). The context of the case is important. Qwest had a state license requiring it to serve anyone requesting service within Santa Fe and forbidding it from terminating service without state-agency permission. *See Qwest Corp. v. City of Santa Fe*, 224 F. Supp. 2d 1305, 1308 (D.N.M. 2002). It (continued...)

plaintiff, and is best understood, as an injunction against enforcement

proceedings.[6]

We do not dispute that *Edmondson* and *Qwest* are binding precedent for the

contexts in which those cases arose. But the case before us, unlike *Edmondson*

and *Qwest*, involves Spending Clause legislation. And Planned Parenthood is not

facing a potential enforcement action—an adversary legal proceeding to impose a

---

[5](...continued)
had been operating under a continuing franchise agreement with the City, which, in exchange for a 2% franchise fee, let Qwest use City rights-of-way to provide services. *See id.* But then Santa Fe adopted an ordinance imposing various burdens on telecommunications carriers (such as a requirement to enter into a costly lease for each City right-of-way being used). Qwest claimed that the ordinance violated federal law barring local laws that "prohibit or have the effect of prohibiting" a telecommunications carrier from providing service, 47 U.S.C. § 253(a), because Qwest would be subject to penalties if it continued to provide telecommunications service as it had in the past (that is, servicing anyone requesting services within Santa Fe, as permitted by the franchise giving it access to City rights-of-way and as required by the state licence) without complying with the new, burdensome provisions of the ordinance. Qwest's concern was that Santa Fe was effectively prohibiting it from providing telecommunications service. The district court "enjoined [the City and its agents] *from taking any enforcement action* against Qwest" based on various sections of the ordinance. *Qwest Corp.*, 224 F. Supp. 2d at 1332 (emphasis added).

[6] The dissent says that *Qwest* is like this case in that Qwest could have sought review under the APA. Perhaps Qwest could have found a way to obtain a final order from the FCC that would have been reviewable under the APA. But that consideration was never addressed by the court and parties in *Qwest*. Indeed, *Qwest* appears to agree with two circuit decisions cited by the opinion as stating that the FTC does not have authority to enforce preemption claims relating to local-government management of public rights-of-way, the very type of preemption claim raised in *Qwest*. *See* 380 F.3d at 1265–66. In any event, the availability of APA review is only one factor in deciding whether Congress intended to allow a private suit for an injunction.

sanction for engaging in prohibited activity.  After all, § 107(*l*) does not prohibit Planned Parenthood from doing anything.  It does not say that all health-care providers must offer comprehensive care.  It does not even prohibit those who do not offer comprehensive care from providing family-planning services.  Planned Parenthood can continue to do so.  The statute says only that the State will not subsidize family-planning services provided by those who do not offer comprehensive care.

Were we to say that *Edmondson* and *Qwest*, in which no party challenged the existence of a Supremacy Clause cause of action, are binding precedent that such a cause of action is available even in very different contexts, we would be unfaithful to Chief Justice Marshall's maxim that "general expressions" in an opinion that "go beyond the case . . . may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Cohens*, 19 U.S. at 399.  Because we do not believe that Title X contemplates enforcement through private suits for injunctive relief and because the office of the Supremacy Clause is to effectuate federal statutes, not contravene them, we hold that Planned Parenthood is without a cause of action to assert its Supremacy Clause claim.[7]

---

[7] The dissent cites ten opinions from other circuits as support for a preemption cause of action for injunctive relief.  But none weaken our analysis. *Pharmaceutical Research & Manufacturers of America v. Concannon*, 249 F.3d 66, 73 (1st Cor. 2001), *aff'd by  Pharmaceutical Research & Manufacturers of*

(continued...)

---

[7](...continued)
*America v. Walsh*, 538 U.S. 644 (2003), addressed only standing, did not rely on any Supreme Court preemption cases, and held that the state law was not preempted (so any statement about the existence of a cause of action would be dictum). *St. Thomas–St. John Hotel & Tourism Ass'n v. Government of United States Virgin Islands*, 218 F.3d 232, 241 (3d Cir. 2000), addressed only jurisdiction (with at most one sentence suggesting the existence of a cause of action), and held that the local law was not preempted. The only Supreme Court case relied on by *Western Air Lines, Inc. v. Port Authority*, 817 F.2d 222, 225–26 (2d Cir. 1987), was *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624 (1973), which did not address whether there was a cause of action; and *Western Air Lines* held that the local law was not preempted. *Lankford v. Sherman*, 451 F.3d 496, 509 (8th Cir. 2006), suggested the existence of a preemption cause of action but it relied only on language in *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989), which appeared to address only the scope of 42 U.S.C. § 1983. *Wright Electric, Inc. v. Minnesota State Board of Electricity*, 322 F.3d 1025, 1028–29 (8th Cir. 2003), addressed only subject-matter jurisdiction (relying on *Shaw*, 463 U.S. at 96 n.14 for support), and held that the local law was not preempted. *Lewis v. Alexander*, 685 F.3d 325, 345–46 & n.20 (3d Cir. 2012), held that there was a cause of action, but the only Supreme Court decision on which it relied (calling it "binding precedent") was *Shaw*, which, as we have explained, addressed only jurisdiction. *Pharmaceutical Research & Manufacturers of America v. Thompson*, 362 F.3d 817, 819 n.3 (D.C. Cir. 2004), held that the state law was not preempted, but it said that there was a cause of action, relying on *Walsh*, 538 U.S. 644. The court said that "[b]y addressing the merits of the parties' arguments without mention of any jurisdictional flaw, the [majority of the Justices] appear to have *sub silentio* found no flaw," and cited *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–102 (1992), for the proposition that "federal courts must ensure they have jurisdiction before considering merits." 362 F.3d at 819 n.3. But the existence of a cause of action is not jurisdictional, and, as we have previously noted, *Steel Co.* itself warned that "drive-by jurisdictional rulings . . . have no precedential effect," 523 U.S. at 91. We should be particularly reluctant to infer that the Supreme Court implicitly decided a nonjurisdictional issue on which it did not grant certiorari. *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050 (9th Cir. 2008), which ultimately (after remand to the district court and a second appeal to the Ninth Circuit) was vacated by the Supreme Court in *Douglas*, *see Shewry*, *id.*, *remanded to* No. CV 08-3155 CAS (MANx), 2008 WL 3891211 (C.D. Cal. Aug. 18, 2008), *aff'd sub nom. Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644

(continued...)

### 2.   Waiver

Planned Parenthood argues that Moser has waived the issue of whether it has a cause of action for injunctive relief under the Supremacy Clause.  Planned Parenthood may be correct.  Although Moser's opening brief directed our attention to the *Douglas* issue and we questioned Planned Parenthood about the matter at oral argument, Moser did not press the point in his briefs as we expect a party to do if it wishes us to decide an issue.  Waiver, however, binds only the party, not the court.  A party that waives an issue is not entitled to have us consider and rule on it.  But it is well-settled that courts have discretion to raise and decide issues sua sponte, even for the purpose of reversing a lower-court judgment.

In *United States National Bank v. Independent Insurance Agents of America, Inc.*, 508 U.S. 439 (1993), the Supreme Court addressed the petitioner's

---

[7](...continued)
(9th Cir. 2009), *vacated and remanded sub. nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204 (2012), also relied on *Shaw* and *Walsh*, and Supreme Court decisions like *City of Burbank* that did not address whether there was a cause of action.  *Planned Parenthood of Houston & Southeast Texas v. Sanchez*, 403 F.3d 324, 331–34 (5th Cir. 2005), improperly based its cause-of-action ruling on *Walsh*, with additional improper support from *Verizon Maryland, Inc. v. Public. Service  Commission of Maryland*, 535 U.S. 635 (2002), which we distinguished above as addressing only jurisdiction.  Finally, the dissent cites the post-*Douglas* opinion in *United States v. South Carolina,* 720 F.3d 518 (4th Cir. 2013).  But that case concerned an injunction against enforcing a criminal statute, an injunction fully consistent with the *Douglas* dissent and this opinion.

argument that the court of appeals had improperly considered an argument (that Congress had repealed the statute permitting certain banks to sell insurance) not raised by the respondents in the circuit court in their opening brief or even at oral argument, despite that court's invitation, *see id.* at 445.  Indeed, in response to the circuit court's orders for supplemental briefing, the respondents did not take a position on the merits.  *See id.*  But the Court wrote, "[W]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."  *Id.* at 446 (internal quotation marks omitted).  In language particularly pertinent here, the Court said that "a court may consider an issue antecedent to and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief."  *Id.* at 447 (ellipsis and internal quotation marks omitted).  The Court held that the circuit court had not abused its discretion in raising and addressing the issue.  *See id.* at 447.  But it reversed on the merits unanimously.

It is not hard to find examples of appellate courts raising issues sua sponte, although sometimes the opinion does not mention that the court did so.  An en banc Ninth Circuit recently pronounced that it "may consider an issue that has not been adequately raised on appeal if such a failure will not prejudice the opposing party."  *United States v. Cotterman*, 709 F.3d 952, 960 (9th Cir. 2013).  It found no prejudice in that case because it had "called for and received supplemental

briefs by both parties." *Id.* (internal quotation marks omitted). The Fifth Circuit did the same in *United States v. Key*, 599 F.3d 469, 474 (5th Cir. 2010). And we disposed of an appeal on an unraised antecedent issue in *Hanson v. Wyatt*, 552 F.3d 1148 (10th Cir. 2008), although it would have been better if we had requested supplemental briefing.

Sometimes it may even be improper not to consider an issue waived by the parties. Certainly when the opposing parties both agree that a contract is unambiguous (but they differ on the meaning), we should be able to decide otherwise. And we think it significant that Justice Stevens (joined by Justice Marshall) once wrote a dissent faulting the majority, which held that the Federal Arbitration Act (FAA) compelled arbitration of an employment claim, because it had not addressed the unraised (except by amici) question of whether the FAA extends to employment disputes, a question "clearly antecedent to disposition of this case." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 37 (1991) (Stevens, J., dissenting). Justice Stevens pointed out that already in that term of court, "the Court ha[d] on at least two occasions decided cases on grounds not argued in any of the courts below or in the petitions for certiorari." *Id.*

We are comfortable with the propriety of our addressing the cause-of-action issue. Whether there is a cause of action under the Supremacy Clause for injunctive relief is certainly a question antecedent to whether injunctive relief is

proper in a particular case.[8]  We see no unfairness to Planned Parenthood given the opportunity we have provided for it to submit two briefs on the subject.  And we think this issue is sufficiently substantial and important to demand our attention.  At least four members of the Supreme Court appear to believe that there is no cause of action in this type of case, and, as the dissent here notes, they might go further than this opinion in restricting suits for injunctive relief.  To be sure, four is not a majority of the Court; but the fact that the issue is as yet undecided argues for, rather than against, consideration of an issue that has clearly grabbed the attention of the Justices.

## B.    First Amendment Claim

The district court also granted Planned Parenthood a preliminary injunction against implementation of § 107(*l*) on the ground that it infringed Planned Parenthood's First Amendment rights.  This claim was brought under § 1983, so there is no dispute that Planned Parenthood has a cause of action.  We therefore address the merits.

---

[8] The dissent seems to suggest that the only issues that can be termed "antecedent" are jurisdictional issues.  But the issue raised by Justice Stevens's dissent in *Gilmer* was quite similar to the issue here—whether the Federal Arbitration Act created a cause of action in the context of employment disputes. *See* 500 U.S. at 36–37.  And the "antecedent" issue in *United States National Bank* was whether the Comptroller of the Currency had statutory authority to permit certain national banks to sell insurance outside their communities.  *See* 508 U.S. at 441.

Moser challenges the preliminary injunction, arguing that § 107(*l*) contains, on its face, nothing that discriminates based on speech or association. He contends that the law neither conditions eligibility for a Title X subgrant on the relinquishment of First Amendment rights, nor punishes entities for exercising such rights. Planned Parenthood argues in response that § 107(*l*) imposes an unconstitutional condition because it penalizes the exercise of Planned Parenthood's rights "to associate with entities that provide abortions and to advocate for access to abortion services." Aplee. Br. at 24. We agree with Moser.

We begin by stating our understanding of the unconstitutional-conditions doctrine. Under the "modern unconstitutional conditions doctrine . . . the government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (ellipsis and internal quotation marks omitted). To do so, the Supreme Court has explained, "would allow the government to produce a result which it could not command directly." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (brackets and internal quotation marks omitted). The Court has applied this doctrine in two distinct contexts.

First, the doctrine has been applied when the condition acts prospectively in statutes or regulations that limit a government-provided benefit—typically a

subsidy or tax break—to those who refrain from or engage in certain expression or association. *See, e.g.*, *FCC v. League of Women Voters*, 468 U.S. 364, 366 (1984) (federal statute that forbids recipients of public-broadcasting subsidy from "engag[ing] in editorializing" (internal quotation marks omitted)); *Speiser v. Randall*, 357 U.S. 513, 515 (1958) (state constitutional provision and effectuating statute that grant tax exemption only to veterans who pledge not to advocate overthrowing the government). These cases recognize that the government ordinarily can impose conditions on the receipt of government funding, but that conditioning a benefit on someone's speech or association achieves an effect similar to direct regulation of the speech or association. *See Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47, 59 (2006). These cases have addressed only conditions *explicitly* imposed by the law.

Second, the unconstitutional-conditions doctrine has been applied when the condition acts retrospectively in a *discretionary* executive action that terminates a government-provided benefit—typically public employment, a government contract, or eligibility for either—in retaliation for prior protected speech or association. *See, e.g.*, *Umbehr*, 518 U.S. at 671 (termination of independent contractor by county officials in retaliation for contractor's criticism of county board); *Perry*, 408 U.S. at 597 (nonrenewal of professor's contract with state university by board of regents in retaliation for his criticizing the board). In these cases, the government official's action has not been compelled by a statute or

regulation; rather, the challenged action is one that would be within the official's
discretion if it were not taken in retaliation for the exercise of a constitutional
right. Thus, these cases necessarily examine the official's motive for taking the
action; the challenge will be rejected unless retaliation against the protected
conduct was "a substantial or motivating factor" for taking the action and the
official would not "have taken the same action . . . in the absence of the protected
conduct." *Umbehr*, 518 U.S. at 675.

Neither of these contexts is present here. The first is absent because
nothing in § 107(*l*) prohibits subgrantees—or even their officers or employees—
from advocating abortion rights or associating with abortion providers. Nor does
any advantage accrue to a potential recipient by its advocacy against abortion.
Planned Parenthood could qualify under the statute if it expanded its services to
satisfy the requirements to be an FQHC. It does not dispute that, on its face,
§ 107(*l*)'s scheme of prioritizing funding to public entities and full-service
healthcare providers does not discriminate in funding based on a potential
recipient's speech or association.

Rather, Planned Parenthood attempts to fit its claim within the second
category of cases, those in which a person is penalized by discretionary executive
action for prior speech or association. It asserts that § 107(*l*) violates the First
Amendment "by imposing a penalty on [Planned Parenthood's] association or
affiliation with, abortion services." Aplt. App., Vol. I at 21. And to show that

-52-

§ 107(*l*) imposes a penalty, it attempts to show the motive for enactment of the measure.  It points to the following evidence:  (1) a declaration by a Planned Parenthood employee that she heard members of both houses of the Kansas legistature refer to § 107(*l*) as the "'Planned Parenthood' provision" and heard Representative Lance Kinzer, who introduced the measure, confirm during floor debates that it "was designed to defund Planned Parenthood," *id.* at 62–63; (2) a press release from Kinzer's office stating that § 107(*l*) "took all state funding away from Planned Parenthood to ensure that state dollars are not used for abortion services," *id.* at 196; (3) a substantially identical release from the Speaker of the House Mike O'Neal, *id.* at 197; (4) a post by Kinzer on his Facebook page hailing the passage of his "floor amendment to deny Title X funding to Planned Parenthood for the balance of FY2011," *id.* at 199; and (5) a news article quoting a spokesperson for the Governor stating that "Gov. Brownback, along with the overwhelming majority of Kansans, opposes taxpayer subsidy of abortions," *id.*, Vol. II at 202 (internal quotation marks omitted).

But Planned Parenthood cites no Supreme Court or Tenth Circuit authority for expanding the second category of unconstitutional-condition cases—those in which adverse discretionary executive action was motivated by the plaintiff's speech or association—to legislative enactments.  Indeed, we are bound by Supreme Court precedent not to consider the motives of lawmakers to determine

whether legislation that imposes no burden on speech (or expressive conduct) or association was enacted to penalize speech or association.

*United States v. O'Brien*, 391 U.S. 367 (1968), considered the 1965 amendment to the Universal Military Training and Service Act of 1948 to impose criminal penalties on anyone who "*knowingly destroys* [or] *knowingly mutilates*" a draft card. *Id.* at 370 (internal quotation marks omitted). The defendant was convicted of violating the statute after he burned his draft card "publicly to influence others to adopt his antiwar beliefs." *Id.*

*O'Brien* is best known for setting forth the test for determining the constitutionality of a statute that restricts expressive conduct. *See id.* at 377 ("A government regulation [of expressive conduct] is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."); *see also Texas v. Johnson*, 491 U.S. 397, 407–20 (1989) (invalidating state flag-burning statute because one of state's asserted interests was not implicated on the facts of the case and the other was related to the suppression of expression). The statute satisfied that test. *See O'Brien*, 391 U.S. at 382.

But the Court then considered the argument that the statute was unconstitutional because Congress' "purpose" was "to suppress freedom of

speech." *Id.* at 382–83 (internal quotation marks omitted).  The Court rejected

the argument as illegitimate, relying on the "familiar principle of constitutional

law that this Court will not strike down an otherwise constitutional statute on the

basis of an alleged illicit legislative motive." *Id.* at 383.  It set forth three reasons

for that practice.  First, determining the motives of all, or even a majority, of a

legislative body is fraught with difficulty.  As the Court explained:

> Inquiries into congressional motives or purposes are a hazardous
> matter.  When the issue is simply the interpretation of legislation, the
> Court will look to statements by legislators for guidance as to the
> purpose of the legislature, because the benefit to sound decision-
> making in this circumstance is thought sufficient to risk the
> possibility of misreading Congress' purpose.  It is entirely a different
> matter when we are asked to void a statute that is, under well-settled
> criteria, constitutional on its face, on the basis of what fewer than a
> handful of Congressmen said about it.  What motivates one legislator
> to make a speech about a statute is not necessarily what motivates
> scores of others to enact it, and the stakes are sufficiently high for us
> to eschew guesswork.

*Id.* at 383–84 (footnote omitted).  Second, the Court noted the futility of striking

down a statute "which could be reenacted in its exact form if the same or another

legislator made a 'wiser' speech about it." *Id.* at 384.  Third, it expressed

reluctance to invalidate—"essentially on the ground that it is unwise

legislation"—a beneficial law because of the tainted process by which it was

enacted.  *Id.*; *see* John Hart Ely, *Legislative & Administrative Motivation in*

*Constitutional Law*, 79 Yale L.J. 1205, 1212–16 (1970) (characterizing the

Court's three reasons for refusing to rely on legislative motive as ascertainability, futility, and disutility).

As here, the plaintiff in *O'Brien* relied primarily on the statements of three lawmakers, the only ones to speak during floor debate. But the Court downplayed the importance of the statements, saying that "[t]here was little floor debate on [the challenged] legislation in either House," the statute having passed after only a "brief statement" by one senator and statements by two congressmen. *O'Brien*, 391 U.S. at 385. It added that although the Senate and House Armed Services Committee reports had made "clear a concern with 'defiant' destruction of" draft cards, "both reports also indicate[d] that this concern stemmed from an apprehension that unrestrained destruction of cards would disrupt the smooth functioning of the Selective Service System." *Id.* at 385–86. Although one might argue that the statements by the supporters of § 107(*l*) are more probative of legislative purpose than were the statements regarding the draft-card statute, the bottom line of *O'Brien* was not the weakness of the evidence but its irrelevance.

We recognize that the Supreme Court has considered legislative motive or purpose in assessing whether a statute is valid under the Establishment Clause and the Equal Protection Clause. *See Edwards v. Aguillard*, 482 U.S. 578, 585 (1987) (invalidating law under Establishment Clause based on state's lack of a legitimate secular purpose); *Wallace v. Jaffree*, 472 U.S. 38, 59 (1985) (same); *Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (invalidating state constitutional provision

under Equal Protection Clause based on racially discriminatory motive and impact); *Crawford v. Bd. of Educ. of L.A.*, 458 U.S. 527, 543–45 (1982) (rejecting equal-protection challenge to state constitutional amendment limiting state court-ordered busing on ground that it was not adopted with a discriminatory purpose); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–67 (1977) (rejecting equal-protection challenge to city's rezoning decision on ground that the challengers failed to carry their burden of proving that racially discriminatory purpose was a motivating factor).[9]  But Planned Parenthood has not pointed to any decision of the Supreme Court that has invalidated a statute containing no explicit restriction on speech (or expressive conduct) or association on the ground that the "motive" of the legislature was to penalize a person for the person's speech or association.

---

[9] Planned Parenthood cites cases inquiring into legislative history to *interpret* a statute, arguing that these cases support consideration of legislative background here.  We find these cases unpersuasive.  As noted above, the Supreme Court observed in *O'Brien*:

> When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstances is thought sufficient to risk the possibility of misreading Congress' purpose.  It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it.

391 U.S. at 383–84 (footnote omitted).

On the contrary, after the decisions cited in the prior paragraph the Supreme Court has reiterated in the context of a First Amendment retaliation claim that a court cannot inquire into a legislator's motives. *Bogan v. Scott-Harris*, 523 U.S. 44 (1998), presents a clear contrast to the Court's decision less than two years earlier in *Umbehr*. In *Umbehr* the Court had held that an independent contractor could sue two members of the board of county commissioners who had allegedly terminated his government contract in retaliation for his criticism of the county and the board. *See* 518 U.S. at 670–73. The Court applied to independent government contractors essentially the same protection provided to public employees.

In *Bogan* the government conduct was quite similar to that in *Umbehr*, except that the alleged retaliation took the form of legislation rather than executive action. The city had adopted an ordinance eliminating the city's Department of Health and Human Services, of which plaintiff was the sole employee. Plaintiff alleged that her department was eliminated in retaliation for her filing a complaint against another city employee, an action protected by the First Amendment. In ruling that the defendant mayor and city councilor were protected from liability by absolute legislative immunity, the unanimous Court noted that it "is 'not consonant with our scheme of government for a court to inquire into the motives of legislators.'" *Bogan*, 523 U.S. at 55 (quoting *Tenney*

-58-

*v. Brandhove*, 341 U.S. 367, 377 (1951)).[10]  If such inquiry is improper in the *Bogan* context, we fail to see how it could be proper here.

Even if we were not bound by *O'Brien* and *Bogan*, we would be most reluctant to expand the statutory-motive cases to the arena of freedom of speech and association.  The implications of doing so are daunting.  Planned Parenthood's theory raises the prospect of every loser in a political battle claiming that enactment of legislation it opposed was motivated by hostility toward the loser's speech.  That is essentially what Planned Parenthood argues here.  Planned Parenthood favors abortion rights.  At least some influential Kansas lawmakers take a contrary view.  If they act on that view to favor legislation opposed by Planned Parenthood, is the statute to be struck down as violating Planned Parenthood's First Amendment rights?  If Congress imposes a tax on oil companies, is the tax to be voided because supporters of the tax said they dislike Big Oil or because those impacted by the tax contributed to losing campaigns challenging legislators who later voted for the tax?  Must courts decide

---

[10] *Tenney*, like *Bogan*, was a legislative-immunity case.  But *Tenney* gave as the ultimate source for the proposition the early case of *Fletcher v. Peck*, 10 U.S. 87, 130 (1810), which considered a challenge to legislation predicated on the improper motives of the enactors.  And both *Tenney*, 341 U.S. at 377, and *O'Brien*, 391 U.S. at 383, pointed to the cases collected by Justice Brandeis in *Arizona v. California*, 283 U.S. 423, 455 (1930), to support the proposition that "[i]nto the motives which induced members of Congress to enact the [statute], this court may not inquire."

in cases such as this whether legislators were motivated to punish Planned Parenthood's speech and association, or were opposed to providing funding to an organization that also provides abortion services, or were simply in favor of family-planning services associated with full-service medical care?  We think not. We reject the notion that Planned Parenthood can challenge § 107(*l*) as an unconstitutional condition solely on the ground that its passage was motivated by a desire to penalize Planned Parenthood's protected speech and association.

We hold that Planned Parenthood's First Amendment claim lacks merit.

## III.   CONCLUSION

We REVERSE and REMAND to the district court with instructions to vacate its preliminary injunction and proceed consistently with this opinion.

11-3235, 12-3178, & 13-3175,
<u>Planned Parenthood of Kansas and Mid-Missouri v. Moser</u>
**LUCERO**, J., dissenting.

I dissent.

Litigants and the public at large are entitled to receive decisions from our court rooted in precedent and based on rigorous analysis of the parties' submissions.  Today's decision meets neither test.  Instead, the majority conveniently defenestrates controlling precedent and proceeds on substituted premises.  This behavior is particularly unjust because the very rule that the majority would scuttle was conceded by the parties as controlling.

This dissent proceeds in two parts.  Part I addresses the case as presented by the parties in their briefing before our court.  It speaks to the issues brought to us by the parties for our resolution and argued to our panel.  Part II addresses the arguments of my majority colleagues in support of the issues of their own irregular creation and about which they sought additional briefing over my objection.

In initial briefing, all parties acknowledged that Planned Parenthood possesses a cause of action under the Supremacy Clause.  The holdings of this court required such an acknowledgement.  In his opening brief, Moser cited <u>Qwest Corp. v. City of Santa Fe</u>, 380 F.3d 1258 (10th Cir. 2004), and correctly stated that the Tenth Circuit "has allowed an equitable injunction action when a state law is alleged to conflict with federal law in violation of the Supremacy Clause."  Moser predicted that "the Supreme Court will abolish this equitable Supremacy Clause cause of action" in <u>Douglas v. Independent Living Center of Southern California, Inc.</u>, 132 S. Ct. 1204 (2012), which was pending at

the time his brief was submitted.  This prediction proved inaccurate, and Moser advanced no other argument on that issue.  Moser thus conceded that our circuit jurisprudence allows for a cause of action under the Supremacy Clause, and Planned Parenthood understandably refrained from addressing this waived issue in its briefing.

I ought not need remind my colleagues that a panel of this court lacks authority to overrule the decisions of prior panels.  United States v. Meyers, 200 F.3d 715, 720 (10th Cir. 2000).  This bedrock principle of stare decisis ensures that parties are treated consistently and invites confidence in the judicial process.  See Payne v. Tennessee, 501 U.S. 808, 827 (1991).  It is "a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon 'an arbitrary discretion.'"  Patterson v. McLean Credit Union, 491 U.S. 164, 172 (1989) (quoting The Federalist No. 78, at 490 (Alexander Hamilton) (H. Lodge ed., 1888)).  The majority has elected to disregard these principles—it is not our office to do so.

# I

## A

In Qwest Corp., we held that "[a] party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action."  380 F.3d at 1266 (emphasis added).  Qwest claimed that the Federal Telecommunications Act of 1996 preempted several provisions of a Santa Fe ordinance that established new procedures for telecommunications providers seeking to access city-owned property.  Qwest Corp., 380 F.3d at 1262.  Pursuant to the ordinance,

telecommunications providers were required to register with the city and obtain a lease agreement to use city-owned rights-of-way.  Id.  To register, a telecommunications provider had to pay a fee and provide information regarding its affiliates, the location of existing facilities, the services provided by the company, and "such other information as the city may reasonably require."  Id.  To obtain a lease agreement, Qwest was required to submit an application containing an appraisal, engineering plans, and "such other and further information as may be required by the city."  Id.  It would then have to pay a rental price based on the appraisal, and would be required to install excess conduit capacity equal to 100% of what the installer planned to use.  Id.

Qwest "sought to install" new telecommunications equipment on a city-owned right-of-way, but after learning that the new ordinance would require a lease for that project and "any use of the City's rights-of-way," the company withdrew its application and filed suit in federal district court.  Id. at 1262-63.  Qwest claimed that various provisions of the ordinance were preempted by 47 U.S.C. § 253, which provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  § 253(a).  The statute further provides that if the Federal Communications Commission ("FCC") "determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) . . . the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency."  § 253(d).

The panel in Qwest Corp. concluded that we had federal question jurisdiction

because "'[a] plaintiff who seeks injunctive relief from state regulation, on the ground

that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy

Clause of the Constitution, must prevail, thus presents a federal question which the

federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.'" Qwest Corp., 380

F.3d at 1264 (quoting Shaw v. Delta Airlines, Inc., 463 U.S. 85, 96 n.14 (1983)). We

noted that "a federal-law defense . . . anticipated in response to the complaint" does not

confer jurisdiction, but explained that "the issue of pre-emption is not an anticipated

defense, but is the basis for a federal claim in Qwest's complaint in federal court." Id. at

1264 n.1.

Qwest Corp. considered whether the district court erred in concluding that § 253

did not evince congressional intent "to create a federal right to be free of local laws or

regulations that prohibit the provision of any telecommunications service" and thus "that

no action under [42 U.S.C.] § 1983 is available." Qwest Corp., 380 F.3d at 1265. The

panel affirmed the district court's conclusion, holding that the statute did "not reveal a

clear congressional intent to create an individual right." Id. Instead, § 253(d) "calls on

the FCC to enforce 253(a)." Qwest Corp., 380 F.3d at 1265.

Although we held that § 253 did not "create[] a right enforceable through 42

U.S.C. § 1983," Qwest Corp., 380 F.3d at 1265, we nevertheless concluded that Qwest

could proceed on a cause of action directly under the Supremacy Clause:

> A federal statutory right or right of action is not required where a party
> seeks to enjoin the enforcement of a regulation on the grounds that the local
> ordinance is preempted by federal law. A party may bring a claim under

the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action.

Id. at 1266 (citations and footnote omitted).

On considering the merits of Qwest's direct Supremacy Clause claims, we affirmed the district court's ruling that many of the ordinance's provisions were preempted by § 253.  Although bare registration and lease requirements were not per se "prohibitive" under § 253(a), Qwest Corp., 380 F.3d at 1269, it was determined that several specific provisions were preempted, including the requirements that telecommunications providers pay a rental price based on the value determined by a city-approved appraiser, install double capacity when installing new conduit, and provide various forms of information to the city as part of the registration process.  Id. at 1270-71, 1274-75.

**B**

It having been acknowledged by the parties that the cause of action at issue was firmly controlled by circuit precedent, our analysis should have proceeded directly to the merits of Planned Parenthood's Supremacy Clause claim.  Remarkably, the majority did not reach the merits.  I would hold that Planned Parenthood possesses standing, has established a likelihood of success on the merits of its claim, and is entitled to a preliminary injunction.

In Bond v. United States, 131 S. Ct. 2355 (2011), a criminal defendant argued that Congress lacked constitutional authority to enact a federal statute that imposed criminal penalties for chemical weapon use.  The Court unanimously rejected the argument that

Bond lacked standing because she asserted only the legal rights and interests of the states. Id. at 2363. Instead, the Court held that a party "has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable." Id. at 2364. Citing to a long list of Supreme Court cases in which individual plaintiffs asserted constitutional challenges based on separation-of-powers and checks-and-balances principles, the Court concluded that individual plaintiffs may by analogy "challenge a law as enacted in contravention of constitutional principles of federalism." Id. at 2365. Bond had standing to raise the federalism issue because she properly sought to vindicate her own interests and could "assert injury from governmental action taken in excess of the authority that federalism defines." Id. at 2363-64. Thus, the Supreme Court specifically rejected the argument, made by Moser in this case, that an individual advancing a Supremacy Clause challenge asserts only the interests of a government entity.

As did Bond, Planned Parenthood seeks to vindicate its own interests in contending that Section 107(*l*) "upset[s] the constitutional balance between the National Government and States." Bond, 131 S. Ct. at 2364. Thus, Planned Parenthood falls within the ambit of plaintiffs defined by the Supreme Court as having standing so long as it asserts a harm that is "concrete, particular, and redressable." Id.; see also Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009).

The district court determined that Planned Parenthood "has demonstrated convincingly the existence of an injury which may be effectively addressed only by

-6-

granting the injunction sought." This finding is entitled to deference and is supported by ample record evidence. Planned Parenthood alleges that Section 107(*l*) caused its Wichita and Hays health centers to lose more than $330,000 in funding, will end their eligibility for a low-cost drug-purchasing program, and will likely lead to declines in staffing levels and the closure of the Hays health center. Thus, Planned Parenthood has suffered concrete harm. These injuries are particular because the funding cuts apply only to Planned Parenthood.[1] Finally, the injuries would be redressed by an injunction barring enforcement of Section 107(*l*).

Moser cannot rely on Wilderness Society v. Kane County, 632 F.3d 1162 (10th Cir. 2011) (en banc), for his contention that Planned Parenthood lacks prudential standing. The Supreme Court's decision in Bond expressly rejected the conclusion that a party "does not assert a valid right to relief of its own," Kane Cnty., 632 F.3d at 1170, and thus lacks prudential standing if it asserts that a statute violates constitutional principles of federalism. See Bond, 131 S. Ct. at 2363. Further, the plaintiff in Kane County was a private environmental organization that, according to the en banc majority, sought to assert the property rights of the federal government and "lack[ed] any independent property rights of its own." 632 F.3d at 1171. Planned Parenthood, in contrast, has direct economic interests at stake in this dispute. It seeks to preserve a crucial funding source, not hypothetical interests in the property rights of another.

---

[1] The funding cuts also applied to the Dodge City Family Planning Clinic, which was previously an intervenor in this case. Because the organization ceased operations and is no longer seeking funding from the Kansas Department of Health and Environment ("KDHE"), we dismissed Dodge City's appeal as moot upon a joint stipulation of the parties.

## C

Under our federal structure, "state law is nullified to the extent that it . . . stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982) (quotation omitted).  This doctrine applies equally to federal regulations. Id.  "[T]he Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and [] any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid." Planned Parenthood Ass'n of Utah v. Dandoy, 810 F.2d 984, 988 (10th Cir. 1987) (quotation omitted).

Title X establishes a broad eligibility standard for grantees, allowing "[a]ny public or nonprofit private entity" to apply for Title X funds.  42 C.F.R. § 59.3.  In addition, federal law recognizes that organizations affiliated with abortion providers may participate in Title X and requires only that Title X funds not "be used in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6; see also Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,270, 41,275-76 (July 3, 2000) (describing the separation Title X grantees must maintain between Title X projects and abortion-related activities).  By explicitly establishing a broad eligibility standard, the federal government precluded participating states from creating additional, narrower standards.

When other circuits have examined state laws that impose heightened Title X eligibility requirements, they have concluded that such provisions violate the Supremacy

Clause.  See Planned Parenthood of Hous. & Se. Tex. v. Sanchez, 403 F.3d 324, 337 (5th Cir. 2005) ("[A] state eligibility standard that altogether excludes entities that might otherwise be eligible for federal funds is invalid under the Supremacy Clause."); Planned Parenthood Fed. of Am. v. Heckler, 712 F.2d 650, 663 (D.C. Cir. 1983) ("Title X does not provide, or suggest, that states are permitted to determine eligibility criteria for participants in Title X programs."); Valley Family Planning v. North Dakota, 661 F.2d 99, 101-02 (8th Cir. 1981) ("The conflict between Title X and [the state law at issue] is clear.").

Section 107(*l*) is similarly inconsistent with the terms and conditions that Congress and the Department of Health and Human Services ("HHS") established in allowing KDHE to receive Title X funding.  Even without considering Section 107(*l*)'s underlying purpose, the provision excludes an entire category of providers from eligibility, contravening the federal command that "[a]ny public or nonprofit private entity" may apply for Title X funds.  42 C.F.R. § 59.3.  Section 107(*l*) directs Title X funding to public entities and then, "if any moneys remain," to non-public hospitals or federally qualified health centers.  2011 Kan. Sess. Laws 2020.  The provision does not mention non-public facilities that solely provide family planning services, such as Planned Parenthood, nor does it provide that, "if any moneys remain" after funds are distributed to non-public hospitals or federally qualified health centers, Title X funding may be distributed to non-public family planning providers.  Implicitly, such entities are barred from applying for funds, contrary to 42 C.F.R. § 59.3.

-9-

Record review fully supports the district court's conclusion that Section 107(*l*) "effectively block[s]" and "exclu[des]" Planned Parenthood from participating in KDHE's Title X program.  Immediately after Section 107(*l*) was passed, Planned Parenthood was informed that "[d]ue to recent legislative action funding is no longer available for your organization."  KDHE sought alternative subgrantees only after terminating Planned Parenthood's contracts.  Further, KDHE acknowledges that at the time the preliminary injunction was granted, it had not contracted with or located sufficient facilities to replace Planned Parenthood's service offerings.  There is no record evidence that Planned Parenthood's funding was terminated because KDHE ran out of Title X funding; rather, KDHE had imposed a policy of wholly excluding Planned Parenthood from obtaining Title X funds.  We thus are not presented with the hypothetical scenario under which an agency merely prioritizes funding pursuant to a blanket rule.  Both the text and the actual implementation of Section 107(*l*) demonstrate a categorical bar on eligibility for Planned Parenthood.

If Section 107(*l*)'s purpose is considered—and it is not necessary to do so before concluding the provision is preempted—the conflict is even clearer.  The district court found that Section 107(*l*) was intended to "single out, punish, and exclude Planned Parenthood, the only historical Kansas subgrantee which provides or associates with a provider of abortion services, from receiving any further Title X subgrants."  In making this factual finding—entitled to our deference—the district court relied on extensive direct evidence from Section 107(*l*)'s legislative history.  Representative Lance Kinzer, who offered the provision as an amendment to a Kansas appropriations bill, stated in an

-10-

accompanying press release that the amendment "took all state funding away from Planned Parenthood to ensure that state dollars are not used for abortion services." Substantially the same press release was circulated by the Communications Director for the Speaker of the Kansas House.  Representative Kinzer also stated online:  "Delighted to announce that the KS House just approved my floor amendment to deny Title X funding to Planned Parenthood . . . a great victory on the first pro-life floor vote of the session."  A news story on the amendment quoted Governor Sam Brownback's spokeswoman as stating, "Gov. Brownback . . . opposes taxpayer subsidy of abortions." Planned Parenthood submitted an affidavit averring that on the floor of the Kansas legislature, the amendment was repeatedly referred to as the "Planned Parenthood" provision.  According to Planned Parenthood, Section 107(*l*) was part of a nationwide effort to prohibit entities affiliated with abortion providers from receiving government funds unconnected to abortion services.

But Title X's enacting statute and implementing regulations recognize that entities affiliated with abortion providers may participate in Title X projects as long as Title X funds are not used for abortion programs.  42 U.S.C. § 300a-6; 65 Fed. Reg. at 41,275-76. Section 107(*l*)'s goal of disqualifying organizations associated with abortion providers contravenes federal regulations that allow abortion providers and their affiliates to participate in Title X.

Regardless of the statute's purpose, the text of Section 107(*l*) and KDHE's manner of implementing it violate 42 C.F.R. § 59.3 by categorically barring entities such as Planned Parenthood from Title X funding.  The district court's conclusion that Planned

-11-

Parenthood is likely to prevail on its Supremacy Clause claim is thus fully supported by

the record and applicable law, and should be affirmed.[2]

## D

Planned Parenthood has demonstrated that the remaining preliminary injunction

factors weigh in its favor.  See Winter v. Nat'l Res. Def. Council, 555 U.S. 7, 20 (2008)

(describing the standard for a preliminary injunction).

The record firmly supports the district court's conclusion that Planned Parenthood

"is likely to suffer irreparable harm in the absence of preliminary relief."  Id.  Plaintiff

attests that Section 107(*l*) caused its health centers to lose more than $330,000 in funding,

will end their health centers' eligibility for a low-cost drug purchasing program, and will

likely lead to declines in staffing levels and the closure of one center.  Furthermore,

---

[2] Because I would affirm the district court's conclusion as to Planned Parenthood's
Supremacy Clause claim, I would not reach its First Amendment claim.  Nonetheless, I
must voice my disagreement with the majority's analysis of that issue.  The majority
argues that Planned Parenthood's claim does not fall within an asserted category of cases,
"those in which a person is penalized by discretionary executive action for prior speech
or association."  (Majority Op. 52.)  In doing so, the majority ignores the undisputed
evidence of executive action noted above:  KDHE pulled funding from Planned
Parenthood without having contracted with alternative providers.

The majority bases its holding entirely on the putative absence of executive action
and the inability of courts to overturn legislative enactments due to improper motives.  It
therefore does not reach plaintiff's argument that Section 107(*l*) is unconstitutional
because it disqualifies Planned Parenthood from receiving government funds on the basis
of its constitutionally protected activity.  KDHE has in practice barred Planned
Parenthood from Title X funding based on its affiliation with abortion.  As the Supreme
Court recently held, legislatures may "define the limits of [a] government spending
program" but may not "leverage funding to regulate speech outside the contours of the
program itself."  Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc., 133 S. Ct.
2321, 2328 (2013).

-12-

Planned Parenthood cannot apply directly to HHS for Title X funding until the next project period begins in 2015. See, e.g., 42 C.F.R. § 59.8(a).

I also agree with the district court's conclusion that "the balance of equities tips in [Planned Parenthood's] favor." Winter, 555 U.S. at 20. The harm to Planned Parenthood outweighs any harm to Moser. As discussed above, the harm to Planned Parenthood is severe. In comparison, the only harm to Moser is that the state will no longer be able to implement its unconstitutional eligibility requirement. Despite Moser's protests, the Eleventh Amendment does not preclude federal courts from enjoining an ongoing violation of federal law. Ex parte Young, 209 U.S. 123, 159-60 (1908); Muscogee Nation v. Okla. Tax Comm'n, 611 F.3d 1222, 1232 (10th Cir. 2010). Further, the district court's order does not harm KDHE revenues because the funding in question is federal money already intended for Planned Parenthood. An injunction merely reestablishes the status quo ante prior to passage of Section 107(*l*).

Finally, I would also affirm the district court's conclusion that an injunction is "in the public interest." Winter, 555 U.S. at 20. Title X plays a key role in ensuring that low-income women and families have access to family planning services. For decades, two Planned Parenthood facilities in Kansas have relied on Title X funds to carry out this mission. Reversal of the district court's injunction will have immediate consequences for the well-being of the women and families that rely on these centers. Without injunctive relief, Planned Parenthood clients will see their cost of service increase and the range of available services decrease. It is questionable that the replacement facilities Moser has cobbled together can meet community needs to the same degree. For example, KDHE's

-13-

2011 continuation grant application states that the alternative provider in Sedgwick

County has no weekend hours and does not provide all the services available at Planned

Parenthood facilities.  As Title X itself indicates, the public has a strong interest in

delivering family planning services to vulnerable populations.

## II

## A

Instead of undertaking the foregoing analysis, the majority sua sponte announced

its skepticism that precedent acknowledged as controlling by all litigants was actually

controlling.  Over my objections, my colleagues then sought supplemental briefing on

two issues not discussed in any of the initial briefs:  (1) Whether the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701-06, provides an alternate and exclusive remedy

to Planned Parenthood; and (2) whether the precedents of this court require recognition of

a cause of action under the Supremacy Clause to enforce Spending Clause legislation.

(Sept. 19, 2013 Order 1-2.)  It also asked whether those two issues were waived, and if

so, whether the waiver stripped this court of jurisdiction.  (Id. at 2.)

The majority is correct that waiver is not a jurisdictional bar.  But that does not

mean it is something to be tossed aside when two judges "are comfortable with the

propriety" of addressing a given issue.  (Majority Op. 48.)  "The premise of our

adversarial system is that appellate courts do not sit as self-directed boards of legal

inquiry and research, but essentially as arbiters of legal questions presented and argued

by the parties before them."  NASA v. Nelson, 131 S. Ct. 746, 756 n.10 (2011) (quotation

omitted).  "Courts do not, or should not, sally forth each day looking for wrongs to right.

-14-

We wait for cases to come to us, and when they do we normally decide only questions presented by the parties." Greenlaw v. United States, 554 U.S. 237, 244 (2008) (alteration and quotation omitted). The waiver rule "is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one." United States v. Burke, 504 U.S. 229, 246 (1992) (Scalia, J., concurring).

The majority pretends that the waiver issue is debatable, stating that Planned Parenthood "may be correct" that the issue was waived. (Majority Op. 46.) It is well established that we do not address arguments an appellant does not assert in its opening brief. See Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 624 (10th Cir. 1998); see also Fed. R. App. P. 28. We "will not craft a party's arguments for him." Perry v. Woodward, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999).

This rule carries particular force in the context of affirmative waiver. "A waived claim or defense is one that a party has knowingly and intelligently relinquished; a forfeited plea is one that a party has merely failed to preserve." Wood v. Milyard, 132 S. Ct. 1826, 1832 n.4 (2012). As the Supreme Court noted in Milyard, consideration of a forfeited issue may be proper in exceptional cases, id. at 1833, but "[a] court is not at liberty . . . to bypass, override, or excuse a [party's] deliberate waiver of a[n affirmative] defense," id. at 1830. Although jurisdiction may not be created by a party's concession, In re Am. Ready Mix, Inc., 14 F.3d 1497, 1499 (10th Cir. 1994), a private cause of action issue is "not of the jurisdictional sort which the Court raises on its own motion," Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 398 (1979)

-15-

(quotation omitted).  When a defendant does not contest the existence of a cause of action, the proper course is to "assume[], without deciding, that the suit could properly be brought."  Id. (quotation omitted); see also Morris v. Okla. Dep't of Human Servs., 685 F.3d 925, 932 n.4 (10th Cir. 2012) ("[W]e will assume without deciding that a cause of action exists when defendants fail to dispute it.").[3]

The majority provides neither a reasoned basis for its rejection of Moser's concession nor a compelling justification for its argument of the cause of action issue on his behalf.  "Today's decision is backwards in many senses.  It elevates the majority's agenda over the litigants' submissions . . . ."  Citizens United v. FEC, 558 U.S. 310, 478 (2010) (Stevens, J., dissenting).  Milyard strongly suggests that a court has no discretion to raise sua sponte an affirmative defense that has been waived, rather than forfeited.  See 132 S. Ct. at 1830, 1832 n.4.  But even assuming this rule is not absolute, a court should depart from regular practice only in "exceptional cases."  Id. at 1833.  What makes this case so exceptional that affirmative waiver should be ignored?  The majority is wholly silent, citing only its comfort with employing an extraordinary and irregular procedure.  The public will fill that silence with its own explanations.  See Morgane v. States Marine Lines, Inc., 398 U.S. 375, 403 (1970) (describing "necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments").

---

[3] As the majority observes, courts must occasionally decide antecedent issues that the parties may not have briefed in order to resolve the dispute between the litigants. (Majority Op. 47); see also U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 447 (1993).  Because the lack of a cause of action is an affirmative defense, the plaintiff is not required to negate this defense unless properly preserved, and thus the issue is not antecedent in the appropriate sense.  See Lake Country Estates, Inc., 440 U.S. at 398.

**B**

The majority's call for additional briefing constitutes nothing more and nothing less than an attempt to find a way to distinguish Qwest Corp. Having received briefing on the subject, my colleagues invent and apply a four-part test for determining whether the Supremacy Clause "authorize[s] an injunction against . . . state action." (Majority Op. 3.) Two elements of the four-part test rely on precisely the sort of statutory interpretation that this court has already held is not part of the analysis for determining whether a plaintiff may proceed directly under the Supremacy Clause. The fourth element, the absence of an "enforcement action," (id. at 4), was also present in Qwest Corp. and thus fails to distinguish our controlling circuit precedent. This leaves the majority's third element, Title X's status as Spending Clause legislation. Numerous courts have already held this to be a distinction without a difference. The majority also argues (though it does not incorporate the claim into its assumedly controlling four-part standard) that potential APA remedies are a relevant consideration. (Majority Op. 20-22.) But this asserted dissimilarity also fails because the plaintiffs in Qwest Corp., as in this case, might have sought a remedy by suing a federal agency under the APA.

**1**

The majority repeatedly asserts that "[w]hether to recognize a private cause of action for injunctive relief [under the Supremacy Clause] is a matter of statutory interpretation." (Majority Op. 15; see also id. at 3, 17.) Specifically, the majority says that to determine whether a cause of action exists under the Supremacy Clause we must decide whether "the statute . . . specifically authorize[s] injunctive relief" and whether

-17-

"the statute . . . create[s] an individual right."  (Id. at 3.)  This newly conjured test cannot be squared with our precedent.  After evaluating the federal statute at issue in Qwest Corp., we concluded that "nothing in the text or structure of [the statute at issue] indicates an intention to create a private right."  380 F.3d at 1265.   Nonetheless, we unanimously held that the plaintiff had a cause of action under the Supremacy Clause.  Id. at 1266.

Engaging in an unwarranted exercise in statutory interpretation, the majority announces that plaintiff lacks a cause of action under the Supremacy Clause because "Title X does not 'display[] an intent to create' the remedy sought by Planned Parenthood."  (Majority Op. 27 (quoting Alexander v. Sandoval, 532 U.S. 275, 286 (2001)).)  Thus the majority imports wholesale the test for determining whether a statutory right of action exists in concluding that Planned Parenthood may not proceed directly under the Supremacy Clause.  See Alexander, 532 U.S. at 286 ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 290 (2002) ("[I]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms—no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action.").

As we explained in Qwest Corp., however, an implied right of action is distinct from a Supremacy Clause claim:  "'A claim under the Supremacy Clause simply asserts that a federal statute has taken away local authority to regulate a certain activity.  In contrast, an implied private right of action is a means of enforcing the substantive

-18-

provisions of a federal law.'"  380 F.3d at 1266 (quoting Western Air Lines, Inc. v. Port

Auth., 817 F.2d 222, 225 (2d Cir. 1987)).  The test to determine whether one may assert a

claim directly under the Supremacy Clause cannot be identical to the statutory cause of

action analysis because we expressly held in Qwest Corp. that "[a] party may bring a

claim under the Supremacy Clause that a local enactment is preempted even if the federal

law at issue does not create a private right of action."  Id.  If, through its legerdemain, the

majority intended to place some daylight between the Supremacy Clause analysis and the

analysis for an implied private right of action under a statute, it has not done so.  To the

contrary, and in obvious contravention of our prior precedent, there are no cases under

the first two prongs of the majority's novel test in which a plaintiff could lack a statutory

cause of action but possess one under the Supremacy Clause.

## 2

My colleagues also argue that Qwest Corp. is distinguishable because Planned

Parenthood, unlike Qwest, cannot be subjected to an "enforcement action" arising from

§ 107(*l*).  (Majority Op. 42-43.)  This assertion misconstrues Qwest Corp., which

enjoined several provisions of a local ordinance that could not have led to an enforcement

action.

The majority cites the dispositional section of the district court opinion we

reviewed in Qwest Corp., (Majority Op. 42 n.5), which enjoined Santa Fe and its agents

"from taking any enforcement action against Qwest Corporation" based on certain

preempted provisions.  Qwest Corp. v. City of Santa Fe, 224 F. Supp. 2d. 1305, 1332

(D.N.M. 2002).  From this, I am led to presume that the majority would hold that if a district court enjoins enforcement, enforcement is possible under the statute.

But that cannot be right, because the district court opinion on review today orders the following:  "[T]he defendants are hereby enjoined from any further enforcement or reliance on Section 107(*l*) of H.B. 2014 . . . ."  <u>Planned Parenthood of Kan. & Mid-Mo. v. Brownback</u>, 799 F. Supp. 2d 1218, 1236 (D. Kan. 2011).  Perhaps the majority believes that the <u>Qwest Corp.</u> district court's use of the word "action," compared to the district court order on review today that merely enjoins "enforcement," works some magic that makes the two statutes distinguishable—one subject to mere enforcement and unchallengeable in a Supremacy Clause suit, the other presenting the possibility of "enforcement actions" and giving rise to potential Supremacy Clause litigation.  That would be an odd approach, given that we can make our own determination without resorting to semantic trivialities.

A review of the provisions enjoined in <u>Qwest Corp.</u> makes it pellucid that an enforcement action would have been logically impossible.  The majority incorrectly suggests that Qwest only wanted to "continue[] to provide telecommunications service as it had in the past."  (Majority Op. 43 n.5.)  Instead, the dispute began when "Qwest sought to install a four-by-four foot utility cabinet on a twelve-by-eighteen foot concrete pad on a city-owned right-of-way."  <u>Qwest Corp.</u>, 380 F.3d at 1262.  Much of the challenge centered on the requirements for installing new telecommunications facilities.  By the majority's own definition of the term—"an adversary legal proceeding to impose

a sanction for engaging in prohibited activity," (Majority Op. 43-44)—Qwest was not and could not have been subjected to an "enforcement action" for violating these provisions.

For example, the requirement that telecommunications companies provide the city certain information as part of the registration process logically cannot be "enforced" against the company in an "action" as the majority uses those terms. And Qwest could not possibly raise preemption of the information requirement as a "defense" in an "enforcement action." If Qwest failed to provide the information, it simply would be ineligible for a government benefit: the opportunity to lease city-owned rights-of-way. The majority fails to provide a scenario under which the city might "enforce" this provision in a coercive action that would place Qwest in a posture to raise preemption as a defense. Similarly, the Qwest Corp. panel barred enforcement of the double-conduit and appraisal-based rental requirements in the Santa Fe ordinance. 380 F.3d at 1271. The opinion says nothing about a potential adversarial enforcement action of these forward-looking provisions, instead holding that "the substantial increase in costs imposed by the excess conduit requirements and the appraisal-based rent . . . in themselves renders those provisions prohibitive." Id. (emphasis added). If a "substantial increase in costs" is by itself sufficient for a private party to assert a successful cause of action under the Supremacy Clause, the possibility of an enforcement action cannot be an essential part of the claim.

My colleagues do not explain how the preempted provisions of the Santa Fe ordinance could have given rise to an enforcement action, or how preemption of the ordinance could possibly serve as a defense. If Qwest violated the terms of its license by

-21-

failing to provide service, it might have raised some sort of impossibility defense in regulatory proceedings to explain its failure, but a claim that the ordinance is preempted would not invalidate the regulations requiring service provision. Alternatively, I suppose, Qwest could have simply trespassed on a city-owned right-of-way and installed new telecommunications facilities. In that circumstance, it may have been subject to sanctions for trespass, but again, the challenged provisions of the ordinance would not form the basis of such an action and a claim that the ordinance was preempted could not possibly serve as a defense.[4]

The Qwest Corp. opinion specifically held that "the issue of pre-emption is not an anticipated defense, but is the basis for a federal claim in Qwest's complaint in federal court." 380 F.3d at 1264 n.1 (emphasis added). We affirmatively held, with respect to a local ordinance that merely imposed conditions on the receipt of government benefits, that "[a] party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action." Id. at 1266. This holding was joined in relevant part by the author of today's majority opinion.

Because Qwest was not defending against a threatened enforcement action, its position is precisely analogous to that of Planned Parenthood. The majority says

---

[4] If this is the basis of the majority's hypothetical enforcement action, it must be presumed that Planned Parenthood could similarly attempt to "continue[] to provide [family planning] service as it had in the past," (Majority Op. 43 n.5), by stealing state funds to replace its prior Title X funding. But as far as I can tell, the subsequent criminal proceeding would qualify as an "enforcement action" under the majority's reasoning. I would hope that important rules of constitutional law are not based on such fanciful hypotheticals, but I must highlight the exact congruence between the plaintiffs in this case and Qwest Corp.

-22-

"Qwest's concern was that Santa Fe was effectively prohibiting it from providing telecommunications service." (Majority Op. 43 n.5.)  Similarly, Planned Parenthood's concern in this case is that Kansas is effectively "prevent[ing] Planned Parenthood from participating in the Title X program." (Planned Parenthood Answer Br. 2.)  In both cases, a local law denies what federal law guarantees.  Both plaintiffs sought to access government benefits but were thwarted by a law that conflicts with a federal statute. Both advanced a cause of action directly under the Supremacy Clause to redress their grievances.  Both requested an order enjoining enforcement of the allegedly preempted law:  Qwest sought "an injunction to prevent the enforcement" of Santa Fe's ordinance, Qwest Corp., 380 F.3d at 1262, and Planned Parenthood similarly seeks an injunction "to prevent the application and enforcement" of Section 107(*l*),  Planned Parenthood of Kan. & Mid.-Mo., 799 F. Supp. 2d at 1220; see also 2011 Kan. Sess. Laws 2020; 30 Kan. Reg. 793 (June 9, 2011).  "Enforcement" in this context simply means conditioning benefits in a manner inconsistent with federal law.

Moreover, Qwest Corp. was not this court's final word as to the existence of a Supremacy Clause cause of action.  In Chamber of Commerce of the United States v. Edmondson, 594 F.3d 742 (10th Cir. 2010), this court held that the plaintiffs "have a valid right of action under the Supremacy Clause" to challenge three provisions of Oklahoma law as preempted.  594 F.3d at 756 n.13.  Because our circuit precedent in Qwest Corp. was controlling on this point, we declined to reach one defendant's argument that the plaintiffs lacked a cause of action under § 1983.  Edmondson, 594 F.3d at 756 n.13.  As in Qwest Corp., the plaintiffs challenged a statutory provision that

simply limited access to government benefits and thus could not logically lead to an "enforcement action."  The panel majority concluded that plaintiffs possessed a cause of action directly under the Supremacy Clause to challenge Okla. Stat. tit. 25, § 1313(B)(2), which prospectively barred public employers from entering into contracts with entities that refused to use a certain employment verification system.  Edmondson, 594 F.3d at 753-54, 756 n.13.  The Supremacy Clause could not logically be used as a defense to this provision in a hypothetical "enforcement action" because such an enforcement action could never occur.  The statute at issue in Edmondson merely directed state officials not to sign certain contracts.[5]

The majority's claim that Planned Parenthood, unlike Qwest and the Chamber of Commerce, faces no "enforcement action" arises from a semantic contortion.  I am reminded of Justice John Marshall Harlan's guidance:  "[A]lmost any word or phrase may be rendered vague and ambiguous by dissection with a semantic scalpel.  I do not, however, consider it a provident use of the time of this Court to coach what amounts to little more than verbal calisthenics."  Cole v. Richardson, 397 U.S. 238, 240 (1970) (Harlan, J., concurring in the result).  The majority's attempt to distinguish away a binding precedent on the basis of one district court's single use of the phrase

_____

[5] Because the majority places great weight on the use of the phrase "enforcement action" in the district court order enjoining parts of the ordinance at issue in Qwest Corp., I note that the district court on review in Edmondson did not use the word "enforcement action" to describe its injunction.  Instead, much like the district court order on review before us, it simply used a form of the verb "enforce":  "Because of . . . the irreparable harm Plaintiffs will suffer if an unconstitutional Act is enforced, the Court finds Plaintiffs' Motion for Preliminary Injunction . . . should be and is GRANTED."  Chamber of Commerce of the U.S. v. Henry, No. CIV-08-109-C, 2008 WL 2329164, at *8 (W.D. Okla. June 4, 2008) (unpublished).

"enforcement action" constitutes precisely the sort of verbal calisthenics that Justice Harlan warned against.

3

Having failed to distinguish <u>Qwest Corp.</u> on three of the elements identified in its novel test, the majority suggests that our circuit has not found that a Supremacy Clause cause of action exists if the "federal law [at issue] is Spending Clause legislation." (Majority Op. 28.)  The Supreme Court has stated that "legislation enacted pursuant to the spending power is much in the nature of a contract."  <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 451 U.S. 1, 17 (1981) ("<u>Pennhurst I</u>").  Therefore, says the majority, we should look to the legislation to determine which remedies are available, because "[s]tates, being political animals, likely prefer placing enforcement power exclusively with a federal agency" and "[w]e should not impose on the States the burden of private suits unless the Spending Clause legislation 'unambiguously' so requires."  (Majority Op. 23.)  My colleagues fail to explain why state preferences ought to be treated more deferentially than the Constitution's explicit statement that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  In any event, a state should be well aware "of what its burdens are before it accepts the federal funds and assumes the concomitant responsibilities," (Majority Op. 22), given that the clear text of the Supremacy Clause informs the states that they are obligated to follow federal law.

Today's majority opinion makes it less clear to the states what their burdens are by introducing confusion into what was once clear and unambiguous circuit precedent.

Four circuits have considered the argument that Spending Clause legislation is fundamentally different from other legislation for Supremacy Clause purposes. None found any merit in the argument. My colleagues do not even acknowledge, much less attempt to distinguish, the countervailing positions of the Fourth, Fifth, Sixth, and Eighth Circuits in choosing to create a deliberate circuit split.

In Westside Mothers v. Haveman, 289 F.3d 852 (6th Cir. 2002), the Sixth Circuit rejected a district court opinion stating "that Medicaid was only a contract between a state and the federal government, that spending-power programs such as Medicaid were not supreme law of the land, . . . [and] that in this case Ex parte Young was unavailable." Westside Mothers, 289 F.3d at 857. The district court had relied on the same language from Pennhurst I that undergirds the majority opinion. Westside Mothers v. Haveman, 133 F. Supp. 2d 549, 557 (E.D. Mich. 2001). The Sixth Circuit explained that the Supreme Court "is using the term 'contract' metaphorically, to illuminate certain aspects of the relationship formed between a state and the federal government in a program such as Medicaid." Westside Mothers, 289 F.3d at 858. The Supreme Court, it added, had already explicitly rejected a Medicaid-as-contract theory, holding that "'unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy.'" Id. (quoting Bennett v. Ky. Dep't of Educ., 470 U.S. 656, 669 (1985)). It went on to review several Supreme Court decisions striking down state enactments as

inconsistent with Spending Clause legislation.  Id. at 860 (citing Dalton v. Little Rock Family Planning Servs., 516 U.S. 474, 477-78 (1996); Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1, 469 U.S. 256, 269-70 (1985)).  Finally, the court ruled that because "spending clause enactments are supreme law of the land, they may be the basis for an Ex parte Young action."  Westside Mothers, 289 F.3d at 861.

The Fifth Circuit adopted the Sixth Circuit's Westside Mothers reasoning in Frazar v. Gilbert, 300 F.3d 530 (5th Cir. 2002), rev'd on other grounds sub nom. Frew ex rel. Frew v. Hawkins, 540 U.S. 431 (2004).  The state of Texas urged the court to adopt the reasoning of the district court in Westside Mothers and recognize a "Spending Clause exception to the Ex Parte Young exception to the Eleventh Amendment."  Frazar, 300 F.3d at 550 (quotation omitted).  The Fifth Circuit easily rejected this invitation to depart from settled practice, explaining that, "[f]or purposes of the Supremacy Clause and Ex Parte Young, the mandates set out in [the] Medicaid statute are more than contractual; they are federal law."  Frazar, 300 F.3d at 550.

In Missouri Child Care Ass'n v. Cross, 294 F.3d 1034 (8th Cir. 2002), the court described as an "unusual assertion" state officials' argument "that Ex parte Young does not apply" to claims based on Spending Clause legislation because such legislation is "not part of the supreme law of the land under the Supremacy Clause."  294 F.3d at 1040.  The court roundly rejected the argument that Spending Clause legislation "amounts to nothing more under the Constitution than a contract to be interpreted under ordinary contract principles," holding that the defendants' contention was based on a "misinterpret[ation of] language from the Supreme Court's opinions in Pennhurst [I] and

Blessing [v. Freestone, 520 U.S. 329 (1997)]." Mo. Childcare Ass'n, 294 F.3d at 1040. Citing Westside Mothers, the Eighth Circuit declined to "make the logical leap . . . from describing such programs as 'like contracts' to treating such programs 'as nothing more than contracts.' Like the Sixth Circuit, we refuse to make that leap, as it is unsupported by the applicable case law." Mo. Childcare Ass'n, 294 F.3d at 1041.

Finally, in Antrican v. Odom, 290 F.3d 178 (4th Cir. 2002), the court rejected the defendants' argument that "Spending Clause legislation[] is not supreme law and therefore does not fall within Ex Parte Young's defining purpose, which is to give life to the Supremacy Clause." 290 F.3d at 188 (quotations omitted). The defendants' "novel position," the court concluded, is "at odds with existing, binding precedent." Id. "[T]he Supreme Court has treated the Medicaid Act as 'supreme' law and has invalidated conflicting State law under the Supremacy Clause." Id. (citing Dalton, 516 U.S. at 478).

Today's majority might respond that these cases are distinguishable because they were brought under statutes enforceable utilizing § 1983.[6] But merely pointing out a difference in procedural posture does not overcome the majority opinion's failure to

---

[6] The majority repeatedly chastises both Planned Parenthood and this dissent for citing cases that deal with § 1983, private statutory rights of action, the Eleventh Amendment, and jurisdictional issues. (Majority Op. 34-38.) My colleagues refuse to follow our Supremacy Clause jurisprudence from Qwest Corp. and Edmondson, and they summarily reject in a single footnote the well-reasoned decisions on point from a majority of other circuits, (Majority Op. 44 n.7), electing instead to spin from whole cloth a new test never endorsed by another court. I am therefore forced to look to analogous precedent for "general expressions" of the law. (Majority Op. 44 (citing Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399 (1821)).) Moreover, because the majority's test imports techniques of statutory interpretation that courts have previously used to determine whether a statute itself or § 1983 provides a private right of action, it is entirely appropriate to rely on such cases in assessing my colleagues' reasoning.

-28-

explain why Spending Clause legislation is somehow less supreme than legislation passed pursuant to other constitutional clauses. And although the majority does not take the clearly erroneous position that Spending Clause legislation is not the law of the land, its attempt to limit the Supremacy Clause has the same effect.

The majority's sole support for its extreme proposition is its citation to dicta in Pennhurst I. In addition to the foregoing circuit court holdings, the Supreme Court itself has cautioned against over-reading the Pennhurst I analogy, noting that it "do[es] not imply, for example, that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise." Barnes v. Gorman, 536 U.S. 181, 188 n.2 (2002). Rather than looking to the well-reasoned decisions of other courts, the majority rests on policy arguments in favor of uniformity. I note that judicial decisions provide such uniformity when judges faithfully observe precedent, and that today's opinion creates disuniformity by placing our circuit in direct conflict with several others that have considered similar issues, as well as with our own cases.

Moreover, the majority's contention that states have not consented to suits to enjoin ongoing violations of federal law is a dramatic and unwarranted expansion of the principles announced in Pennhurst I. (See Majority Op. 22-23.) In that case, the Court noted that the $1.6 million grant provided under the Spending Clause legislation at issue was "woefully inadequate to meet the enormous financial burden" of the alleged conditions attached to that grant. Pennhurst I, 451 U.S. at 24. Planned Parenthood does not seek damages, nor does it attempt to impose costs on the state in excess of the funds

provided by the federal government.  It merely argues that KDHE should be enjoined from prospectively violating federal law by misdirecting federal funds.

The Court has stressed the unanticipated financial liability rationale as fundamental to its Spending Clause jurisprudence.  With respect to "legislation enacted pursuant to Congress' authority under the Spending Clause . . . private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue."  Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 640 (1999) (emphasis added).  Similarly, after acknowledging an implied injunctive or equitable remedy for Title IX violations, the Court in Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998), noted the need to "examine closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with [a Spending Clause] condition," and held that its "central concern in that regard is with ensuring that the receiving entity of federal funds has notice that it will be liable for a monetary award."  Id. at 287 (quotation and alteration omitted).

In light of these cases, I am baffled by the following assertion by the majority: "Presumably the Qwest court would not have thought it untoward to consider whether to distinguish Spending Clause legislation from other legislation with regard to whether it created a cause of action for damages.  The same should be true for a cause of action for injunctive relief."  (Majority Op. 42.)  In the context of Spending Clause legislation, the Supreme Court has clearly explained that unanticipated financial liability through private damages actions is paramount in determining whether a state may be sued.  The possibility of injunctive relief does not implicate the same concerns.  Immediately after

the text quoted by the majority, (Majority Op. 22-23), the <u>Pennhurst I</u> decision explains, "in return for federal funds, the States agree to comply with federally imposed conditions."  451 U.S. at 17.  And under traditional equitable principles, "[a]n injunction to prevent [a state official] from doing that which he has no legal right to do is not an interference with the discretion of an officer."  <u>Ex parte Young</u>, 209 U.S. at 159.

**4**

The majority also suggests that the potential availability of a remedy under the APA should make us reluctant to consider a Supremacy Clause challenge.  (Majority Op. 20-21.)  This is, to put it mildly, an invented claim that finds no support in precedent or practice.  The majority cites <u>Gonzaga</u>, 536 U.S. at 290, for the proposition that "[t]he advantages of . . . centralized, expert administration do not appear to be controversial and would be obvious to Congress."  (Majority Op. 21.)

If the availability of APA review were a relevant factor in determining whether a cause of action under the Supremacy Clause exists, <u>Qwest Corp.</u> itself would have been decided differently.  In that case, Qwest argued that the Federal Telecommunications Act, specifically 47 U.S.C. § 253, preempted the local ordinance at issue.  That statute includes the following provision:

> If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

§ 253(d).

Section 253(d) grants power to the FCC; presumably an action filed under the APA to compel the FCC to "preempt the enforcement of such statute," id., would have been available to Qwest.  Such an action would have promoted "[t]he advantages of . . . centralized, expert administration."  (Majority Op. 21.)  The Qwest Corp. panel expressly acknowledged other courts' holding "that 47 U.S.C. § 253(d) calls on the [FCC] to enforce 253(a) and 253(b)."  380 F.3d at 1265.  Yet none of the panel members, including the author of today's majority opinion (who wrote separately in Qwest Corp.), concluded that the possibility of an APA action foreclosed Qwest's suit against Santa Fe.[7]

Today's majority cites Chief Justice Roberts' dissent in Douglas for the proposition that "[a]llowing for both Supremacy Clause actions and agency enforcement threatens potential inconsistency or confusion, and imperils the uniformity that Congress intended by centralizing administration of the federal program in the agency . . . ."  (Majority Op. 21-22.)  I am sure my colleagues are well aware that dissents, even those "not challenged by any other Justice on [a particular] point," (id. at 24), and even those whose reasoning the majority finds sound, (id. at 26), are not law.  To my knowledge, no court has ever held that the hypothetical possibility of bringing a suit against an agency under the APA forecloses a litigant from bringing an entirely different suit against a state

---

[7] My colleagues say that the possibility of APA relief in Qwest Corp. "was never addressed by the court and parties," (Majority Op. 43 n.6), suggesting that the panel's silence on the matter supports their position.  But the absence of any discussion of an APA remedy is precisely the point.  The majority's assertion that the possible availability of APA review in this case distinguishes it from Qwest Corp. is an invention; APA review is equally available to the plaintiffs in both cases.  And as I have already noted, the APA was not properly addressed by the parties in this case.  The majority raised the issue sua sponte in its call for supplemental briefing.

or a municipality.  The majority certainly does not direct the reader to any such case, nor does it suggest that the text of the APA provides any support for its position.  And because this entirely novel factor was also present in Qwest Corp., it provides the majority no shelter.

In its eagerness to jettison the binding holding of Qwest Corp., the majority omits a series of cases that undermine its assertion that a Supremacy Clause action is unavailable because "statutory requirements should be enforced through the administering agency."  (Majority Op. 27.)  In Seminole Tribe v. Florida, 517 U.S. 44 (1996), the Supreme Court considered the circumstances under which a traditional equitable cause of action under Ex parte Young might be curtailed based on concerns of interference with executive administration.  The Court concluded that such suits are unavailable only if "Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right."  Seminole Tribe, 517 U.S. at 74.  But "[t]he fact that the Federal Government can exercise oversight of a federal spending program and even withhold or withdraw funds . . . does not demonstrate that Congress has displayed an intent not to provide the more complete and more immediate relief that would otherwise be available under Ex parte Young."  Va. Office for Prot. & Advocacy v. Stewart, 131 S. Ct. 1632, 1639 n.3 (2011) (quotation omitted).[8]  Because the

---

[8] Similarly, a federal right may be unenforceable under § 1983 if the statute creates a "comprehensive enforcement scheme."  City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 120 (2005) (quotation omitted).  However, an agency's "power to shut off all or part of a state's funding is not a comprehensive enforcement scheme."  Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dept. of Health, 699 F.3d 962, 974-75 (7th Cir. 2012) (quotation omitted).  As the Supreme Court has explained, agency

Seminole Tribe doctrine already provides an important limitation on direct Supremacy

Clause causes of action, effectively limiting the possibility of interference with a

comprehensive statutory scheme, the majority's decision to create a new and far more

restrictive test is all the more indefensible.

## C

The majority's asserted rationales for distinguishing Qwest Corp. and Edmondson

are unavailing.  But I am also troubled by the way the majority opinion would undermine

the precedents of the Supreme Court and our court to reach its conclusion.  I fear that

today's opinion creates a dangerous norm that will allow future litigants to undermine

and re-litigate issues once thought to be settled law, depriving the public of the

"evenhanded, predictable, and consistent development of legal principles."  Payne, 501

U.S. at 827.

## 1

To justify its conclusion that neither Qwest Corp. nor Edmondson binds this panel,

the majority writes:  "In neither was the existence of a Supremacy Clause cause of action

disputed."  (Majority Op. 39.)  The majority characterizes our holding in Qwest Corp. as

"four conclusory sentences, citing decisions by two other circuits."  (Id. at 40.)  It adds,

"[t]here was no need for any additional analysis because no one disputed the existence of

---

authority over funding, even when coupled with the "availability of an action against [an
agency] under the APA," does not provide a "sufficiently comprehensive" scheme to bar
other avenues of relief.  Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 522 & n.19 (1990).
Thus, "[c]ourts have consistently held that statutory schemes that merely give oversight
and funding control to the federal government do not foreclose § 1983 claims."  Joseph
A. v. Ingram, 275 F.3d 1253, 1263 (10th Cir. 2002).

a cause of action."  (Id. at 40-41.)  And because Edmondson simply applied the rule

articulated in Qwest Corp., its discussion of the cause of action issue was even barer.

The majority infers from the brevity of these discussions that they failed to "definitively

resolve[] the issue before us."  (Id. at 39.)  With no small degree of hubris, the majority

opinion suggests that the Qwest Corp. panel improperly reached out to decide an

unargued issue.  (But see Majority Op. 15-45.)

      But to make that conclusion, my colleagues must rely not on the published

opinions of this court or the Court, but instead (erroneously, see Part II.C.2, infra) on the

briefs and pleadings of the parties in earlier decided cases, (see Majority Op. 39, 42 n.5).

Neither Qwest Corp. nor Edmondson indicates that the cause of action issue was

undisputed; the majority makes this claim based on an incorrect reading of briefs filed in

those cases.  This approach does violence to any reasonable conception of precedent and

potentially undermines countless decisions of this court.  The existence of a cause of

action in Qwest Corp. was unambiguously decided by the panel.  A later panel is not

entitled to announce—based entirely on its reading of the briefs in a previous case—that

a holding is invalid.  Such an approach reduces the certainty and predictability that are

central to the principle of stare decisis.  Any future litigant unsatisfied with an

unambiguous holding of this court may now apparently turn to documents authored not

by an Article III judge, but by the interested parties, and convince a subsequent panel to

re-try the case.

      A person seeking to understand the law in this circuit should not have to read

briefs in already decided cases to capture the meaning of a published opinion of our

court.  When a panel of this court writes, "[a] party may bring a claim under the

Supremacy Clause that a local enactment is preempted even if the federal law at issue

does not create a private right of action," Qwest Corp., 380 F.3d at 1266, it should not be

necessary to look past that statement and decide whether that issue was sufficiently

"disputed" to make that statement by this court binding law.  By relying on its own

assessment to undermine a precedent that both parties to this litigation treated as settled,

the majority establishes a norm that permits infinite relitigation of our court's holdings.

## 2

In any event, the majority's claim that the existence of a Supremacy Clause cause

of action was undisputed is erroneous.  In its combined opening and answer brief,[9] the

City of Santa Fe advanced a jurisdictional argument intertwined with the question of

whether the Supremacy Clause provides a cause of action.  The majority correctly states

that the existence of a cause of action and the question of jurisdiction are distinct,

(Majority Op. 36), but in light of the specific arguments advanced by the parties in Qwest

Corp., the questions collapsed into a single inquiry.

Santa Fe argued that Qwest lacked a cause of action under either § 1983 or § 253

of the Federal Telecommunications Act.  (See City of Santa Fe Combined Opening and

Answer Br. 2.)  It thus stated that the district court's decision "rests federal jurisdiction

solely on the Supremacy Clause" and that this was error because "the Supremacy Clause

cannot in and of itself confer 'arising under' jurisdiction."  (Id.)  The City argued that

although the Supremacy Clause might provide a defense based on federal law, "under the

---

[9] Qwest Corp. was a cross-appeal.  380 F.3d at 1262.

-36-

well-pleaded complaint rule, a federal defense does not show that 'the plaintiff's original cause of action arises under the Constitution.'"  (Id. at 2-3 (quoting Franchise Tax Bd. v. Laborers Vacation Trust, 463 U.S. 1, 10 (1983)).)  In its conclusion, the City explicitly equated the jurisdictional and cause of action questions, arguing that if the court "finds that Qwest's complaint fails to state a federal cause of action, the court should remand with instructions to dismiss for want of jurisdiction under 28 U.S.C. § 1331."  (Id. at 58.)

Qwest responded that "private plaintiffs seeking injunctive or declaratory relief may challenge local telecommunications ordinances under the Supremacy Clause, regardless of whether the Telecom Act confers a private right of action."  (Qwest Reply Br. 2-3.)  In a footnote, Qwest noted that "[e]ven in the absence of an explicit statutory provision establishing a cause of action, a private party may ordinarily seek declaratory and injunctive relief against state action on the basis of federal preemption."  (Id. at 2 n.4 (quoting Bud Antle, Inc. v. Barbosa, 45 F.3d 1261, 1269 (9th Cir. 1995)).)  The City of Santa Fe replied that the relevant precedent "does not hold that federal courts have jurisdiction to enjoin local telecommunications ordinances, even absent a private right of action."  (City of Santa Fe Reply Br. 2.)

As the foregoing makes clear, Santa Fe asserted two premises:  (1) that Qwest lacked a federal cause of action; and (2) that a federal cause of action was a precondition of federal question jurisdiction.  The Qwest Corp. panel might have disposed of Santa Fe's jurisdictional argument by rejecting the second premise and holding that federal question jurisdiction can exist even without a federal cause of action.  In Grable & Sons Metal Products v. Darue Engineering & Manufacturing, 545 U.S. 308 (2005), decided the

-37-

year after Qwest Corp., the Supreme Court "resolve[d] a split within the Courts of
Appeals on whether . . . a federal cause of action [is] a condition for exercising federal-
question jurisdiction," by holding just that. Id. at 311-12. But the Qwest Corp. panel
instead addressed the first premise, ruling that "the issue of pre-emption is not an
anticipated defense, but is the basis for a federal claim," 380 F.3d at 1264 n.1,
specifically, a direct "claim under the Supremacy Clause," id. at 1266.

Because this legal conclusion was a necessary step in the court's decisional path, it
is a binding holding. See Yost v. Stout, 607 F.3d 1239, 1244 n.6 (10th Cir. 2010) ("A
holding consists of those propositions along the chosen decisional path or paths of
reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3)
lead to the judgment." (quotation and emphasis omitted)). And despite the majority's
attempt to limit Qwest Corp. to a misstated version of its specific facts, "[t]he precedent
of prior panels which this court must follow includes not only the very narrow holdings
of those prior cases, but also the reasoning underlying those holdings, particularly when
such reasoning articulates a point of law." United States v. Meyers, 200 F.3d 715, 720
(10th Cir. 2000).

## D

There are but two exceptions to the rule that one panel may not overrule another:
superseding en banc review or intervening Supreme Court decisions. See Rezaq v.
Nalley, 677 F.3d 1001, 1012 n.5 (10th Cir. 2012). The majority does not identify any
such superseding decisions. Instead, the majority relies on the dissent in Douglas in its
attempt to rewrite our circuit jurisprudence. Again, a dissent is not superseding Supreme

Court precedent.  To the extent the majority is drawn to the <u>Douglas</u> dissent, it is free to argue for en banc reversal of <u>Qwest Corp.</u>  <u>See</u> Fed. R. App. P. 35.  But it is not at liberty to usurp the authority of the Supreme Court or our en banc court and overturn <u>Qwest Corp.</u> on its own.

There can be no doubt that the <u>Douglas</u> dissent is incongruous with our circuit precedent.  The dissenting Justices in that case would have established a blanket rule: "the Supremacy Clause does not provide a cause of action to enforce the requirements of [a federal statute] when Congress, in establishing those requirements, elected not to provide such a cause of action in the statute itself."  <u>Douglas</u>, 132 S. Ct. at 1212 (Roberts, C.J., dissenting); <u>see also</u> <u>id.</u> ("Thus, if Congress does not intend for a statute to supply a cause of action for its enforcement, it makes no sense to claim that the Supremacy Clause itself must provide one.").  These statements are the antithesis of our holding in <u>Qwest Corp.</u> that "[a] party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action."  380 F.3d at 1266.  Tellingly, despite the majority's extensive quotation of the <u>Douglas</u> dissent, these passages are omitted.  The majority nevertheless applies them.

Other than the <u>Douglas</u> dissent, the majority provides no support for its novel theory of Supremacy Clause jurisprudence.  The text of the Constitution does not assist the majority's attempt to limit these claims.  The Supremacy Clause states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

-39-

U.S. Const. art. VI, cl. 2.  It does not distinguish between preemption of state "enforcement actions" and laws that interfere with positive federal rights, nor does it exclude Spending Clause legislation.

The majority finds no support in majoritarian Supreme Court opinions.  This is because our holding in Qwest Corp. is fully in line with Supreme Court practice.  In Shaw, the Court explained that "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights."  463 U.S. at 96 n.14 (citing Ex parte Young, 209 U.S. at 160-62).  And the Court notes that it "frequently has resolved pre-emption disputes in a similar jurisdictional posture."  Id.  As numerous commentators and courts—including our own—have noted, "[t]he best explanation of Ex parte Young and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution and laws."  Charles Alan Wright et al., 13D Federal Practice and Procedure § 3566, at 292 (3d ed. 2008); see Joseph A. ex rel. Wolfe v. Ingram, 275 F.3d 1253, 1265 (10th Cir. 2002) (quoting Charles Alan Wright et al., 13B Federal Practice and Procedure § 3566, at 102 (2d ed. 1984)); Burgio & Campofelice, Inc. v. N.Y. Dep't of Labor, 107 F.3d 1000, 1006 (2d Cir. 1997) (quoting same); Guar. Nat'l Ins. Co. v. Gates, 916 F.2d 508, 512 (9th Cir. 1990) (quoting same); see also Richard H. Fallon et al., Hart and Wechsler's The Federal Courts and the Federal System 807 (6th ed. 2009) (describing as "well established" "the rule that there is an implied right of action to enjoin state or local regulation that is preempted by a federal statutory or constitutional provision").

-40-

The Supreme Court has explicitly rejected the majority's assertion that only preemptive defenses are permitted under the Supremacy Clause.  In <u>Franchise Tax Board</u>, a case decided the same day as <u>Shaw</u>, the Court explained that "a claim of federal pre-emption does not always arise as a defense to a coercive action."  463 U.S. at 12 n.12.  This holding fits neatly with the Court's prior pronouncement that "the prospective relief authorized by <u>Young</u> 'has permitted the Civil War Amendments to the Constitution to serve as a sword, rather than merely a shield, for those whom they were designed to protect.'"  <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 105 (1984) (quoting <u>Edelman v. Jordan</u>, 415 U.S. 651, 664 (1974)).

Moreover, the Court has repeatedly addressed the merits of Supremacy Clause claims that do not involve "enforcement actions" and are based on Spending Clause legislation.  In <u>Pharmaceutical Research & Manufacturers of America v. Walsh</u>, 538 U.S. 644 (2003), seven Justices (three in the plurality, one concurring, and three in dissent) reached the merits of preemption claims concerning a state law that provided for the public identification of manufacturers who refused to participate in a rebate program, and forbade the dispensation of drugs from non-compliant manufacturers to state Medicaid beneficiaries without "prior authorization."  <u>Id.</u> at 654, 668; <u>see id.</u> at 670-71 (Breyer, J., concurring in part); <u>id.</u> at 684 (O'Connor, J., concurring in part and dissenting in part).  And in <u>Lawrence County</u>, the Court considered whether a state statute regulating the manner in which certain federal funds could be distributed by local governments violated the Supremacy Clause.  469 U.S. at 257-58.  It noted that a related federal case seeking a declaration that the statute "conflicted with the federal Act and was therefore invalid

-41-

under the Supremacy Clause" had been dismissed by the Eighth Circuit, which concluded "that the county's invocation of the Supremacy Clause did not convert the action into one arising under federal law." Id. at 259 n.6. "This ruling was erroneous," the Court added. Id.

The majority cites Justice Kennedy's concurrence in Virginia Office for Protection & Advocacy for the proposition that the Supremacy Clause permits only "an anticipatory action to enjoin enforcement of a state law." (Majority Op. 31.) But the actual quote is descriptive rather than restrictive; it simply notes that the injunction sought in Ex parte Young was a preemptive assertion of a defense in equity. Va. Office for Prot. & Advocacy, 131 S. Ct. at 1642 (Kennedy, J., concurring). Justice Kennedy states immediately following the quoted sentence that "[t]he Court has expanded the Young exception far beyond its original office in order to vindicate the federal interest in assuring the supremacy of federal law." Va. Office for Prot. & Advocacy, 131 S. Ct. at 1642 (quotation and alteration omitted). As this statement indicates, the concurrence does not suggest that defensive claims are the only ones permitted under the Supremacy Clause. To the contrary, Justice Kennedy joined the opinion of the court, which gave the green light to a suit "alleg[ing] that respondents' refusal to produce the requested medical records violates federal law; and seek[ing] an injunction requiring the production of the records." Id. at 1639 (majority opinion). Such a suit is clearly not one asserting a preemptive defense.

-42-

**E**

The majority's deviation from <u>Qwest Corp.</u> also breaks with the clear weight of authority in other circuits. Numerous decisions have stressed the distinction between a cause of action under the Supremacy Clause and one seeking enforcement of the federal law in question—a distinction the majority attempts to eliminate by imposing the same requirements on Supremacy Clause claimants as those applying to plaintiffs seeking to assert an implied right of action. <u>See</u> <u>Indep. Living Ctr. of S. Cal., Inc. v. Shewry</u>, 543 F.3d 1050, 1058 (9th Cir. 2008) (holding that "a plaintiff seeking injunctive relief under the Supremacy Clause on the basis of federal preemption need not assert a federally created 'right,' in the sense that term has been recently used in suits brought under § 1983, but need only satisfy traditional standing requirements"); <u>Wright Elec., Inc. v. Minn. State Bd. of Elec.</u>, 322 F.3d 1025, 1028 (8th Cir. 2003) ("[A] claim under the Supremacy Clause that a federal law preempts a state regulation is distinct from a claim for enforcement of that federal law." (quotation omitted)); <u>St. Thomas-St. John Hotel & Tourism Ass'n v. Virgin Islands</u>, 218 F.3d 232, 241 (3d Cir. 2000) (concluding that "a state or territorial law can be unenforceable as preempted by federal law even when the federal law secures no individual substantive rights for the party arguing preemption" after noting that "[w]e know of no governing authority to the effect that the federal statutory provision which allegedly preempts enforcement of local legislation by conflict must confer a right on the party that argues in favor of preemption").

As these courts recognize, the potential relief available in a Supremacy Clause claim is limited to enjoining a state or local government official from engaging in an

ongoing violation of the Constitution. See Qwest Corp., 380 F.3d at 1266. A private statutory cause of action, in contrast, frequently allows for damages and in some circumstances may be asserted against private parties. See Western Air Lines, 817 F.2d at 225-26 ("an implied private right of action is a means of enforcing the substantive provisions of a federal law" and "provides remedies, frequently including damages, for violations of federal law by a government entity or by a private party"); see also Gonzaga, 536 U.S. at 277 (damages remedy under private cause of action); Sanchez, 403 F.3d at 335 ("The Supremacy Clause claim advanced here by Appellees is not based on a claim of right under Title X, nor is it a claim for damages; it is a preemption claim. The Gonzaga Court gave no indication that it intended to alter its prior practice regarding such claims . . . ."). Unlike a damages remedy, a suit that merely prevents a state official from violating our federal structure cannot reasonably be described as interfering with a statutory scheme. See Bond, 131 S. Ct. at 2365 (noting the role of individual claims in remedying "violation[s] of a constitutional principle that allocates power within government"); Green v. Mansour, 474 U.S. 64, 68 (1985) ("[T]he availability of prospective relief of the sort awarded in Ex parte Young gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law.").

Further, a majority of circuits have recognized a cause of action under the Supremacy Clause to challenge allegedly preempted state laws that merely impose conditions on the receipt of government benefits and thus could not lead to an "enforcement action." Most of these cases involve Spending Clause legislation. Yet the

-44-

majority asserts that "tradition" backs its naked "assum[ption]" that Planned Parenthood is prohibited from redressing its injury through the Supremacy Clause without actually looking to the case law.  (Majority Op. 24.)

In Sanchez, the Fifth Circuit concluded that it was "well-established" that "there is an implied right of action to enjoin state or local regulation that is preempted by a federal statutory or constitutional provision," 403 F.3d at 334 (quotation omitted), and reached the merits of a claim alleging that a Texas statute "imposes conditions on the receipt of federal funds that are incompatible with Title X," id. at 335.  That statue—just like the Kansas statute at issue in this case—could not have led to an "enforcement action" because it merely distributed funding.  Id. at 328.  Today's panel majority creates a direct circuit split with Sanchez.

The Eighth Circuit has also held that the Supremacy Clause provides a private right of action for claims that involve the provision of government benefits.  In Lankford v. Sherman, 451 F.3d 496 (8th Cir. 2006), the plaintiffs challenged a state regulation making them ineligible for durable medical equipment as inconsistent with the Medicaid Act.  Id. at 501-02.  The court held "that plaintiffs do not have a private right of action to enforce Medicaid's reasonable-standards provision under section 1983," but reached the opposite conclusion with respect to the Supremacy Clause:  "Preemption claims are analyzed under a different test than section 1983 claims, affording plaintiffs an alternative theory for relief when a state law conflicts with a federal statute or regulation."  Id. at 509.  Lankford held that the plaintiffs were likely to prevail on their Supremacy Clause claim, id. at 513, which would require the state to provide additional

-45-

benefits and thus could not possibly be a defense against an "enforcement action."

Similarly, the Third Circuit held in Lewis v. Alexander, 685 F.3d 325 (3d Cir. 2012),

"that the Supremacy Clause provides Plaintiffs with an independent basis for a private

right of action in this case." Id. at 345.[10]  The challenged state statute defined which

trusts would be counted as assets for purposes of determining Medicaid eligibility, id. at

333-34, and the challenge thus was not being used to defend against government coercion

but to establish eligibility for government benefits.

In Pharmaceutical Research & Manufacturers of America v. Concannon, 249 F.3d

66 (1st Cir. 2001), the plaintiff challenged a statute that directed a state agency to enter

into rebate agreements with drug manufacturers. Id. at 71.  Drug manufacturers were not

required to enter into these agreements, and thus an "enforcement action" would be

impossible.  Instead, the statute provided for public identification of providers that did

not participate, and required prior authorization of drugs from those companies before

they could be dispensed to Medicaid beneficiaries. Id. at 71-72.  The court rejected the

argument that the plaintiff's interests were not adequately at issue, because the plaintiff

did not assert "an action to enforce rights under the Medicaid statute, . . . but rather a

preemption-based challenge under the Supremacy Clause.  In this type of action, it is the

interests protected by the Supremacy Clause, not by the preempting statute, that are at

---

[10] Although the plaintiffs also filed suit under § 1983, the district court concluded that it was necessary to reach the Supremacy Clause issue because plaintiffs challenged one of the statutory provisions solely in their Supremacy Clause claim.  Lewis, 685 F.3d at 345 n.17.  Noting that this "may be an overly narrow construction of the Complaint," the Third Circuit nevertheless concluded that "the Supremacy Clause does provide a cause of action" and affirmed. Id.

-46-

issue." Id. at 73.  The Supreme Court affirmed, although it did not discuss the

Supremacy Clause private right of action issue.  Walsh, 538 U.S. at 670.  The D.C.

Circuit reached the same conclusion in a case essentially identical to Concannon.  In

Pharmaceutical Research & Manufacturers of America v. Thompson, 362 F.3d 817 (D.C.

Cir. 2004), the court rejected the state of Michigan's argument that "the appellants have

no private right of action for injunctive relief."  Id. at 819 n.3 (over the separate opinions

of Justices Scalia and Thomas in Walsh, 538 U.S. 644).  The Thompson court noted that

by reaching the merits of the Supremacy Clause claim, "the remaining seven Justices

appear to have sub silentio found no flaw" in the reasoning of the First Circuit.  Id.

The Second Circuit has held, consistent with Qwest Corp., that a plaintiff may sue

directly under the Supremacy Clause to seek access to government property.  In Western

Air Lines, the court concluded that the plaintiff lacked a cause of action under the

allegedly preemptive federal statutes and affirmed the dismissal of the plaintiff's § 1983

claims for lack of prosecution.  817 F.2d at 224-25.  Highlighting the "distinction

between a Supremacy Clause claim and other private rights of action," the court held that

the plaintiff could sue directly under the Supremacy Clause to challenge an airport's

perimeter rule that refused flights from a certain distance.  Id. at 226.  The court in

Western Air Lines expressly noted that this rule was not a coercive restriction but part of

the "proprietary powers of airport operators."  Id.  Thus the allegedly preempted rule was

not one that could lead to an "enforcement action" but simply imposed a condition on the

use of property held by a local government body.

And our circuit, in Qwest Corp. and Edmondson, has recognized a direct cause of action under the Supremacy Clause to challenge local enactments that could not be enforced in a coercive action.  That makes no fewer than seven circuits that have rejected the rationale espoused by the majority.

## F

In some future case, the Supreme Court might upend the long line of cases flowing from Ex parte Young to Shaw to Qwest Corp., reject the view of a majority of circuits, and curtail litigants' ability to assert the supremacy of federal law in protecting their rights.  In the Supreme Court, "stare decisis is a principle of policy rather than an inexorable command."  Hohn v. United States, 524 U.S. 236, 251 (1998) (quotations omitted).  Not so in this court.  Meyers, 200 F.3d at 720.

In Douglas, the Court explicitly stated:  "[W]e do not address whether the Ninth Circuit properly recognized a Supremacy Clause action to enforce this federal statute before the agency took final action."  132 S. Ct. at 1211.  Notwithstanding the position of the Chief Justice's dissent on the matter, the only fair interpretation of Douglas is that the inquiry remains open at that level.  Since Douglas, the Fourth Circuit has explicitly declined to reassess its existing precedent.  See United States v. South Carolina, 720 F.3d 518, 525-26 (4th Cir. 2013) ("Nothing in the Chief Justice's dissent disturbed the prior holdings of the Supreme Court or circuit courts that have allowed private parties to seek injunctive relief from state statutes allegedly preempted by federal law.").

My colleagues claim that Planned Parenthood of Indiana supports their decision to upend our circuit precedent based on the Douglas dissent because the Seventh Circuit

was "not inclined to agree" with the position of multiple circuits, including our own, that allow a cause of action directly under the Supremacy Clause.  (Majority Op. 28 (quoting 699 F.3d at 983).)  But the Seventh Circuit's discussion of the <u>Douglas</u> dissent did not reject binding circuit precedent, and that panel did what my colleagues categorically refuse to do:  proceed to the merits of Planned Parenthood's claims.  <u>Planned Parenthood of Ind.</u>, 699 F.3d at 983-85.  Looking for whatever they can find that might support the adoption of a dissenting opinion, my colleagues meekly point to a state court decision from Massachusetts.  <u>Boston Med. Ctr. Corp. v. Sec'y of the Exec. Office of Health & Human Servs.</u>, 974 N.E.2d 1114, 1127-28 (Mass. 2012).  I acknowledge that state opinions may provide persuasive analysis in some instances, but the cited decision contains no substantive discussion of the Supremacy Clause issue, and "the federal courts are particularly appropriate bodies for the application of pre-emption principles."  <u>Hagans v. Lavine</u>, 415 U.S. 528, 550 (1974) (quotation omitted).  The majority's invocation of the <u>Douglas</u> dissent as a basis for denying Planned Parenthood a cause of action is unwarranted.

## III

The district court opinion before us on review for error is well-grounded in its findings of fact and based on a learned presentation of the appropriate authorities. Because it correctly applies the precedents of the Court and of this court, it is free of error and justly worthy of affirmance.  I am neither persuaded to follow the vanishing trail that my colleagues pursue in an end run around the district court, nor am I amenable to their harsh treatment of binding precedent.  Accordingly, I dissent.